# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

Case. No. 23-61557-CIV-SINGHAL

AARON DURALL, an individual, and
NEISHA ZAFFUTO, an individual,

      Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC. d/b/a FLORIDA BLUE
a Florida corporation; UNITEDHEALTH
GROUP INCORPORATED, a Delaware
Corporation; ELEVANCE HEALTH, INC.,
f/k/a ANTHEM INSURANCE COMPANIES,
INC., an Indiana corporation; and CVS
HEALTH CORPORATION d/b/a AETNA,
a Delaware corporation,

      Defendants.

_____/

## <u>DEFENDANTS' JOINT MOTION TO DISMISS</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ..........................................................................1

FACTUAL BACKGROUND .............................................................2

I.    Law Enforcement Investigates Rural Hospitals' Business Practices, and Defendants Comply with the Resulting Grand Jury Subpoenas and Other Government Requests ..........................................................2

II.   The Grand Jury Proceedings, Various Guilty Pleas, and Plaintiffs' Indictments ...............5

III.  More Guilty Pleas and Two Successive Criminal Trials .....................................7

IV.   The Place of Service Code Was Irrelevant to the Criminal Proceedings ..........................9

LEGAL STANDARD ....................................................................11

ARGUMENT ............................................................................12

I.    Plaintiffs' Claims Are Barred by Sovereign Immunity and Its Variants ..........................12

      A.    Defendants as Agents of OPM Are Insulated from Liability ................................12

      B.    Defendants Administered Health Benefit Plans Pursuant to Government Authority ..........................................14

II.   Plaintiffs' Claims Are Preempted by FEHBA .................................................15

III.  Defendants Are Entitled to Absolute Litigation Immunity .....................................17

IV.   Defendants Are Entitled to Qualified Litigation Immunity ....................................20

V.    Defendants Are Entitled to Statutory Immunity .............................................21

VI.   Plaintiffs Fail to State Claims for Malicious Prosecution .....................................22

## <u>TABLE OF CONTENTS - continued</u>

Page

A.    *Defendants Were Not the Legal Cause of the Criminal Charges Against Plaintiffs* ............................................................................................23

B.    *The Complaint Does Not Plausibly Allege the Absence of Probable Cause* ........................................................................................................25

C.    *The Sufficiency of the Evidence Has Already Been Determined as a Matter of Law* ..................................................................................28

VII.    Plaintiffs Fail to State Claims for Abuse of Process ...........................................29

A.    *Plaintiffs Do Not Plausibly Allege that Defendants Used "Process"* ...................29

B.    *Plaintiffs Do Not Allege Use of Process to Accomplish a Result Other Than That for Which the Process Was Created* .........................................30

VIII.    Plaintiffs Fail to State Claims for Civil Conspiracy ...........................................31

A.    *The Underlying Torts Are Not Viable* ....................................................31

B.    *Plaintiffs Do Not Plausibly Allege the Existence of a Conspiratorial Agreement* ........................................................................................31

IX.    Plaintiffs Fail to State Claims for Aiding and Abetting .......................................32

A.    *The Aiding and Abetting Counts Fail Because the Underlying Torts Are Not Viable* ...............................................................................32

B.    *Plaintiffs Do Not Plausibly Allege that Each Defendant had Knowledge of their Co-Defendants' Alleged Plans* ................................................32

C.    *Plaintiffs Do Not Plausibly Allege that Any Defendant Provided "Substantial Assistance" to the Primary Wrongdoer* ...........................................33

X.    Plaintiffs Fail to State Claims for Tortious Interference with Business Relationships ........................................................................................33

## <u>TABLE OF CONTENTS- continued</u>

Page

A.    *There Is No Plausible Factual Basis for Such Claims and, in Any Event, All Such Claims Would Be Time-Barred* .........................................33

B.    *The Complaint Does Not Identify Any Legally Cognizable Business Relationships with which Defendants Interfered* ...................................34

XI.    Plaintiffs Fail to State Claims for Negligence ....................................................35

A.    *The Negligence Counts Fail Because They Are Premised on Alleged Intentional Torts*.................................................................................35

B.    *The Negligence Counts Fail Because the Complaint Does Not Allege an Actionable Duty Owed to Plaintiffs* ..................................................35

C.    *The Negligence Counts Fail Because the Complaint Does Not Allege That Defendants Proximately Caused Their Alleged Injuries* .............................36

D.    *The Negligence Counts Fail Because the Damages Plaintiffs Seek Are Not Available*....................................................................................37

E.    *The Negligence Counts Are Barred by the Statute of Limitations*........................37

XII.    Plaintiffs Fail to State a Claim for Defamation and Defamation *Per Se* ..........................38

A.    *The Defamation Counts Are Barred by the Applicable Statute of Limitations* ..............................................................................38

B.    *The Defamation Counts Fail Because the Publication Was Not About Plaintiffs*....................................................................................38

C.    *The Defamation Counts Fail Because the Publication Is Not the Cause of the Alleged Damages* ........................................................................40

CONCLUSION.................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AGM Invs., LLC v. Bus. L. Grp., P.A.*,
   219 So. 3d 920 (Fla. 2d DCA 2017) ............................................................................18, 20

*Anderson v. Occidental Life Ins. Co.*,
   727 F.2d 855 (9th Cir. 1984) ....................................................................................12, 14

*Angell v. Allergan Sales, LLC*,
   18-CV-282, 2019 WL 3958262 (S.D. Fla. Aug. 22, 2019) ........................................32, 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................11, 12

*Barts v. Joyner*,
   865 F.2d 1187 (11th Cir. 1989) ................................................................................24, 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................11, 12, 40

*Bembry v. City of Tallahassee*,
   05-CV-286, 2006 WL 1080676 (N.D. Fla. Apr. 24, 2006) ..............................................31

*Biondolillo v. U.S.*,
   05-CV-21014, 2007 WL 5396771 (S.D. Fla. Aug. 24, 2007) ....................................27, 28

*Blue v. Lopez*,
   808 F. App'x 947 (11th Cir. 2020) ..................................................................................27

*Blue v. Weinstein*,
   381 So. 2d 308 (Fla. 3d DCA 1980) ................................................................................30

*Blue Dolphin, Inc. v. U.S.*,
   666 F. Supp. 1538 (S.D. Fla. 1987) ................................................................................29

<u>**TABLE OF AUTHORITIES - continued**</u>

**Page(s)**

*Blue-Grace Logistics LLC v. Fahey*,
    21-CV-2523, 2023 WL 424285 (M.D. Fla. Jan. 26, 2023)..........................................17, 19

*Borneisen v. Capital One Fin. Corp.*,
    490 F. App'x 206 (11th Cir. 2012) .................................................................................24

*Bothmann v. Harrington*,
    458 So. 2d 1163 (Fla. 3d DCA 1984) .............................................................................30

*Brown v. J.C. Penney Corp., Inc.*,
    521 F. App'x 922 (11th Cir. 2013) .................................................................................35

*Buchanan v. Miami Herald Pub. Co.*,
    206 So. 2d 465 (Fla. 3d DCA 1968) ...............................................................................19

*Burkey v. Gov't Emp. Hosp. Ass'n*,
    983 F.2d 656 (5th Cir. 1993) ..........................................................................................16

*Burns v. HCC Beverages, Inc.*,
    502 So. 2d 1217 (Fla. 1986)............................................................................................26

*Bushman v. Seiler*,
    755 F.2d 653 (8th Cir. 1985) ..........................................................................................15

*Codeventures, LLC v. Vital Motion, Inc.*,
    20-CV-21574, 2021 WL 1131531 (S.D. Fla. Mar. 24, 2021)...........................................33

*Casado v. Miami-Dade Cnty.*,
    340 F. Supp. 3d 1320 (S.D. Fla. 2018.............................................................................32

*Ctr. for Reconstructive Breast Surgery, LLC v. Blue Cross Blue Shield of La.*,
    2014 WL 4930443 (E.D. La. Sept. 30, 2014) ..................................................................13

*Coronado v. Bank Atl. Bancorp, Inc.*,
    222 F.3d 1315 (11th Cir. 2000) ......................................................................................36

## TABLE OF AUTHORITIES - continued

**Page(s)**

*Coventry Health Care of Mo., Inc. v. Nevils*,
    581 U.S. 87 (2017)................................................................................................12

*Debrincat v. Fischer*,
    217 So. 3d 68 (Fla. 2017)....................................................................................18

*Dershowitz v. Cable News Network, Inc.*,
    541 F. Supp. 3d 1354 (S.D. Fla. 2021) ...............................................................5

*EMI Sun Vill., Inc. v. Catledge*,
    779 F. App'x 627 (11th Cir. 2019) ...............................................18, 29, 30, 31

*Empire HealthChoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006)............................................................................................16

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
    647 So. 2d 812 (Fla. 1994)..................................................................................34

*Floyd v. Stoumbos*,
    20-CV-353, 2022 WL 1591356 (M.D. Fla. Apr. 15, 2022)........................23, 27

*Fridovich v. Fridovich*,
    598 So. 2d 65 (Fla. 1992)..............................................................................19, 20

*Fullerton v. Fla. Med. Ass'n, Inc.*,
    938 So. 2d 587 (Fla. 1st DCA 2006) .................................................................20

*Gen. Surg. Assoc., P.A. v. Humana Health Plan of Tex., Inc.*,
    2014 WL 12496771 (W.D. Tex. Apr. 21, 2014)...............................................16

*Gilison v. Flagler Bank*,
    303 So. 3d 999 (Fla. 4th DCA 2020).................................................................33

*Gonzalez v. Blue Cross Blue Shield Ass'n*,
    62 F.4th 891 (5th Cir. 2023) ..............................................................................17

*Grippa v. Rubin*,
    20-CV-457, 2021 WL 5033817 (N.D. Fla. Feb. 22, 2021)...............................18

## TABLE OF AUTHORITIES - continued

**Page(s)**

*Harduvel v. Gen. Dynamics Corp.*,
878 F.2d 1311 (11th Cir. 1989) ...................................................................................14

*Hernandez v. Pasco Cnty. Sheriff*,
2021 WL 598237 (M.D. Fla. Feb. 16, 2021) ...................................................................23

*Hollis v. W. Acad. Charter, Inc.*,
782 F. App'x 951 (11th Cir. 2019) .................................................................................38

*Honig v. Kornfeld*,
339 F. Supp. 3d 1323 (S.D. Fla. 2018) .....................................................................32, 33

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) .......................................................................................5

*Hoti v. Garten*,
18-CV-80657, 2021 WL 3482979 (S.D. Fla. July 21, 2021)...........................................18

*Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Ga., Inc.*,
12-CV-1607, 2014 WL 360291 (N.D. Tex. Feb. 3, 2014) .........................................13, 15

*In re Jan. 2021 Short Squeeze Trading Litig.*,
76 F.4th 1335 (11th Cir. 2023) .......................................................................................37

*In re Fundamental Long Term Care, Inc.*,
873 F.3d 1325 (11th Cir. 2017) ......................................................................................30

*Jackson v. BellSouth Telecomms.*,
372 F.3d 1250 (11th Cir. 2004) ......................................................................................18

*Jackson Hewitt, Inc. v. Kaman*,
100 So. 3d 19 (Fla. 2d DCA 2011) .................................................................................36

*Kern v. Modernage Furniture Corp.*,
125 So. 2d 893 (Fla. 3d DCA 1961) ...............................................................................27

*Kowkabany v. Home Depot, Inc.*,
606 So. 2d 716 (Fla. 1st DCA 1992) ...............................................................................36

## <u>TABLE OF AUTHORITIES - continued</u>

**Page(s)**

*Lanchile Airlines v. Conn. Gen. Life Ins. Co. of N. Am.*,
   731 F. Supp. 477 (S.D. Fla. 1990) ...................................................................15

*Laterza v. JPMorgan Chase Bank, N.A.*,
   221 F. Supp. 3d 1347 (S.D. Fla. 2016) ...........................................................38

*Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*,
   497 So. 2d 1261 (Fla. 4th DCA 1986) .............................................................35

*Lawrence v. Dunbar*,
   919 F.2d 1525 (11th Cir.1990) .......................................................................11

*Livingston v. Blue Cross & Blue Shield of Ala.*,
   788 F. Supp. 545 (S.D. Ala. 1992) .............................................................14, 15

*Mac Isaac v. Twitter, Inc.*,
   557 F. Supp. 3d 1251 (S.D. Fla 2021) .............................................................39

*Mahajan v. Blue Cross Blue Shield Ass'n*,
   2017 WL 4250514 (S.D.N.Y. Sept. 22, 2017)..................................................17

*Malibu v. Anthem Blue Cross Life*,
   2016 WL 5746337 (C.D. Cal. Sept. 30, 2016) ...........................................13, 15

*Matranga v. Travelers Ins. Co.*,
   563 F.2d 677 (5th Cir. 1977) ..........................................................................12

*McBride v. Guzina*,
   21-CV-546, 2022 WL 111230 (M.D. Fla. Jan 12, 2022)...................................38

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*,
   501 F.3d 1244 (11th Cir. 2007) .......................................................................11

*McMurray v. U-Haul Co., Inc.*,
   425 So. 2d 1208 (Fla. 4th DCA 1983) .............................................................31

*Mentis El Paso, LLP v. Health Care Serv. Corp.*,
   58 F. Supp. 3d 745 (W.D. Tex. 2014).........................................................12, 15

## TABLE OF AUTHORITIES - continued

**Page(s)**

*Meyer v. Franklin*,
   15-CV-185, 2016 WL 944421 (N.D. Fla. Feb. 25, 2016)..................................39

*Meyer v. City of Gainesville, Fla.*,
   686 F. App'x 694 (11th Cir. 2017) ...................................................39

*Nguyen v. U.S.*,
   556 F.3d 1244 (11th Cir. 2009) .......................................................21

*Norkin v. The Fla. Bar*,
   311 F Supp. 3d 1299 (S.D. Fla. 2018) ...............................................38

*Orr v. Belk Lindsey Stores, Inc.*,
   462 So. 2d 112 (Fla. 5th DCA 1985)..................................................36

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
   297 F.3d 1182 (11th Cir. 2002) .......................................................12

*Palmer v. Robbins*,
   23-10433, 2023 WL 5786381 (11th Cir. Sept. 7, 2023)...............................24

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998).............................................................14

*Parekh v. CBS Corp.*,
   820 F. App'x 827 (11th Cir. 2020) ...................................................39

*Pearce v. U.S. Fid. & Guar. Co.*,
   476 So. 2d 750 (Fla. 4th DCA 1985)..................................................21

*Pompy v. Monroe Bank & Trust*,
   2020 WL 6298102 (E.D. Mich. Aug. 5, 2020) .......................................22

*Roberson v. Enter. Leasing Co. of Fla., LLC*,
   364 So. 3d 1097 (Fla. 4th DCA 2023)................................................20

## TABLE OF AUTHORITIES - continued

**Page(s)**

*Saenz v. State Farm Fire & Cas. Co.*,
    861 So. 2d 64 (Fla. 3d DCA 2003) ................................................................................21

*Scott v. J.P. Morgan Chase & Co.*,
    296 F. Supp. 3d 98 (D.D.C. 2017) ...............................................................................14

*Sloan v. Shatner*,
    17-CV-332, 2018 WL 3769968 (M.D. Fla. June 22, 2018).............................................40

*Spagnuolo v. Ins. Off. of Am., Inc.*,
    356 So. 3d 908 (Fla. 5th DCA 2023) ............................................................................20

*Steinhilber v. Lamoree*,
    825 F. Supp. 1003 (S.D. Fla. 1992) ..............................................................................29

*Truell v. Blue Cross & Blue Shield f Fla., Inc.*,
    08-CV-103, 2008 WL 11336248 (M.D. Fla. Mar. 21, 2008) .........................................16

*U.S. v. Byrns*,
    19-CR-166 (M.D. Fla.) ..............................................................................................6, 26

*U.S. v. DiBernardo*,
    775 F.2d 1470 (11th Cir. 1985) .....................................................................................26

*U.S. v. Marcotte*,
    3:19-CR-00113 (M.D. Fla.) ........................................................................................6, 26

*U.S. v. Nordic Vill., Inc.*,
    503 U.S. 30 (1992)..........................................................................................................12

*U.S. v. Perez, et al.*,
    20-CR-0086 (M.D. Fla.) ...................................................................................... view *passim*

*U.S. v. Rey*,
    811 F.2d 1453 (11th Cir. 1987) .......................................................................................5

*Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Ins. Co.*,
    2016 WL 1253867 (S.D. Cal. Mar. 11, 2016) ................................................................13

## <u>TABLE OF AUTHORITIES - continued</u>

**Page(s)**

*Ware v. U.S.*,
    971 F. Supp. 1442 (M.D. Fla. 1997)...............................................................................26

*Watson v. Polk Cnty. Sheriff Off.*,
    15-CV-2566, 2016 WL 674915 (M.D. Fla. Jan. 28, 2016)...............................................40

*Willis v. Gami Golden Glades, LLC*,
    967 So. 2d 846 (Fla. 2007)...............................................................................................37

*Zargari v. U.S.*,
    13-CV-23806, 2014 WL 1669968 (S.D. Fla. Ap. 28, 2014) ......................................27, 28

### STATUTES

5 U.S.C. § 8901, et seq.........................................................................................................12

5 U.S.C. § 8902....................................................................................................................17

5 U.S.C. § 8902(m)(1) .........................................................................................................15, 16

5 U.S.C. § 8913(a) ...............................................................................................................17

Fla. Stat § 95.11(3)...............................................................................................................37

Fla. Stat. § 95.11(3)(n)..........................................................................................................34

Fla. Stat. § 95.11(4)(g)..........................................................................................................38

Fla. Stat. § 95.031(1).............................................................................................................37

Fla. Stat. § 626.989 ...............................................................................................................21, 22

Fla. Stat. § 626.989(4)(c).......................................................................................................21

### RULES

5 C.F.R. Part 890..................................................................................................................17

## <u>TABLE OF AUTHORITIES - continued</u>

**Page(s)**

5 C.F.R. § 890.101, et seq..........................................................................................12

48 C.F.R. Ch. 16 ........................................................................................................17

48 C.F.R. § 1652.222-70(a)(12)................................................................................13

Fed. R. Civ. P. 12(b)(1)..............................................................................................11

Fed. R. Civ. P. 12(b)(6).....................................................................................2, 5, 11

Fed. R. Crim. P. 17(g)................................................................................................36

**OTHER AUTHORITIES**

38 Fla. Jur. 2d Negligence § 15 .................................................................................36

Defendants Blue Cross and Blue Shield of Florida, Inc. ("Florida Blue"), UnitedHealth Group Incorporated ("UnitedHealth"), Elevance Health, Inc. ("Elevance"), and CVS Health Corporation ("CVS Health"), move the Court for the entry of an Order dismissing the Complaint filed by Plaintiffs Aaron Durall ("Durall") and Neisha Zaffuto ("Zaffuto") for failure to state a claim and for lack of subject matter jurisdiction.

## **INTRODUCTION**

The gloss Plaintiffs put on this matter is simple: they bring this civil action for damages against the various health insurance Defendants for allegedly "duping" federal law enforcement into bringing charges against Plaintiffs, who after multiple federal criminal trials were ultimately acquitted of those charges. But the truth is something far different.

In June 2020, a federal grand jury found probable cause to hand up an indictment against a web of co-conspirators (including the named Plaintiffs here) for engaging in a $1.4 billion laboratory test health care fraud and money laundering scheme. Then, in the wake of ***multiple*** criminal co-defendants pleading guilty, just over one year ago, a federal jury found ***various other*** of Plaintiffs' criminal co-defendants guilty for participating in that scheme, though the jury hung as to Plaintiffs. Then, less than six months ago, on retrial, and after ***yet other*** co-defendants had entered guilty pleas, another federal jury was at loggerheads over Plaintiffs' criminal culpability. The jury reported to the judge that it was deadlocked on a verdict. Only ***after*** the judge issued an "*Allen* charge" did the jury finally return with a not-guilty verdict as to Plaintiffs.

And this is only part of the background. Before and around these trials:

- federal law enforcement initiated an independent investigation for illegal billing practices by rural hospitals (notably, while the thrust of the individual Plaintiffs' Complaint is seemingly that ***they*** were the wrongful targets of the initial federal law enforcement investigation that Defendants "trumped up," the actual allegations reveal otherwise);

- at least four of the largest national providers of health insurance subsequently and separately commenced investigations into potential fraud by rural hospitals (at the time completely unrelated to the Plaintiffs, whose names and laboratories were unknown to the insurers);

- federal investigators (DOJ, HHS, OIG) and prosecutors (U.S. Attorney's Office) uncovered sufficient evidence to bring criminal charges alleging that such conduct included Plaintiffs and amounted to health care fraud;

- a federal grand jury found probable cause to issue an indictment;

- the criminal indictment withstood the criminal defendants' efforts to dismiss it;

- multiple of Plaintiffs' criminal co-defendants pleaded guilty to conspiracy to commit health care fraud, wire fraud, and money laundering;

- *two* multi-week federal criminal trials were held and all motions for acquittal were denied; and

- multiple criminal co-defendants were convicted.

Setting aside this critical context (of which the Court clearly can take notice), Plaintiffs theorize that Defendants actually "hoodwinked" federal law enforcement into investigating, a grand jury into indicting, and a federal judge into twice trying Plaintiffs in order to avoid paying benefit claims, and now assert a series of tort claims against Defendants, including tortious interference with business relations, malicious prosecution, and defamation to name a few. The Complaint fails as a matter of law.  Plaintiffs' claims are barred by a series of immunities, including the doctrine of sovereign immunity and litigation immunity. And even if Plaintiffs' claims were not barred, each one still fails to state a claim. Accordingly, this action should be dismissed.

## **FACTUAL BACKGROUND**[1]

I.   **Law Enforcement Investigates Rural Hospitals' Business Practices, and Defendants Comply with the Resulting Grand Jury Subpoenas and Other Government Requests**

At one time, Plaintiffs Durall and Zaffuto (and others who would eventually become their criminal co-defendants) were in the lab-testing business. Durall owned Reliance Laboratory Testing, Inc. ("Reliance"), a Florida laboratory, and Zaffuto owned Medivance Billing Services, Inc. ("Medivance"), a Florida medical billing company. *Id.* Compl. ¶¶ 9, 11. Realizing that insurance companies like Defendants typically reimbursed a higher amount for lab tests performed by rural hospitals than by lab companies like Reliance, in 2015, Reliance entered a "laboratory

---

[1] As required in a motion to dismiss under Rule 12(b)(6), Defendants accept the well-pleaded facts alleged in the Complaint as true, solely for purposes of this motion.

service agreement" with Campbellton-Graceville Hospital ("CGH") in Graceville, Florida. *Id.* ¶¶ 12, 13, 10, 31.[2] Pursuant to this agreement, Reliance would obtain urine samples from physicians and drug treatment facilities across the country, ***not*** test them itself, but rather provide those samples to CGH (without the patients ever having been to CGH), which in turn allegedly "tested the samples, released the results, and submitted claims" to Defendants for payment.[3] *Id.* ¶¶ 10, 32, 34-38.

In April 2016, Reliance entered into a similar arrangement with Regional General Hospital ("RGH"), located in Williston, Florida, pursuant to which Reliance would send urine samples to RGH, and RGH would in turn allegedly test the samples and bill Defendants (and others) for such services. *Id.* ¶¶ 10, 34-36, 40. Of course, if Reliance (which was itself a lab) tested the samples and billed for those services ***itself***, the reimbursement would be lower than passing those samples through the hospitals. *Id.* ¶¶ 31-34.

Seeking to expand this increasingly lucrative arrangement, between August 2016 and June 2017, Durall (through entities he owned) purchased Chestatee Regional Hospital ("Chestatee") in Georgia; Cherokee Medical Center ("Cherokee") in Alabama; and Jenkins Medical Center ("Jenkins") in Georgia. *Id.* ¶¶ 17, 13, 44. Not satisfied to stop there, in July 2017, Durall (through one of those entities he owned) also took over management of Sonoma West Medical Center ("Sonoma West") in California. *Id.* ¶ 45. The Complaint asserts that each of those hospitals performed ***some*** tests that were billed to Defendants, but does not allege that the hospitals performed ***all*** the tests that were billed. *See id.* ¶¶ 47-53, 60-61 (limiting description of how tests were billed to those performed at Chestatee), ¶¶ 60-61 (same as to other hospitals). By purchasing these

---

[2] The numbering of paragraphs in the Complaint proceeds from 1-17, then reverts to 10.

[3] This allegation in and of itself is striking. There is no reason that Reliance, an independent laboratory with the ability to perform the tests ordered, needed to send specimens to the rural hospitals, particularly where those hospitals ***could not perform the tests ordered by the providers***. *See, e.g., id.* ¶ 50 (rural hospitals with limited resources must use third-party laboratories, known as reference laboratories, that the hospitals themselves are unequipped to perform).

hospitals and then billing for toxicology tests through them (which Medivance did using the hospitals' identifiers, *id*. ¶ 57), Plaintiffs were able to secure reimbursement at the higher rates set forth in the contracts **rather** than at the rates Reliance would be paid if that lab billed for these tests itself (after, of course, even having performed such testing in the first place). *Id*. ¶¶ 19, 30, 58.

Federal law enforcement soon became interested in the outsized billing practices of – at first not Plaintiffs – but these rural hospitals. (As explained in Defendants' Notice of Removal, some of the claims the hospitals were submitting were for enrollees of the FEHBA Plan, which implicates federal dollars and thus the particular interest of the federal government.) In early August 2016, federal agents contacted Aetna, who according to Plaintiffs "falsely speculat[ed]" that CGH was billing for tests "most likely not being performed at the hospital" and provided those agents with claims data for CGH. Compl. ¶¶ 76-77. Federal agents also allegedly obtained information from Florida Blue to support a theory that claims from CGH were false because the claims reflected a certain "Place of Service" code (22), which "signifies that a patient physically went to a facility [here, the hospitals], had a service performed, and left that same day," which CGH told Florida Blue was incorrect (as the patients never went to these hospitals). *Id*. ¶¶ 78-86.

Although, as Plaintiffs allege, about a year later, the U.S. Attorney's Office for the Northern District of Georgia reviewed the circumstances and declined to prosecute, by January 2018, the DOJ decided investigate. *Id*. ¶ 117. With an open investigation, the DOJ then had calls with Elevance and Aetna personnel and previewed certain requests for billing data – again, from the hospitals, not Plaintiffs – that the Department would pursue as part of its investigation. *Id*. ¶¶ 118-119.

In April 2018, the government's criminal investigation was in full swing, and grand jury subpoenas requesting claims data were issued to Defendants. *Id*. ¶ 120. In response, each Defendant understandably complied with those grand jury proceedings by providing information in the form of claims spreadsheets as they were kept in the ordinary course of business. *Id*. ¶ 121; *see also, e.g.,*

Ex. 1 (Grand Jury Subpoena– the subpoenas issued to all Defendants were materially identical).[4] Plaintiffs claim the spreadsheets were false because they included the Place of Service field, which reflected the "22" code. Compl. ¶¶ 122-126.

Plaintiffs allege that throughout the fall 2018, the government's criminal investigation into the hospitals continued. In August 2018, the FBI interviewed a witness from Florida Blue who allegedly falsely stated the claims billed included the Place of Service code "22," *id*. ¶ 127; that same month, the FBI interviewed an Elevance investigator who said Chestatee's claims were fraudulent because they provided "a misleading test location on the claim forms," which Plaintiffs *speculate* to have been a reference to the Place of Service code, *id*. ¶ 128; and in September, the FBI met with UnitedHealth and Elevance witnesses to further investigate, but Plaintiffs claim the witnesses failed to disclose to the FBI that the Place of Service code was not actually billed by Plaintiffs. *Id*. ¶ 129-130. In March 2019, the FBI also interviewed a witness from Aetna who claimed that the Place of Service code "22" "made it appear as though the patients were going to the hospital for the toxicology testing at issue." *Id*. ¶ 133.

## II.    The Grand Jury Proceedings, Various Guilty Pleas, and Plaintiffs' Indictments

In April 2019, an FBI agent testified before the grand jury that "all of the claims submitted by and on behalf of CGH, RGH, and Chestatee to the Defendants were false because the[y] were billed with codes and identifiers to make it appear as it [sic] these were tests done for patients physically at the hospital (inpatients or outpatients)." *Id*. ¶ 134. In June 2019, an Aetna witness

---

[4] On a Rule 12(b)(6) motion, the Court may consider documents attached to the motion without converting it into one for summary judgment if, as here, the documents are central to the plaintiff's claim and their authenticity is unchallenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also, Dershowitz v. Cable News Network, Inc.*, 541 F. Supp. 3d 1354, 1362 (S.D. Fla. 2021) (Singhal, J.). Moreover, "A court may take judicial notice of its own records and the records of inferior courts." *U.S. v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987). Applied here, this means that in deciding this Motion to Dismiss, the Court can consider the documents underpinning the Complaint, including the underlying criminal indictment, as well as other documents from the public criminal docket, such as those incorporated by reference into the Complaint.

allegedly testified (likewise before the grand jury) that "the claims submitted by or on behalf of the rural hospitals to Aetna included the POS Code 22," when they did not. *Id*. ¶ 135. In February 2020, the FBI agent testified that the claims were submitted with the Place of Service code "22" and that the tests were not performed at the hospitals. *Id*. ¶ 142.

On July 9, 2019, the Government secured its first guilty plea resulting from this investigation when Kyle Marcotte pleaded guilty to Conspiracy to Commit Money Laundering. *See U.S. v. Marcotte*, 3:19-CR-00113 (M.D. Fla.), Dkt. 10. Marcotte admitted that Durall and Reliance (referred to as "Person A" and "Laboratory A") caused the submission of claims "using [CGH's] [National Provider Identifier ("NPI")] and [Tax Identification Numbers ("TIN")], without disclosing that testing had taken place at [Reliance] or that the patients . . . had no connection to [CGH,]" thereby rendering the claims fraudulent. Marcotte further admitted that Durall engaged in similar schemes at RGH and Chestatee, and to having paid almost $50 million in kickbacks to providers who sent urine specimens to Reliance and Durall. *Id*. at 28-33.

Then came the second, when, on October 29, 2019, David Byrns pleaded guilty to Conspiracy to Commit Health Care Fraud. *See U.S. v. Byrns*, 19-CR-166 (M.D. Fla.), Dkt. 12. Byrns' plea relates principally to Putnam County Memorial Hospital in Missouri, which he admitted he and his co-conspirators turned to after billing "tens of millions of dollars of claims" for tests "performed on patients with no connection to CGH" through CGH. *Id*. at 29.

On June 17, 2020, an Indictment was issued in the Middle District of Florida against Durall, Zaffuto, and others. *Id*. ¶ 144; *see also U.S. v. Perez, et al.*, 20-CR-0086 (M.D. Fla.), Cr. Dkt. 3.[5] A Superseding Indictment was filed October 7, 2020. *See* Notice of Removal, at Ex. 2 (ECF No. 1-3). The Indictments describe Plaintiffs and their co-conspirators' using "financially distressed" hospitals to "bill[] false and fraudulent claims for laboratory testing under the hospitals' in-network

---

[5] Citations to "Cr. Dkt." refer to *U.S. v. Perez, et al.*, 3:20-CR-0086 (M.D. Fla.).

contracts, even though such testing took place at independent laboratories on behalf of patients with no connection to the hospitals." Cr. Dkt. 3, ¶ 37(a), (d). The grand jury determined that, after closer review of claims billed by Durall and Zaffuto through Chestatee, Plaintiffs switched to "generic diagnosis codes" making no mention of drug treatment to avoid additional scrutiny. *Id*. ¶ 37(q). It also determined that "[n]one of the Rural Hospitals had the equipment or laboratory capacity to conduct large-scale confirmatory [urine] or blood tests." *Id*. ¶ 27.

Notably consistent with Plaintiffs' current allegations about obtaining higher reimbursement when billing for the alleged underlying testing through the hospitals rather than labs, the Indictments focus on the criminal defendants' use of the NPIs and TINs belonging to the hospitals as representing that "the testing was reimbursable under the Rural Hospitals' insurance contracts with the [Defendants], when in truth and in fact, it was not." *Id*. ¶¶ 35 & 37(j).

Contrary to the thrust of Plaintiffs' allegations against Defendants (*i.e.*, that Defendants "misled" the Government about the Place of Service code issue, duping the Government into pursuing the charges in the first place), the Indictments make no mention of the Place of Service code at all. *See generally id*. Plaintiffs further admit that, by no later than November 4, 2021, counsel for Durall told the DOJ that none of the claims billed by or on behalf of CGH, RGH, or Chestatee included the Place of Service code "22." Compl. ¶ 147. And as Plaintiffs allege, witnesses from each Defendant confirmed that the Place of Service field – like many others in the claims data (*e.g.*, the amount paid) – was data maintained by the Defendants about the claims, but not a field billed by the Plaintiffs. *Id*. ¶ 148.

### III.    More Guilty Pleas and Two Successive Criminal Trials

On April 21, 2022, prior to the first trial, another co-defendant, Nestor Rojas, pleaded guilty to Conspiracy to Commit Health Care Fraud and Wire Fraud. Cr. Dkt. 575. In the guilty plea, Rojas admitted that Durall agreed with certain co-conspirators to perform tests at Reliance and bill them

through CGH and RGH. *Id*. at 26. The Rojas plea focuses on the Defendants' use of the hospitals' NPI and TIN. *Id*. at 24. There is no mention of the Place of Service as a theory of fraud. *See id*. Rojas also admitted that CGH "did not need numerous 'reference labs'" because it had no excess urine, "[a]ll urine specimens that were claimed to be associated with or were shipped to CGH came from an outside source," and "CGH and RGH lacked the capacity to perform . . . confirmatory drug testing . . . ." *Id*. at 29-30. And, after the criminal defendants took their cuts, "[v]ery little funds were left for the hospital which was ostensibly providing the service." *Id*. at 27.

In May 2022, Plaintiffs and multiple co-defendants were tried. The Complaint does not articulate ***any*** reliance by the DOJ at trial on the Place of Service code. *See generally* Compl. To the contrary, witnesses from each Defendant testified truthfully that Plaintiffs did not bill the Place of Service code. Compl. ¶¶ 151, 163, 167, 172. In its closing, the Government stated: "The defense loves to talk about the 22 code," but "I'm not going to talk about that much, because it doesn't matter. It doesn't matter." Cr. Dkt. 794 at 260-261. The jury convicted two of Plaintiffs' co-defendants, Jorge Perez and Ricardo Perez, on a variety of charges. Cr. Dkts. 768-69. The jury hung as to Durall, Zaffuto, and two others. Compl. ¶ 173.

After the first trial, Durall and Zaffuto, as well as each of the other defendants, filed Motions for Judgment of Acquittal. All were denied with a finding, under Fed. R. Crim. P. 29, that the evidence was sufficient for a reasonable jury to have found Durall and Zaffuto (and others) guilty "beyond all reasonable doubt." Cr. Dkt. 820, 822, 866.

Between the first and second trials, James F. Porter, Jr. pleaded guilty to Conspiracy to Commit Health Care Fraud, Cr. Dkt. 904, and Sean Porter pleaded guilty to Conspiracy to Commit Money Laundering, Cr. Dkt. 905. James Porter admitted that the co-conspirators, including Durall, used the NPIs and TINs of rural hospitals to bill for tests "as if the testing had been performed" at the hospitals, "when in fact the overwhelming majority were performed at independent

laboratories," including Reliance. Cr. Dkt. 905 at 25-26. James Porter also admitted that CGH could not and did not perform "the overwhelming majority" of confirmatory tests that were billed to Defendants through CGH or RGH. *Id*. at 26.

In February 2023, Plaintiffs and two others were re-tried. Once again, personnel associated with Defendants testified truthfully that Plaintiffs did not bill the Place of Service code. Compl. ¶¶ 175-76, 195, 204. The jury ultimately acquitted Plaintiffs. *Id*. ¶ 215.

## IV.    **The Place of Service Code Was Irrelevant to the Criminal Proceedings**

The centerpiece of Plaintiffs' claims against Defendants in this action is that Defendants conspired to falsely convince the Government that Plaintiffs and their entities and accomplices had put the Place of Service code 22 on the lab claims prior to submitting them for payment and that the Government seized on such "false" information in mistakenly deciding to bring such criminal proceedings. Not so. Prior to the first trial, the Government accurately stated that "the '22' code [in the Place of Service field] is self-generated by the insurer based on the hospital's submission of the '141' type of bill code." Cr. Dkt. 477 at 10; *see also* Cr. Dkt. 478 at 11 ("[T]he government agrees that the defendants did not submit the '22' code; rather, the '22' code is self-generated by the insurer based on the hospital's submission of the '141' code."); Cr. Dkt. 477 at 10 (same).

In the criminal matter, Durall and his co-defendants repeatedly made the same argument about the Place of Service" field that is now the basis for the Complaint. *See*, *e.g.*, Cr. Dkt. 448 at 6; Cr. Dkt. 450 (Durall's joinder). The Government called this the "reddest of red herrings:"

> [Durall and Zaffuto's criminal co-defendants] also raise the reddest of red herrings in this trial: the insurers' addition of the 22 place of service code in their claims data, and the suggestion that this and other additions somehow 'tainted' the data. The unrefuted evidence established that the insurers added the 22 code when claims were billed with the 141 code to signify for their own internal purposes that the service was provided at an outpatient location at the hospital (*e.g.*, the outpatient clinic at a large urban hospital). (Tobin Vol. III, p. 26-27.)

Cr. Dkt. 831 n.2. It repeatedly stated the Place of Service field was irrelevant: "[T]he Government

has never alleged, and does not intend to allege or prove, that the hospitals made a fraudulent misrepresentation by submitting Place of Service "22" code." Cr. Dkt. 477 at 12; *id.* (the "hospitals did not submit [the Place of Service codes], and no insurer witness will testify otherwise").

The Government's view was that Durall was "manufactur[ing] confusion" about the "Place of Service" code. *Id.* at 12; *see also* Cr. Dkt. 478 at 14.  Simply put, "[t]he lie . . . [was] the identity of the entity that tested the sample – because that made all the difference to whatever the insurers would reimburse at the favorable contract rates the hospitals enjoyed for services *they themselves provided*[.]"[6] Cr. Dkt. 831.

The Government also rejected Plaintiffs' arguments that the inclusion of the "Place of Service" field was false or deceptive. *See* Cr. Dkt. 477 at 10 ("Insurers routinely generate this code because of its relevance to their payment determinations, not, as Durall implies, for some nefarious motive."); *id.* ("It is utterly illogical for Durall to suggest that large commercial insurers generated information to store in their own data warehouses, and then presented it on claims spreadsheets subpoenaed by the grand jury, for the sole purpose of deceiving themselves or to facilitate the Government's prosecution of individuals who previously defrauded the insurers."); *id.* at 11 (same); Cr. Dkt. 478 at 2 (same); *id.* at 4 (same); *id.* at 10 (same).[7] The Government wrote: "The 22 code was inserted for the insurers' own internal purposes in tracking information about the claim, and its presence in no way indicates that the data was tampered with or was otherwise rendered unreliable. The Government has repeatedly explained this point in pretrial filings, at trial, and in post-trial

---

[6] Durall understood this distinction. *See* Cr. Dkt. 822 (arguing for acquittal because the Government allegedly did not introduce proof about "where the lab tests were performed"); Cr. Dkt. 873 (summarizing the Government's case as being that "most of the testing billed through these hospitals was not actually performed at these hospitals and was not medically necessary").

[7]  Plaintiffs rely heavily on testimony purportedly provided before the grand jury by Aetna's Teresa Jackson regarding the "Place of Service" field. *See* Compl. ¶¶ 135, 193. The Government made clear that Ms. Jackson "did not mislead the grand jury into believing that the defendants included the '22' code when submitting claims, as Durall claims." Dkt. 477 n.4. Instead, the Government said, she "described the '22' code accurately as out-patient services." *Id.*

filings. ***Durall simply refuses to accept it.***" Cr. Dkt. 881 at 2 (emphasis added).

What's more, after Plaintiffs commenced this matter, and in response to a motion made by a non-party in the criminal case, the Government again rejected ***the entire premise of Plaintiffs' civil claims***:

> The thrust of [the non-party's] claim is his allegation that the insurance companies all got together and determined to alter claims data information, and feed it to the Government in altered form, which then caused the Department of Justice and the United States Attorney's Office for the Middle District of Florida to blindly prosecute a criminal case based on false and fraudulent pretenses. [The non-party's] motion leads only to the conclusion that if not complicit, this Court was entirely duped as well. These are frivolous allegations . . . .

Cr. Dkt. 1042 at 4-5.

## LEGAL STANDARD

Because this motion to dismiss is based on Plaintiffs' failure to state viable claims and sovereign and other federal immunity grounds, it is brought under Rules 12(b)(1) and (b)(6).

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (cleaned up). "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990)).

Under Rule 12(b)(6), a complaint should be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level," meaning a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. And while the Court must accept a plaintiff's well-pleaded facts as true, it need not accept "conclusory allegations, unwarranted deductions of fact[]," *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002), or "legal conclusion[s] couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I.      **Plaintiffs' Claims Are Barred by Sovereign Immunity and Its Variants**

Plaintiffs' claims are barred entirely by the doctrine of sovereign immunity, which disallows claims against the federal government and its agents except when the government "unequivocally" waived immunity. *U.S. v. Nordic Vill., Inc.*, 503 U.S. 30, 33 (1992). This protection extends to federal contractors in suits where the U.S. government is the "real party in interest," *i.e.*, if the judgment sought against the contractor either ultimately would be satisfied by the federal treasury or would impact a federal program. *Matranga v. Travelers Ins. Co.*, 563 F.2d 677, 677 (5th Cir. 1977); *Anderson v. Occidental Life Ins. Co.*, 727 F.2d 855, 856–57 (9th Cir.1984) (per curiam) (claim for negligent infliction of mental anguish by Medicare carrier barred by sovereign immunity). Both concerns are present here.

### A.      *Defendants as Agents of OPM Are Insulated from Liability*

OPM administers the Federal Employees Health Benefits Program ("FEHBP"), through which the Government provides medical benefits to federal employees, retirees, and eligible spouses and dependents. *See* Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901, et seq.; 5 C.F.R. § 890.101, et seq. Under FEHBA, OPM is permitted to contract with private health insurance "carriers" to administer FEHBP plans and carry out OPM's duties. 5 U.S.C. § 8902(a); *see also Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 90 (2017).

Defendants contracted with OPM to provide healthcare benefits to FEHBP enrollees. *See* Removal, ECF No. 1 (this also applies to Elevance's BCBS subsidiaries); *see also* Dec. of J. Aissis, attached as Ex. 2. Plaintiffs' companies submitted claims to Defendants for patients enrolled in the

FEHBP through direct contracts with OPM and subcontracts with federal employee associations. *See id*., Superseding Indictment, ECF No. 1-3, ¶ 29; Compl. ¶ 57. Defendants, as contractors of the federal government, had a legal obligation to report to the Government any ***suspected*** fraudulent billing practices. For example, federal regulations require that the following clause be inserted into all FEHBP contracts: "***The Carrier agrees to notify OPM of any Significant Event," which includes "[a]ny fraud, embezzlement or misappropriation of FEHB funds***. . . ." 48 C.F.R. § 1652.222-70(a)(12); ECF No. 1.

Many courts have extended the doctrine of sovereign immunity to the FEHBP. *See, e.g.*, *Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Ga., Inc.*, 12-CV-1607, 2014 WL 360291, at *6 (N.D. Tex. Feb. 3, 2014); *Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Ins. Co.*, 2016 WL 1253867 (S.D. Cal. Mar. 11, 2016); *Ctr. for Reconstructive Breast Surgery, LLC v. Blue Cross Blue Shield of La.*, 2014 WL 4930443 (E.D. La. Sept. 30, 2014); *Mentis El Paso, LLP v. Health Care Serv. Corp.*, 58 F. Supp. 3d 745 (W.D. Tex. 2014). In this case, Plaintiffs claim Defendants were obligated to pay for the tests, but wrongfully withheld payment and levied false accusations. *See* Compl. ¶ 63 ("[b]ecause the contracts between Defendants and the rural hospitals obligated the Defendants to pay for these laboratory services, Defendants conspired with each other to withhold payment of tens of millions of dollars owed . . . through false allegations of fraud"); ¶ 75 (same). The claims at issue here go to the heart of Defendants' conduct undertaken as agents of OPM, a role which requires Defendants to alert OPM to suspected fraud. In addition, because federal Treasury funds are used for benefit payments and for administrative expenses, sovereign immunity applies regardless of whether a plaintiff is seeking FEHBA benefits or some other form of damages. *Malibu v. Anthem Blue Cross Life*, 2016 WL 5746337, at *7 (C.D. Cal. Sept. 30, 2016); *Mentis*, 58 F. Supp. 3d at 756.

*B.   Defendants Administered Health Benefit Plans Pursuant to Government Authority*

Contractors administering government insurance programs are immunized "to the extent that the government is exposed to financial risk." *Livingston v. Blue Cross & Blue Shield of Ala.*, 788 F. Supp. 545, 548 (S.D. Ala. 1992), *aff'd*, 996 F.2d 314 (11th Cir. 1993). "The defense derives from the principle that where a contractor acts under the authority and direction of the United States, it shares the sovereign immunity that is enjoyed by the government." *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989).

The protections afforded by sovereign immunity are broad. To withstand dismissal based on a federal contractor's assertion of sovereign immunity, a plaintiff must show "that a private contractor acted pursuant to invalidly conferred authority or exceeded its validly conferred authority." *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 107 (D.D.C. 2017). In this action, Defendants are protected by sovereign immunity because, in undertaking the conduct that forms the gravamen of Plaintiffs' claims, Defendants were administering health benefit plans pursuant to authority conferred to them by the U.S Government. *See* ECF Nos. 1, 1-3.

In addition, a fiscal intermediary is entitled to sovereign immunity on the rationale that the suit at issue is really one against the United States because the fiscal intermediary or carrier is an agent of the government who carries out certain administrative responsibilities on behalf of the government. *See, e.g.*, *Anderson*, 727 F.2d at 856–57 (claim for negligent infliction of mental anguish by Medicare carrier barred by sovereign immunity). The Second Circuit's decision in *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998), is particularly instructive. There, a medical doctor (Pani) was prosecuted for submitting false claims to a Medicare carrier. Pani sued the carrier for its role in the prosecution, asserting that the carrier tortiously interfered with various contractual relations and acted negligently or fraudulently in its notifications to the Government. The district court dismissed on the doctrine of official immunity (a variant of the doctrine of

sovereign immunity). On appeal, the Second Circuit concluded that the carrier was shielded from tort liability as a fiscal intermediary acting within the scope of its authority to report suspected fraud. *Id*. The court reasoned that policy considerations militate in favor of such an outcome:

> The policy considerations underlying the extension of official immunity to a federal official's duty to investigate and report suspected fraud apply with equal force to a fiscal intermediary or carrier. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy or by private contractors.

*Id*. at 73. The court remarked that the investigation and reporting of possible fraud is "precisely the type of delegated discretionary function that the public interest requires to be protected by immunity," to mitigate against the "enormous toll" exacted on the public fisc by fraud. *Id*.; *see also Bushman v. Seiler*, 755 F.2d 653 (8th Cir. 1985) (rejecting plaintiff's argument that the tortious nature of the defendant's alleged conduct stripped him of immunity and noting that "to separate the activity that constitutes the wrong from its surrounding context – an otherwise proper exercise of authority – would effectively emasculate the immunity defense"); *Livingston*, 788 F. Supp. at 550 ("Courts extend official immunity where the threat of liability might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.").[8]

Because these doctrines insulate Defendants from tort liability for the conduct at issue, the Court lacks subject matter jurisdiction to consider Plaintiffs' claims. *Tantuwaya*, 169 F. Supp. 3d at 1071; *Mentis*, 58 F. Supp. 3d at 745; *Malibu*, at *7; *Innova,* at *6.

## II.    Plaintiffs' Claims Are Preempted by FEHBA

Even if the Court found subject matter jurisdiction, the claims against Defendants are also

---

[8] In addition to being federal contractors under the aforementioned programs, Defendants administer Medicare Advantage plans, and therefore case law addressing Medicare fraud are directly relevant. *See* Medicare Advantage Plan Directories, available at www.cms.gov.

subject to dismissal based on FEHBA preemption. FEHBA contains an express preemption clause, found in 5 U.S.C. § 8902(m)(1), which states that "FEHBA contract terms that 'relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) preempt any state laws that 'relate[ ] to health insurance or plans.'" *Truell v. Blue Cross & Blue Shield of Fla., Inc.*, 08-CV-103, 2008 WL 11336248, at *3 (M.D. Fla. Mar. 31, 2008) (quoting 5 U.S.C. § 8902(m)(1)). The Supreme Court recently emphasized that the phrase "relate to" in FEHBA's preemption provisions "express[es] a broad pre-emptive purpose" and is "notably expansive [in] sweep." *Nevils*, 581 U.S. at 96. "[S]tate law – whether consistent or inconsistent with federal plan provisions – is displaced on matters of 'coverage or benefits'" under § 8902(m)(1). *Empire HealthChoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 686 (2006).

Plaintiffs' state-law claims implicate FEHBA contractual provisions that relate to the administration of Patients' FEHBA-governed benefit plans. Plaintiffs allege the Defendants were acting to avoid payments. This includes the payment of benefits under individual FEHBA plans and requires examination of whether the claims were payable in the first instance, an inquiry which cannot be disentangled from the terms of the underlying FEHBA-governed benefit plans. As courts have repeatedly held, "claims arising out of the manner in which a benefit claim is handled are not separable from the terms of the contract that governs benefits." *Burkey v. Gov't Emp. Hosp. Ass'n*, 983 F.2d 656, 660 (5th Cir. 1993). "[S]uch claims "relate to" the plan under § 8902(m)(l) as long as they have a connection with or refer to the plan." *Id.*; *see also Gen. Surg. Assoc., P.A. v. Humana Health Plan of Tex., Inc.*, 2014 WL 12496771, at *6 (W.D. Tex. Apr. 21, 2014); *Williams v. Blue Cross & Blue Shield of Va.*, 827 F. Supp. 1228, 1229–30 (E.D.V.A. 1993) (state contract and tort claims related to the manner in which plaintiff's request was handled and were therefore expressly preempted under FEHBA).

Even if FEHBA had no express preemption provision, Plaintiffs' tort claims would still fail

because of conflict-preemption (a type of implied preemption). A claim is conflict-preempted if, as here, it poses an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See, e.g.*, *Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 904 (5th Cir. 2023) (affirming dismissal of tortious interference, fraud, negligent misrepresentation, and other claims as preempted by FEHBA).

Even if Plaintiffs' claims against Defendants are construed as something other than a benefits dispute, they are still preempted because they conflict with the statutes and regulations establishing OPM's supervisory role over FEHBA plans. Congress delegated to OPM the broad authority to police the conduct, policies, and practices of FEHBA carriers and their subcontractors, and OPM has promulgated extensive regulations on the topic. *See* 5 U.S.C. §§ 8902, 8913(a); 5 C.F.R. Part 890; 48 C.F.R. Ch. 16.  In this case, the broad enforcement powers that Congress gave to OPM conflict with Plaintiff's attempt to use Florida tort law to regulate the conduct of a FEHBA administrator and the terms of a FEHBA plan. *Mahajan v. Blue Cross Blue Shield Ass'n*, 2017 WL 4250514, at *9–11 (S.D.N.Y. Sept. 22, 2017). Because Plaintiffs' law claims conflict with OPM's broad authority over FEHBA carriers and plans, and with the uniform federal scheme the statute is designed to create, the tort claims are preempted by FEHBA and should be dismissed.

### III.    Defendants Are Entitled to Absolute Litigation Immunity

All Plaintiffs' claims further fail because they depend on allegations that Defendants responded to grand jury subpoenas and supplied testimony at trial – conduct that occurred during a judicial proceeding and was related to that proceeding. Under deeply-rooted protections afforded by the Florida litigation privilege, Defendants are entitled to absolute immunity for such conduct.

"Under the Florida litigation privilege, absolute immunity must be afforded to any act occurring during the course of a judicial proceeding so long as the act has some relation to the

proceeding." *Blue-Grace Logistics LLC v. Fahey*, 2023 WL 424285, at *8 (M.D. Fla. Jan. 26, 2023), *appeal dismissed*, 2023 WL 3691014 (11th Cir. Apr. 12, 2023). "Absolute immunity extends to acts taken during and necessarily preliminary to the litigation, such as actions required to be taken as conditions precedent to suit." *Id*. (internal quotation marks omitted). "The privilege reflects a policy judgment that in most cases 'participants in litigation must be free to engage in unhindered communication' and 'to use their best judgment in prosecuting or defending a lawsuit' without fear of civil liability notwithstanding the potential harm to an individual on the receiving end of a defamatory statement or other bad act." *AGM Invs., LLC v. Bus. L. Grp., P.A.*, 219 So. 3d 920, 924 (Fla. 2d DCA 2017) (holding that, "the privilege in Florida has been extended to ***any tort or statutory cause of action based on false statements or other wrongful conduct***."). Absolute immunity means that even statements made in bad faith, or which were defamatory or malicious, would be protected. *See Grippa v. Rubin*, 20-CV-457, 2021 WL 5033817, at *3 (N.D. Fla. Feb. 22, 2021) (finding allegedly defamatory statements to be absolutely privileged).

The causes of action Plaintiffs assert here are precisely the kind that Courts dismiss on the basis of litigation privilege. *See, e.g., EMI Sun Vill., Inc. v. Catledge*, 779 F. Appx. 627, 635 (11th Cir. 2019) (affirming dismissal of cause of action for abuse of process due to application of litigation privilege); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004) (affirming dismissal of tortious interference claim due to application of litigation privilege); *Hoti v. Garten*, 18-CV-80657, 2021 WL 3482979, at *12 (S.D. Fla. July 21, 2021) (dismissing cause of action for negligence due to application of litigation privilege)[9].

There are two primary categories of conduct that drive the allegations in Plaintiffs'

---

[9] *See Debrincat v. Fischer*, 217 So.3d 68, 69-71 (Fla. 2017) (holding that litigation privilege only did not apply specifically to a "claim for malicious prosecution that was based on adding a party defendant to a civil suit"); *but see EMI Sun Vill., Inc. v. Catledge*, 779 Fed. Appx. 627, 635 n.8 (11th Cir. 2019) (recognizing narrow holding of *Debrincat* and stating that whether litigation privilege applies is based on "the specific conduct for which the defendant seeks immunity").

Complaint: (1) providing billing data and interviews in connection with grand jury subpoenas; and (2) testifying at trial concerning Plaintiffs' billing practices. But, because all of that alleged conduct occurred during the course of a judicial proceeding and was related to that proceeding, that conduct is protected by Florida's absolute litigation privilege.

*First*, all four substantive causes of action are premised on Defendants providing allegedly false information to the Department of Justice and the U.S. Attorney's Office for the Middle District of Florida, including spreadsheets that contain billing data, Compl. ¶¶ 221, 231, 309, 319, 388, 398, 467, 477, and interviews in connection with the grand jury subpoenas, *id*. ¶¶ 127-130, 133, and in testimony before the grand jury, *id*. ¶ 135. The Complaint reflects that in April 2018, grand jury subpoenas were issued to each of the Defendants requesting certain claims data. *Id*. ¶ 120; *see, e.g.,* Ex. 1 (Grand Jury Subpoena - the subpoenas issued to all Defendants were materially identical). And Defendants provided the spreadsheets containing billing data to the Government in response to the grand jury subpoenas. Compl. ¶ 121. Responding to a grand jury subpoena is necessarily an "act occurring during the course of a judicial proceeding;" the action was "taken during and necessarily preliminary to the litigation." *Blue-Grace*, 2023 WL 424285, at *8; *see also Fridovich v. Fridovich*, 598 So. 2d 65, 66 n.3 (Fla. 1992) (noting that statements made to grand jury were "clearly within the scope of the judicial proceeding privileges"); *Buchanan v. Miami Herald Pub. Co.*, 206 So. 2d 465, 468 (Fla. 3d DCA 1968) ("[T]he trial judge was eminently correct when he determined that *State v. Tillett*, s*upra*, and the public policy of the State of Florida, precluded any civil action based upon information presented to the grand jury."); *Lanchile Airlines v. Conn. Gen. Life Ins. Co. of N. Am.*, 731 F. Supp. 477, 479 (S.D. Fla. 1990) (grand jury testimony within privilege) (citing *Buchanan*, 206 So. 3d at 468). Providing the spreadsheets with billing data "ha[d] some relation to the proceeding" because it was evidence used by the Government to evaluate potential insurance fraud, which was the subject of the grand jury inquiry. *See id*. The same is true

for Defendants' participation in interviews related to a grand jury subpoena and any testimony provided before the grand jury. These are "necessarily preliminary to the litigation" because the Government is still in an investigation stage and are related to the proceeding because they were about the potential insurance fraud. *See id.*

*Second*, Plaintiffs allege that Defendants falsely testified that Plaintiffs fraudulently billed for confirmation tests. Compl. ¶ 296, 384, 463, 542. But the litigation privilege applies also to the trial testimony of witnesses. *See Fullerton v. Fla. Med. Ass'n, Inc.*, 938 So. 2d 587, 592 (Fla. 1st DCA 2006) ("The common law has long recognized that an absolute civil privilege extends to a witness's testimony . . . in the course of an existing judicial proceeding."); *Fridovich*, 598 So. 2d at 66 ("[Litigation] privilege extends to the protection of the . . . witnesses.").

Because allegations that drive Plaintiffs' claims necessarily occurred during the scope of the judicial proceeding, those facts cannot form the factual basis for any of Plaintiffs' claims, and Defendants are therefore entitled to absolute litigation immunity.

## IV.    Defendants Are Entitled to Qualified Litigation Immunity

Defendants are also entitled to qualified immunity. "There is also a qualified privilege that offers protection to a litigation participant for a comment or action that occurs during informal litigation-related circumstances, such as during investigative conversations with potential witnesses if it is relevant to the litigation-related subject of inquiry." *Spagnuolo v. Ins. Off. of Am., Inc.*, 356 So. 3d 908, 918 (Fla. 5th DCA 2023). For conduct preliminary to a judicial proceeding, "[a] qualified privilege protects a litigation participant from liability for conduct related to the subject of inquiry in a judicial proceeding unless the conduct was undertaken with express malice." *AGM Invs.*, 219 So. 3d at 928. To the extent some conduct that occurred in advance of the proceeding are not protected by the privileges articulated above, Defendants would be protected by the qualified privilege. "[The Florida Supreme] Court and others have long recognized that a judicially created

qualified privilege exists in regard to injuries resulting from malicious prosecution, false imprisonment, defamation, and slander." *Roberson v. Enter. Leasing Co. of Fla., LLC*, 364 So. 3d 1097 (Fla. 4th DCA 2023) (holding defendant immune from malicious prosecution and false arrest claims where defendant reported suspected car theft to police).

## V.      Defendants Are Entitled to Statutory Immunity

Aside from the common law, the Florida Statutes also protect Defendants' conduct. Under the plain text of Section 626.989(4)(c), Fla. Stat., in the absence of fraud or bad faith, Defendants are entitled to immunity for, *inter alia*, filing reports or furnishing other information: (1) "relating to suspected fraudulent insurance acts or persons suspected of engaging in such acts furnishes to . . . law enforcement;" (2) "to any local, state, or federal enforcement officials or their agents or employees;" or (3) for "other actions taken in cooperation with any of the agencies or individuals specified in this paragraph in the lawful investigation of suspected fraudulent insurance acts." Fla. Stat.§ 626.989. Here, Plaintiffs allege Defendants reported to federal agents about Plaintiffs' potentially fraudulent activity. *See, e.g.*, Compl. ¶¶ 76, 77, 82, 83, 121 (alleging Defendants provided information to law enforcement investigating Plaintiffs' fraudulent acts).

Given the conduct alleged is precisely what the Florida Statutes are designed to protect, the inquiry should end here and Plaintiffs' claims should be dismissed. *See Nguyen v. U.S.*, 556 F.3d 1244, 1256 (11th Cir. 2009) ("We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it, especially when doing so would defeat the clear purpose behind the provision.") (citations omitted).

Perhaps on account of the breadth and clarity of this statute, there is scant case law applying it in Florida. But in the few instances that Section 626.989 has arisen in Florida courts, those courts have not hesitated to afford the statutory immunity provided in the text. *See Saenz v. State Farm Fire & Cas. Co.*, 861 So. 2d 64 (Fla. 3d DCA 2003) (affirming application of statutory immunity

in action brought by insured for malicious prosecution against insurer where insured accused insurer of instigating criminal action and authorities ultimately abandoned charges); *see also Pearce v. U.S. Fid. & Guar. Co.*, 476 So. 2d 750 (Fla. 4th DCA 1985) (affirming application of immunity under Section 626.989 in action brought by former adjuster against insurer for malicious prosecution).

Where statutes analogous to Section 626.989 have been interpreted, courts have dismissed actions for defendant-insurers reporting suspected fraudulent activity. In *Pompy v. Monroe Bank & Trust*, a physician sued insurers, asserting claims related to the insurers' alleged reports to law enforcement of plaintiff's possible fraudulent activity. *See* 2020 WL 6298102, at *9 (E.D. Mich. Aug. 5, 2020). The insurers argued that, based on a statute materially identical to Section 626.989, they were immune from liability. *Id*. Despite the plaintiff's allegations that the insurers' investigation was "illegitimate" and "undertaken by improper means," the court granted the motion to dismiss. *Id*. at *10. The court emphasized: "the purpose of the statute is to foster communication related to insurance fraud and prevention," and that "communicating with law enforcement entities regarding an insurance fraud investigation would directly further that purpose." *Id.* As a result, the court held that "Defendants' work with, or provision of information to, law enforcement falls under the purview of the statute." *Id.* The exact same is true of the similarly-situated Defendants in this case, and – applying a materially identical statute – the same result should obtain.

## VI.     Plaintiffs Fail to State Claims for Malicious Prosecution

Plaintiffs assert malicious prosecution claims against each Defendant based on the inclusion of the "Place of Service" field in claims data produced in response to grand jury subpoenas. *See* Compl. ¶¶ 221-226, 309-314, 388-393, 467-472. To state a claim, Plaintiffs must allege: "(1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original

proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding." *Hernandez v. Pasco Cnty. Sheriff*, 2021 WL 598237, at \*11 (M.D. Fla. Feb. 16, 2021).

A.  *Defendants Were Not the Legal Cause of the Criminal Charges Against Plaintiffs*

Plaintiffs' malicious prosecution claims should be dismissed because the Complaint does not plausibly allege that Defendants were the legal cause of the charges against Durall or Zaffuto. "[A] defendant is generally not the legal cause of a proceeding if he merely gives a statement to the authorities, 'leaving the decision to prosecute entirely to the uncontrolled discretion of the officer.'" *Floyd v. Stoumbos*, 20-CV-353, 2022 WL 1591356, at \*4 (M.D. Fla. Apr. 15, 2022), *aff'd* 22-11679, 2023 WL 2592297 (11th Cir. Mar. 22, 2023) (quotations omitted). "But the defendant may be the legal cause if: (1) his persuasion is the determining factor in inducing the officer's decision; (2) he affirmatively gave information to authorities that he knew or should have known was false which was the determining factor in inducing the decision to arrest or prosecute; or (3) he knowingly withheld evidence that could have ceased the prosecution." *Floyd*, 2022 WL 1591356 at \*4 (citations omitted). Plaintiffs allege Defendants "duped" the Government into taking the case based on the provision of false information in the form of the "Place of Service" data. *See, e.g.*, Compl. ¶ 65. But they cannot carry their pleading burden on this element.

***First***, the Complaint does not allege any Defendant made any false statements about Durall or Zaffuto. *See generally* Compl. Instead, the Complaint relies on generalizations about what was represented in claims billed to Defendants through various hospitals. *See, e.g.*, *id*. ¶¶ 121-126. The only allegations about Defendants' interactions with the Government identifying Durall or Zaffuto are that, after a call with an Elevance investigator, federal prosecutors in Georgia declined to prosecute, *id.* ¶ 111, and that the investigator "shar[ed] emails about Durall and Zaffuto" with the

Department of Justice, *id.* ¶ 114. Put differently, Defendants provided information about claims billed by certain hospitals, but ***the Government and grand jury*** made the decision to press charges against specific individuals, including Durall and Zaffuto. This is insufficient to state a claim. *See Barts v. Joyner*, 865 F.2d, 1187, 1195-96 (11th Cir. 1989); *Borneisen v. Capital One Fin. Corp.*, 490 F. App'x 206, 213-214 (11th Cir. 2012) (where decision to prosecute left in hands of authorities, plaintiff must allege defendants' persuasion was "determining factor" in charging or defendant gave false information "which he knew to be false and so unduly influences the authorities"); *Palmer v. Robbins*, 23-10433, 2023 WL 5786381, at *4 (11th Cir. Sept. 7, 2023) (Defendant not legal cause where he "identified [plaintiff] as a suspect . . . , the intervening acts of [officers] and the Savannah-Chatham police broke the causal chain" and defendant had no authority to criminally prosecute).

**Second**, the Complaint does not plausibly allege that the supposedly false field in the claims data – the "Place of Service" field – was the determining factor that induced the decision to prosecute Durall or Zaffuto. Both Indictments identify certain fields in the claims that were fraudulent, but the "Place of Service" field is not among them. *See* Compl., Ex. 2 ¶ 35 (use of hospitals' NPI and TIN); ¶ 37j (same). Plaintiffs allege the Government described the Place of Service field as the "big lie" in a pre-Indictment meeting, but the Indictment does not rely on that theory, and the Government has repeatedly stated that the Place of Service field was irrelevant. *See*, *e.g.*, Cr. Dkt. 477 at 12 ("[T]he Government has never alleged, and does not intend to allege or prove, that the hospitals made a fraudulent misrepresentation by submitting Place of Service '22' code."); Cr. Dkt. 831 n.2; Cr. Dkt. 487 at 14. Moreover, Plaintiffs allege each Defendant informed the Government ***prior to the first trial*** that Plaintiffs did not bill the "Place of Service" code. *See* Compl. ¶ 148. That the Government continued its prosecution, trying Plaintiffs twice after these "admissions," allows for only one plausible conclusion:  whatever the purported untruth about the "Place of Service" field, it did not cause the prosecution of Durall or Zaffuto. *See Barts*, 865 F.2d

at 1195 ("The intervening acts of the prosecutor, grand jury, judge[,] and jury . . . each break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant.").

   *Third*, Plaintiffs claim that the inclusion of the "Place of Service" field in the claims data sets were "false" because the grand jury subpoenas requested data "showing exactly how the claims were billed and how those claims were fraudulent." *Id.* ¶ 120. This is a materially inaccurate description of the grand jury's subpoenas, which sought, *inter alia*, "all records or documents" that "constitute, ***relate to or refer to***" claims submitted to Defendants by or on behalf of the hospitals for laboratory tests. *See, e.g.,* Ex. 1 (Grand Jury Subpoena) (emphasis added). The inclusion of the "Place of Service" field in response to the grand jury subpoenas was appropriate and did not represent that the field was a specific misrepresentation, which is the foundation of Plaintiffs' Complaint. *See* Compl. ¶¶ 120-125. Nor does the Complaint identify any specific statements ***any*** Defendant made to the Government that were false and related Durall or Zaffuto, or that Durall or Zaffuto billed the Place of Service field. *See* Compl. ¶¶ 75-144. Finally, the only allegations as to UnitedHealth and Elevance regarding the "Place of Service" field rely entirely on their production of that field in claims data, which is insufficient to establish falsity or that it was the determining factor in the decision to prosecute Plaintiffs.

   B.  *The Complaint Does Not Plausibly Allege the Absence of Probable Cause*

   Plaintiffs' malicious prosecution claims also fail because the Complaint does not plausibly allege the absence of probable cause for the Plaintiffs' charges.[10] To carry their "onerous" burden on this element, Plaintiffs must demonstrate that the charges against them were brought "without a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to

_____

[10] Plaintiffs also do not plausibly allege Defendants acted with malice. Where, as here, probable cause existed, Plaintiffs cannot carry their burden.

warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Burns v. HCC Beverages, Inc.*, 502 So. 2d 1217, 1219 (Fla. 1986). They cannot.

*First*, there was probable cause to believe Plaintiffs engaged in the offenses charged (*i.e.*, the use of distressed hospitals to submit fraudulent claims for tests using the hospitals' NPI and TIN even though the tests were performed at independent laboratories and/or were for patients with no connection to the hospitals). *See* Compl., Ex. B ¶¶ 35-37. Prior to their Indictment, two of Plaintiffs' co-conspirators, *see* Compl., Ex. 1 at ¶¶ 12-13, pleaded guilty and admitted facts supportive of the charges against them. Kyle Marcotte, a marketer for Reliance, admitted, *inter alia*: (1) that Durall and Reliance caused the submission of claims using the NPIs and Tax IDs of CGH, RGH, and Chestatee, even though Reliance performed certain of the tests and the patients had no connection to the hospitals; and (2) Marcotte paid almost $50 million in kickbacks to providers who sent their patients' urine to Reliance. *See U.S. v. Marcotte*, 3:19-CR-00113 (M.D. Fla.), Dkt. 10. On October 29, 2019, David Byrns pleaded guilty to Conspiracy to Commit Health Care Fraud. *See U.S. v. Byrns*, 19-CR-166 (M.D. Fla.), Dkt. 12. Byrns' plea describes the continuation of the charged conspiracy at Putnam County Memorial Hospital, which he admitted took place shortly after "tens of millions of dollars of claims" for tests "performed on patients with no connection to CGH" were billed through CGH. *Id.* at 29. These guilty pleas provide at least **some** degree of probable cause of criminal conduct by Plaintiffs.

The Indictment and Superseding Indictment are additional evidence of probable cause. *See Ware v. U.S.*, 971 F. Supp. 1442, 1463 (M.D. Fla. 1997) (indictment is evidence of reasonable grounds for prosecution); *see U.S. v. DiBernardo*, 775 F.2d 1470, 1476-77 (11th Cir. 1985) (grand jury's two "basic functions" are "(1) the determination of whether there is probable cause to believe a crime has been committed and (2) the protection of citizens against unfounded criminal prosecutions"). To overcome the Indictments, Plaintiffs "must sufficiently allege [each Defendant]

committed fraud, perjury, or otherwise acted improperly in the acquisition of [Plaintiffs'] indictment." *Zargari v. U.S.*, 13-CV-23806, 2014 WL 1669968, at *5-6 (S.D. Fla. Apr. 28, 2014) (citing *Kern v. Modernage Furniture Corp.*, 125 So. 2d 893, 894 n.1 (Fla. 3d DCA 1961)).

Plaintiffs must also explain how the fraud, perjury, or other improper act was used to prosecute them. *Id.* (citations omitted). Here, even if the "Place of Service" data provided by Defendants was "false" (which it was not), the Indictment does not rely on that data, meaning there was sufficient information to support a finding of probable cause after setting the "Place of Service" data aside. *See Floyd*, 2022 WL 1591356 at *5 ("[I]f – after setting aside such false statements – there is still sufficient information to support a finding of probable cause, then the plaintiff fails to establish this element.") (citing *Blue v. Lopez*, 808 F. App'x 947, 952 (11th Cir. 2020)); *see also Biondolillo v. U.S.*, 05-CV-21014, 2007 WL 5396771, at *14 (S.D. Fla. Aug. 24, 2007) (plaintiff "ha[s] the burden to prove that [the defendants] lied as to certain material facts and that, without those lies, there would have been no reasonable grounds for concluding that Plaintiff committed fraud"). Plaintiffs cannot plausibly allege that, but for the "Place of Service" field and statements about it, there would not have been reasonable grounds for concluding that Plaintiff committed fraud. Plaintiffs admit that, even after the alleged falsity of the statements was "revealed," the Government continued to prosecute the charges against Plaintiffs through ***two separate criminal trials***, resulting in the conviction of two alleged co-conspirators. Compl. ¶¶ 147-148, 150, 174; *see also id.*, Ex. 1 (Count I alleges conspiracy among Jorge Perez, Ricardo Perez, Durall, Zaffuto and others); Cr. Dkt. 768-69 (guilty verdicts as to Jorge and Ricardo Perez). Even after Plaintiffs allege it was revealed that the "Place of Service" field was not billed by Plaintiffs, two more of Plaintiffs' alleged co-conspirators pleaded guilty. *See* Cr. Dkts. 904-905. And, after the first trial, when Durall and Zaffuto (as well as each of the other defendants) filed Motions for Judgment of Acquittal, all were denied.  Cr. Dkt. 820, 822, 866.

*Second*, Plaintiffs were required to allege facts supporting their contention that each Defendant acted with knowledge of the alleged falsity. *See Biondolillo*, 2007 WL 5396771 at *14 & n.9 ("[A] plaintiff must show deliberate and malicious fraud on the grand jury to indict."); *see also Zargari*, 2014 WL 1669968, at *6 ("[C]onclusory, unopposed recitations that [the agents] acted with knowledge of the falsity of these statements are insufficient."). There is no plausible allegation that the Defendants knowingly presented falsities in the claims spreadsheets, particularly where the "Place of Service" field existed in Defendants' claims databases, *see* Compl. ¶¶ 148, 225; *see also* Cr. Dkt. 477 at 10; Cr. Dkt. 478 at 11, and that field's production was appropriate given the breadth of the requests in the grand jury subpoenas and that Defendants produced data, as the Government acknowledged, as it was "kept in the ordinary course of business." Cr. Dkt. 478 at 1. The Court "need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." *Biondolillo*, 2007 WL 5396771, at *14 (citations omitted).

*Finally*, to the extent that Plaintiffs argue that conduct by Defendants was a continuation of the malicious prosecution (rather than originating it), they do not plead facts establishing the absence of probable cause at any time. Durall and Zaffuto filed unsuccessful Motions to Dismiss. *See* Cr. Dkts. 212, 216. After the Government confirmed Plaintiffs did not bill the "Place of Service" field, alleged co-conspirator Nestor Rojas pleaded guilty, Cr. Dkt. 575, Jorge Perez and Ricardo Perez were convicted, Cr. Dkts. 768-69, and the jury hung on the charges against Plaintiffs in the first trial. Compl. ¶ 173. Plaintiffs even filed Motions for Acquittal, which were denied. *See* Cr. Dkt. 820, 822, 866. The Government, then fully informed of all relevant facts, chose to retry the charges against Durall and Zaffuto, rather than drop them. *See* Cr. Dkt. 814. Before the second trial, two more alleged co-conspirators pleaded guilty. Cr. Dkts. 905 & 905.

## C.   *The Sufficiency of the Evidence Has Already Been Determined as a Matter of Law*

Finally, Plaintiffs previously attacked – incessantly – the sufficiency of the evidence upon

which the Court found probable cause. In Durall's motion for acquittal following the first criminal trial, he stated: "Either the evidence was sufficient to support a reasonable juror's conclusion that the defendant's guilt was established beyond a reasonable doubt, or the evidence was not sufficient. **This is a legal question**." Cr. Dkt. 822 at 3. The court in the Criminal Case, noting it had "presided over the multi-week trial and ha[d] carefully reviewed the evidence against each Defendant," denied the motion, finding that a reasonable jury could have found Durall and Zaffuto guilty beyond a reasonable doubt, Cr. Dkt. 866 at 2, an evidentiary standard much more difficult to meet than that necessary to find probable cause. There is no reason for this Court to disturb that legal finding based on the re-hashed arguments Plaintiffs now bring again in a new forum.

## VII.   Plaintiffs Fail to State Claims for Abuse of Process

Plaintiffs assert identical claims for abuse of process against each Defendant based on the allegations that each Defendant "submitted false evidence" to the Government, failed to inform the Government of the truth about the evidence, and acted "in an effort to have Plaintiffs criminally charged, prosecuted, and imprisoned" and "to avoid paying millions of dollars of valid claims . . . and to force Plaintiffs out of the healthcare business." Compl. ¶¶ 263-266, 351-354, 430-433, 509-512. To state a claim, Plaintiffs must allege: "(1) the defendant made an illegal, improper, or perverted use of process; (2) the defendant had an ulterior motive or purpose in exercising the illegal, improper or perverted process; and (3) the plaintiff was injured as a result of defendant's action." *EMI Sun Vill., Inc.*, 779 F. App'x at 635.

### A. *Plaintiffs Do Not Plausibly Allege that Defendants Used "Process"*

Plaintiffs' claims for abuse of process must be dismissed because the Complaint does not plausibly allege that **the Defendants** made an illegal, improper, or perverted use **of process**. *See Blue Dolphin, Inc. v. U.S.*, 666 F. Supp. 1538, 1541 (S.D. Fla. 1987) ("An abuse of process claim is proper only when the action results in issuance of some form of process from the *Court*, such as a writ of garnishment.") (emphasis original); *Steinhilber v. Lamoree*, 825 F. Supp. 1003, 1006 (S.D.

Fla. 1992) (collecting cases).[11]

This defect is particularly acute for the Complaint's allegations that are not covered by the litigation privilege. The Complaint alleges the following interactions between Defendants and law enforcement prior to the grand jury: Aetna personnel "speculat[ed]" to agents that CGH was billing for tests "most likely" not performed at the hospital, Compl. ¶ 76; Aetna transmitted claims data for CGH to agents, falsely alleging that "CGH was billing for urine drug testing not performed at CGH," *id*. ¶ 77; Florida Blue personnel shared "baseless allegations" with agents and, with the agents, confronted personnel at CGH, *id*. ¶¶ 82-83; an Elevance investigator made a referral to the U.S. Attorney's Office for the Northern District of Georgia, had a call with that office, and the office declined to prosecute, *id*. ¶¶ 108-111, and then shared emails about Durall and Zaffuto with the Department of Justice Fraud Division, *id*. ¶ 115; and the Fraud Division previewed its request for claims data, *id*. ¶¶ 118-119. Notably, ***none*** involve "process." *See EMI Sun Vill., Inc.*, 779 F. App'x at 636 (non-privileged conduct did not involve "process").

    B. *Plaintiffs Do Not Allege Use of Process to Accomplish a Result Other Than That for Which the Process Was Created*

"There is no abuse of process . . . when the process is used to accomplish the result for which it was created, regardless of an incidental or concurrent motivate of spite or ulterior purpose." *Bothmann v. Harrington*, 458 So. 2d 1163, 1169 (Fla. 3d DCA 1984); *see also In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1346 (11th Cir. 2017) (complaint must allege that the alleged abuse of process "was not primarily designed" to accomplish the result for which it was created). Although the pleading is vague, to put it charitably, to the extent Plaintiffs' abuse of process claims rely on the criminal matter itself, there is no claim because Plaintiffs admit that Defendants intended

---

[11]   Depending on the process Plaintiffs claim Defendants abused, the claims could also be time-barred. *See Blue v. Weinstein*, 381 So. 2d 308, 310 (Fla. 3d DCA 1980) (four-year statute runs from "termination of the acts which constitute the abuse complained of . . . ."). If the claim relates to Defendants' responses to grand jury subpoenas in 2018, they are barred. *See id.*

to "have Plaintiffs criminally charged, prosecuted, and imprisoned."[12] Compl. ¶¶ 264, 351, 430, 509; *Bembry v. City of Tallahassee*, 05-CV-286, 2006 WL 1080676, at *8 (N.D. Fla. Apr. 24, 2006) (withholding exculpatory evidence to ensure prosecution not abuse of process because it would "accomplish the result for which it was created.").

**VIII.**   <u>**Plaintiffs Fail to State Claims for Civil Conspiracy**</u>

Plaintiffs assert identical claims against each Defendant for civil conspiracy to maliciously prosecute and for abuse of process. *See*, e.g., Compl. ¶¶ 240-245, 268-279. Civil conspiracy requires: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *EMI Sun Vill., Inc.*, 779 F. App'x at 637 (citations omitted).  These claims also fail.

A.   *The Underlying Torts are Not Viable*

The civil conspiracy claims must be dismissed because the underlying torts – malicious prosecution and abuse of process – are not viable. *See supra* §§ VI & VII.

B.   *Plaintiffs Do Not Plausibly Allege the Existence of a Conspiratorial Agreement*

Even if the Complaint stated a claim for an actionable underlying tort (which it does not), it does not plausibly allege the existence of a conspiratorial agreement between the Defendants to engage in an unlawful act. The Complaint only alleges: representatives of each Defendant attended a meeting where the participants "discussed claims submitted by CGH" and "Florida Blue's false allegation that CGH was defrauding Florida Blue by submitting claims with the POS Code 22," Compl. ¶ 88; Florida Blue posted an alert that was viewed by personnel from the other Defendants, *id.* ¶¶ 87-89, 91-95, 97-102, 106, 112-113-131, 132, 141, 146; and representatives from Florida

---

[12] This would render the abuse of process claim a "thinly disguised claim for malicious prosecution," without any "post-service misuse of process," justifying dismissal. *See McMurray v. U-Haul Co., Inc.*, 425 So. 2d 1208, 1210 (Fla. 4th DCA 1983).

Blue had a call with representatives for Aetna, *id*. ¶ 94.[13] But "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (quotations omitted). There are no factual allegations in the Complaint from which the Court may plausibly infer that any Defendant knew of an unlawful scheme; they are entirely conclusory. *See id*. at 1346-47; *see also Casado v. Miami-Dade Cnty*., 340 F. Supp. 3d 1320, 1333 (S.D. Fla. 2018) (allegation that officers "agreed to fabricate evidence in order to . . . maliciously prosecute" was insufficient). Nor should parallel conduct be surprising where each has investigators looking into potential fraud. *See*, *e.g.*, Compl. ¶ 75 (by early August 2016, investigators at each of Defendants was "investigating millions . . .  in reimbursements to CGH and RGH for laboratory testing").

**IX.    Plaintiffs Fail to State Claims for Aiding and Abetting**

Plaintiffs' claims for aiding and abetting malicious prosecution and abuse of process should also be dismissed. To state a claim for aiding and abetting, Plaintiffs must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abetter [sic]; and (3) the rendering of substantial assistance in committing the wrongdoing by the aider and abettor." *Angell v. Allergan Sales, LLC*, 2019 WL 3958262, at *8 (S.D. Fla. Aug. 22, 2019). These claims fail for at least three reasons.

A.  *The Aiding and Abetting Counts Fail Because the Underlying Torts are Not Viable*

Plaintiffs' aiding and abetting claims should be dismissed because the underlying torts – malicious prosecution and civil conspiracy – are not viable. *See supra* §§ VI & VIII.

B.  *Plaintiffs Do Not Plausibly Allege that Each Defendant had Knowledge of Their Co-Defendants' Alleged Plans*

The Complaint does not plausibly allege that each Defendant had knowledge of their co-

---

[13] The other allegations of conspiracy in the Complaint are entirely conclusory. *See*, *e.g.*, *id*. ¶¶ 241 ("Defendants . . . collaborated, conspired, and acted in concert to falsely identify the Plaintiffs").

defendants' alleged plans to maliciously prosecute or abuse process. This element is "only satisfied if the plaintiff pleads facts demonstrating that the [secondary wrongdoer] had 'actual knowledge' of the wrongdoings." *Angell*, 2019 WL 3958262, at *8 (quotations omitted). Here, the Complaint does not even have ***conclusory*** allegations to this effect. Instead, Plaintiffs' allegations in support of its aiding and abetting claims focus principally on each Defendants' ***own*** conduct, rather than that of the alleged primary wrongdoer. *See, e.g.*, Compl. ¶¶ 246-259 (claim against Florida Blue for aiding and abetting malicious prosecution premised on Florida Blue's own conduct, without alleging Florida Blue had knowledge of other Defendants' alleged malicious prosecution of Plaintiffs). There are no facts that give rise to a reasonable inference that each Defendant had ***actual knowledge*** of their co-Defendants' alleged conduct.

C. *Plaintiffs Do Not Plausibly Allege that Any Defendant Provided "Substantial Assistance" to the Primary Wrongdoer*

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the [underlying violation] to occur." *Codeventures, LLC v. Vital Motion, Inc.*, 20-CV-21574, 2021 WL 1131531 at *5 (S.D. Fla. Mar. 24, 2021). Substantial assistance "requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Gilison v. Flagler Bank*, 303 So. 3d 999, 1004 (Fla. 4th DCA 2020). Here, the Complaint merely alleges that each Defendant "aided and abetted" the others. *See, e.g.*, Compl. ¶ 252. There are no facts supporting any contention of coordinated efforts between the Defendants, much less knowing and substantial assistance by any Defendant of another. They should be dismissed. *See Honig*, 339 F. Supp. 3d at 1345 ("A mere recitation of the elements" is insufficient to establish substantial assistance).

X.   **Plaintiffs Fail to State Claims for Tortious Interference with Business Relationships**

A. *There Is No Plausible Factual Basis for Such Claims and in Any Event, All Such Claims Would be Time-Barred*

Defendants' conduct following the empaneling of the grand jury that relates to the criminal matter is absolutely privileged. *See supra* § III. On the other hand, any conduct complained of by

33

Plaintiffs that **_predates_** the grand jury subpoenas – for example, allegedly posting "alerts" to an insurance fraud database in 2016 or a "media smear campaign" in early 2018, Compl. ¶¶ 89, 116 – fails to state a claim for tortious interference with business relationships two reasons. First, none of the pre-subpoena conduct is alleged as part of the factual basis of the tortious interference claim; nor does Durall argue that any such conduct resulted in any interference with a business relationship. And second, such claims are time-barred under the four-year statute of limitations. Fla. Stat. § 95.11(3)(n). The only comprehensible read of Plaintiffs' pre-subpoena allegations is that they had been harmed by Defendants, and knew about that harm, no later than 2018 – well over four years before they filed suit in July 2023.

### B. The Complaint Does Not Identify Any Legally Cognizable Business Relationships with which Defendants Interfered

To state a claim, a plaintiff must allege the existence of a protected business relationship, which is one characterized by "an actual and identifiable understanding or agreement" with another party that "afford[s] the plaintiff existing or prospective legal or contractual rights." *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994).

Here, Plaintiffs allege "interference" with nine "relationships." The first five, at least, are not cognizable relationships subject to interference because they are **_Plaintiffs'_** wholly-owned companies. Durall alleges Defendants interfered with his relationships with four companies he "wholly owned" and managed – Reliance, Durall Capital, NNZ Holdings, and GA Medical. Compl. ¶¶ 9–11, 288, 376, 455, 534. Zaffuto alleges interference between her and Medivance, her "wholly owned" billing company. *Id.* ¶¶ 289, 377, 456, 535. Unlike the type of business "relationship" the tort contemplates – which involve multiple, but separate parties, either one of which can be tortiously enticed to abandon that relationship by a defendant – these relationships were impervious to interference. Defendants did not have the ability to impact Plaintiffs' ownership of their single-member entities.

The other four relationships at issue are between Zaffuto and each of Reliance, Durall Capital, NNZ Holdings, and GA Medical. But the formulaic allegations that Zaffuto had "a beneficial business relationship" with each of those entities; Defendants were "aware of [the] aforementioned business relationships;" and Defendants "intentionally and unjustifiably interfered with the aforementioned business relationships" by "providing false information to the [government]," *see, e.g.*, *id.* ¶¶ 289–91, are not supported by facts.

Instead, Plaintiffs focus on Defendants' undermining the value, not of Plaintiffs single-member entities, or the relationships between them, but of the hospitals that the Government alleged Plaintiffs used to bill fraudulent claims: GCH, RGH, Chestatee, Sonoma West, Cherokee, and Jenkins. But Plaintiffs do not bring claims based on alleged interference between them and those hospitals. "An essential element of a claim … is that the interference be both direct and intentional." *Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*, 497 So. 2d 1261, 1263 (Fla. 4th DCA 1986). At best, the loss of value to Plaintiffs' wholly owned companies was only an ***indirect*** consequence of Defendants' refusal to pay the hospitals on fraudulent claims. Plaintiffs have failed to state claims for tortious interference.

## XI.    Plaintiffs Fail to State Claims for Negligence

### A.   *The Negligence Counts Fail Because They Are Premised on Alleged Intentional Torts*

"A claim for negligence cannot be premised solely on a defendant's alleged commission of an intentional tort." *Brown v. J.C. Penney Corp., Inc.*, 521 F. App'x 922, 924 (11th Cir. 2013). Plaintiffs' negligence claims are based solely on Defendants' alleged intentional conduct, including that they "falsely and maliciously" "manufactur[ed]" false information to the Government "in order to persuade the Department of Justice to prosecute" them.  Compl. ¶¶ 64, 95, 128.

### B.   *The Negligence Counts Fail Because the Complaint Does Not Allege a Duty Owed*

Plaintiffs also fail to allege an actionable duty owed to ***them***. "The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may

lie." *Jackson Hewitt, Inc. v. Kaman*, 100 So. 3d 19, 28 (Fla. 2d DCA 2011). "[I]t is not sufficient to show that the defendant owed to another person or class of persons a duty which, had it been performed, would have prevented the injury of which complaint is made by the plaintiff." 38 Fla. Jur. 2d Negligence § 15 (citing *Kowkabany v. Home Depot, Inc.*, 606 So. 2d 716, 720 (Fla. 1st DCA 1992)). Defendants' duty to provide accurate information in response to subpoenas is owed, not to a criminal defendant, but to the issuing court. *See* Fed. R. Crim. P. 17(g); *Coronado v. Bank Atl. Bancorp, Inc.*, 222 F.3d 1315, 1320 (11th Cir. 2000) ("A grand jury has the power to compel the production of evidence because 'a federal grand jury subpoena is issued under the authority of a court.'" (internal citations omitted)). Here, Defendants did not owe a duty to Plaintiffs "to act in good faith and not provide false information to government agencies," Compl. ¶¶ 293, 381, 460, 539, as Plaintiffs simplistically conclude; rather, Defendants owed a duty to ***the court*** to respond to the grand jury subpoenas with the data in their possession, or risk being held in contempt.

C. *The Negligence Counts Fail Because the Complaint Does Not Allege that Defendants Proximately Caused Their Alleged Injuries*

Plaintiffs fail to allege that Defendants proximately caused their alleged injuries because the Government's and grand jury's decisions to prosecute are intervening causes that break the chain of causation. A defendant is the proximate cause of a wrongful prosecution only "if the defendant's persuasion is the determining factor in inducing the officer's decision or if he gives information which he knew to be false and so unduly influences the authorities." *Orr*, 462 So. 2d at 114; *Barts*, 865 F.2d at 1195 (intervening acts break causation). Even in the light most favorable to Plaintiffs, their allegations demonstrate that the purportedly "false information" regarding the "Place of Service" field was not the "determining factor in" the government's decision to prosecute and did not "unduly influence" the government. Before the first trial, Durall's attorneys "revealed" to the Government that Defendants, not Plaintiffs, generated the "Place of Service" field in the claims data, and Defendants "admitted" as much. Compl. ¶¶ 147–50. As a result, before both trials, the

Government was fully aware that neither Durall nor Zaffuto had submitted the "Place of Service" codes . *See* Compl. ¶¶ 151, 163, 167, 172. Thus, Plaintiffs' allegations establish that the allegedly false "Place of Service" field was not the "determining factor" inducing the Government to prosecute Plaintiffs and did not "unduly influence" the government.

D. *The Negligence Counts Fail Because the Damages Plaintiffs Seek Are Not Available*

The negligence claims also fail because the two broad types of damages Plaintiffs seek are not available to remedy ordinary negligence. "Florida law still has a strong presumption against a negligence duty to cause economic loss." *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1354 (11th Cir. 2023). The Eleventh Circuit "highly doubt[s] that Florida courts would expand a zone-of-risk negligence duty" to cases "with no connection to negligent damage of physical property." *Id.* Plaintiffs' alleged economic harm to their businesses is therefore not cognizable. And Plaintiffs' alleged non-economic harms – mental anguish, personal humiliation, and embarrassment – are only available in negligent infliction of emotional distress claims, which Plaintiffs do not bring, and only when the complained-of mental distress is "manifested by physical injury" after a plaintiff is involved in a traumatizing event, which Plaintiffs do not allege either. *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007).

E. *The Negligence Counts Are Barred by the Statute of Limitations*

Plaintiffs' negligence claims are also barred by the governing four-year statute of limitations. Fla. Stat. § 95.11(3) (pre-2023 amendment, which changed the limitations period to two years). The statute begins to run when the last element constituting the cause of action occurred. Fla. Stat. § 95.031(1). For example, when a defendant responds to a search warrant that ultimately resulted in a plaintiff's assets being improperly taken, the statute of limitations began to run on the date the defendant responded to the search warrant. *Laterza v. JPMorgan Chase Bank, N.A.*, 221 F. Supp. 3d 1347, 1353 (S.D. Fla. 2016). There is no tolling under such circumstances. *Id.* Here, the statute of limitations began to run on Plaintiffs' negligence claims when Defendants responded to

the grand jury subpoenas in 2018. Because Plaintiffs filed their negligence claims on July 7, 2023, they are barred by the four-year statute of limitations.

**XII.    Plaintiffs Fail to State a Claim for Defamation and Defamation *Per Se***

Plaintiffs base their defamation claims on the allegation that "on September 7, 2016, an employee at Florida Blue allegedly published a false and defamatory alert purporting that RGH billed drug screens using the Place of Service "22" code, Compl. ¶¶ 87-89, and that personnel for the other Defendants viewed the alert, *id*. ¶¶ 91-95, 97-102, 106, 112-113, 131, 132, 141, 146. The claims for defamation and defamation *per se* fail for at least three reasons.

*A.   The Defamation Counts Are Barred by the Applicable Statute of Limitations*

"In Florida, the statute of limitations for a defamation action is two years and accrues upon the publication of the defamatory statement." *Hollis v. W. Acad. Charter, Inc.*, 782 F. App'x 951, 953-54 (11th Cir. 2019) (citing Fla. Stat. § 95.11(4)(g)) (affirming dismissal of plaintiff's defamation claims as barred by the statute of limitations); *see McBride v. Guzina*, 21-CV-546, 2022 WL 111230, at *12 (M.D. Fla. Jan. 12, 2022) (granting motion to dismiss because of statute of limitations); *Norkin v. The Fla. Bar*, 311 F. Supp. 3d 1299, 1304 (S.D. Fla. 2018) (same)).

The publicly accessible NHCAA SIRIS alert that gave rise to the cause of action was published on September 7, 2016. Two years from that date – and the end of the statute of limitations period – is September 7, 2018.  Plaintiffs did not file the Complaint until July 7, 2023, almost ***five years*** after the statute of limitations for these claims had ended. The Court should dismiss Counts 9 and 10 of the Complaint with prejudice. *See Hollis*, 782 F. App'x at 953-54.

*B.   The Defamation Counts Fail Because the Publication Was Not About Plaintiffs*

Florida courts also require the allegedly false statement to be made ***about the plaintiff***. *See Meyer v. Franklin*, 15-CV-185, 2016 WL 944421, at *11 (N.D. Fla. Feb. 25, 2016), *aff'd sub nom. Meyer v. City of Gainesville, Fla.*, 686 F. App'x 694 (11th Cir. 2017); *see also Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) (affirming order granting motion to dismiss because, "[A]

defamatory statement must be 'of and concerning' the plaintiff to be actionable." (citations omitted)). "Florida courts have long held that if a defamed person is not named in the defamatory publication, the communication as a whole must contain sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1258 (S.D. Fla. 2021) (internal quotation marks and brackets omitted) (dismissing claims for defamation and defamation *per se* because the persons identified in the allegedly defamatory publication did not reasonably refer to the plaintiff). "The relevant inquiry is whether the average person upon reading the statements could reasonably have concluded that the plaintiff was implicated." *Id*. at 1259 (internal quotations omitted).

Here, the NHCAA SIRIS alert was not about Plaintiffs. The alert did not identify Plaintiffs by name, and the "communication as a whole" does not "contain sufficient facts or references" from which Plaintiffs may be identified by the persons receiving the communication. *See id*. at 1258. The alert stated, *inter alia*, that RGH "**may** be billing for excessive Urine Drug Tests, Hospital based Laboratory testing without medical need . . . and billing for services not rendered."  Compl., Ex. 2 (emphasis added). It also states that members "have never been to these hospitals for any of these services" and that RGH had been using "Place of Service" code "22." *Id*. It even carefully characterized that misconduct as merely "suspected." *Id.* There are no hints, references, or any other information in the alert suggesting that Durall or Zaffuto individually participated in any of the actions described therein, much less submitting claims with the "Place of Service" code "22." An "average person" upon reading the alert could not reasonably have concluded that Durall or Zaffuto were implicated in the *suspected* conduct described in the alert. *See Mac Isaac*, 557 F. Supp. 3d at 1259. There certainly is no false statement about **Plaintiffs**, which necessitates dismissal. *See id.* at 1253, 1258-1260, 1262 (granting motion to dismiss where publication did not contain a photo of the plaintiff's store, did not mention the plaintiff or his store, and did not provide any descriptive information identifying plaintiff); *Sloan v. Shatner*, 17-CV-332, 2018 WL 3769968, at *6 (M.D.

Fla. June 22, 2018) (granting motion to dismiss because plaintiff failed to plead that the allegedly defamatory interview was "of and concerning" him because the transcript did "not mention [the p]laintiff, his business, or identifying characteristics").

    *C. The Defamation Counts Fail Because the Publication Is Not the Cause of Damages*

    Another necessary element for defamation is that "the party suffered damages ***as a result of the publication***." *Watson v. Polk Cnty. Sheriff Off.*, 15-CV-2566, 2016 WL 674915, at *4 (M.D. Fla. Jan. 28, 2016) (emphasis added). Notwithstanding the Complaint's formulaic recitation of the damage element, Plaintiffs do not ***plausibly*** allege that Florida Blue's alert caused Plaintiffs any damage. *See Twombly*, 550 U.S. at 555. Indeed, Plaintiffs' own allegations preclude Florida Blue's alert being the cause of any damages. Plaintiffs allege that other health care insurers, like Aetna, had conversations with federal agents as early as August 4, 2016. Compl. ¶ 76. But Florida Blue's alert was published over one month later, on September 7, 2016. As a matter of logic, Florida Blue's alert cannot be said to be the cause of any damages Plaintiff might have suffered when Plaintiff also alleges that separate, earlier conduct spawned the Government's investigation ultimately leading to Plaintiffs' damages. Even the corresponding criminal indictment incorporated by reference into Plaintiffs' Complaint does not once mention the alleged defamatory publication, but does offer many other allegations for the criminal defendants' wrongdoing. *See* Compl., Ex. 1. As such, the SIU alert could not have plausibly been the proximate cause of any damages and for this reason as well, the Court should dismiss these claims with prejudice.

## CONCLUSION

    For the foregoing reasons, the Court should enter an Order granting Defendants' Motion to Dismiss and dismissing Plaintiffs' claims with prejudice.

Respectfully submitted,

**SINTON SCOTT MINOCK & KEREW**
1550 Market Street, Suite 400
Denver, CO 80202

By: */s/Ben Van Horn*
Benjamin D. Van Horn, Esq.
Florida Bar No.: 123952
bvanhorn@ssmklaw.com
Adam J. Sinton, Esq.
*Admitted Pro Hac Vice*
asinton@ssmklaw.com
Scott P. Kerew, Esq.
*Admitted Pro Hac Vice*
skerew@ssmklaw.com

**BOISE SCHILLER FLEXNER LLP**
Jesse Panuccio, Esq.
Florida Bar No. 31401
jpanuccio@bsfllp.com
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL 33301

Tyler Ulrich, Esq.
Florida Bar No. 94705
tulrich@bsfllp.com
Andrew S. Brenner, Esq.
Florida Bar No. 978663
abrenner@bsfllp.com
100 SE Second Street, Suite 2800
Miami, FL 33131

*Counsel for UnitedHealth Group, Inc.*

**HOGAN LOVELLS US LLP**
600 Brickell Avenue
Suite 2700
Miami, FL 33131
Telephone:      (305) 459-6500
Facsimile:      (305) 459-6550

By*: /s/Allen P. Pegg*
Allen P. Pegg, Esq.
Florida Bar No.: 597821
allen.pegg@hoganlovells.com
Daniel Balmori
Florida Bar No.: 0112830
daniel.balmori@hoganlovells.com

*Counsel for Blue Cross & Blue Shield of Florida, Inc. d/b/a Florida Blue*

**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8562
Facsimile: (305) 503-9583

By:  */s/ Ardith Bronson*
Ardith Bronson, Esq.
Florida Bar No. 423025
ardith.bronson@us.dlapiper.com
Maia Sevilla-Sharon, Esq.
Florida Bar No. 123929
maia.sevillasharon@us.dlapiper.com

Brian H. Benjet, Esq. (*Pro Hac Vice application forthcoming*)
Rachel A.H. Horton (*Pro Hac Vice application forthcoming*)
1650 Market Street, Suite 5000
Philadelphia, PA 19103

*Counsel for CVS Health Corporation*

**GUNSTER, YOAKLEY & STEWART, P.A.**
450 E. Las Olas Blvd., Suite 1400

Fort Lauderdale, 33301
Telephone: (954) 462-2000

By:  */s/ Jonathan J. Osborne*
George S. LeMieux, Esq.
Florida Bar No. 16403
glemieux@gunster.com
Jonathan K. Osborne, Esq.
Florida Bar No. 95693
josborne@gunster.com

**ROBINS KAPLAN LLP**
800 LaSalle Ave.
Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500

Jeffrey S. Gleason, Esq.
*Admitted Pro Hac Vice*
jgleason@robinskaplan.com
Nathaniel J. Moore, Esq.
*Admitted Pro Hac Vice*
nmoore@robinskaplan.com

*Counsel for Elevance Health, Inc. f/k/a Anthem*
*Insurance Companies, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2023, a true and correct copy of the foregoing

was filed with the Clerk of Court using CM/ECF .

By:  */s/ Allen P. Pegg*