UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:23-cv-61557-AHS

AARON DURALL, an individual,
NEISHA ZAFFUTO, an individual,

      Plaintiffs,                              CASE NO.:

v.

BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.
d/b/a FLORIDA BLUE, a Florida Corporation,
BLUE CROSS BLUE SHIELD HEALTHCARE
PLAN OF GEORGIA, INC. f/k/a/ BLUE CROSS
AND BLUE SHIELD OF GEORGIA, INC. d/b/a
GEORGIA BLUE, a Georgia Corporation,
UNITEDHEALTH GROUP INCORPORATED,
a Delaware Corporation; ANTHEM INSURANCE
COMPANIES, INC., an Indiana Corporation, and
AETNA LIFE INSURANCE COMPANY,
a Connecticut Corporation,

      Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**COMES NOW**, AARON DURALL ("Durall"**)**, and NEISHA ZAFFUTO ("Zaffuto"**)** (jointly, "Plaintiffs"), by and through the undersigned counsel, hereby file this Amended Complaint against Defendants, BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. d/b/a FLORIDA BLUE ("Florida Blue"), BLUE CROSS BLUE SHIELD HEALTHCARE PLAN OF GEORGIA, INC. f/k/a BLUE CROSS AND BLUE SHIELD OF GEORGIA, INC. d/b/a GEORGIA BLUE, a Georgia Corporation ("Georgia Blue"), UNITEDHEALTH GROUP INCORPORATED ("UnitedHealth"); ANTHEM INSURANCE COMPANIES, INC. ("Anthem") and AETNA LIFE INSURANCE COMPANY ("Aetna") (collectively, "Defendants"), and respectfully allege, state, and pray as follows:

1

## <u>INTRODUCTION</u>

1.      This is an action about an all-to-familiar American experience taken to the extreme: billion-dollar private insurance companies, obligated pursuant to insurance contracts to pay claims, willing to say anything or do anything, to avoid paying those claims.  Here, however, it was not enough for the private insurance companies to just deny the claims. Instead, the private insurance companies went even further, providing false documents, false information, false testimony before a Grand Jury, and false testimony, all to avoid paying claims and as part of a campaign to maliciously prosecute Aaron Durall and Neisha Zaffuto, two highly successful minority business owners based out of Broward County, Florida.

2.      Facing decades in prison, Durall and Zaffuto refused to capitulate to the demands of those private insurance companies, and instead fought back for years to prove their innocence. After a grueling three-year fight, and two criminal trials, Durall and Zaffuto proved their innocence to a jury, and by so doing, exposed the repeated lies and false information conveyed to the government by these private insurance companies.

3.      Although Durall and Zaffuto were ultimately vindicated at trial, their businesses have been shut down, their reputations in tatters, and they suffered millions of dollars in economic loss, all as a proximate cause of the outrageous misconduct of these billion-dollar private insurance companies.

4.      By this complaint, Durall and Zaffuto seek to hold those billion-dollar private insurance companies accountable for their lies, for their abuse of process, for their defamation, and for their malicious prosecution.

## <u>PARTIES, JURISDICTION, AND VENUE</u>

5.      This is an action for damages in excess of fifty thousand dollars ($50,000.00), exclusive of interest, attorneys' fees, and costs. In fact, Plaintiffs' damages exceed a half of a billion dollars ($500,000,000.00), excluding any future request for punitive damages.

### The Plaintiffs and Their Entities

6.      Plaintiff, Durall, is a resident of Broward County, Florida, and is otherwise *sui juris*.

7.      Plaintiff, Zaffuto, is a resident of Broward County, Florida, and is otherwise *sui juris.*

8.      Durall is an attorney, who has been licensed to practice law in the State of Florida since July 2002. Since 2002, Durall operated the Law Offices of Aaron Durall, Inc. whereby he provided legal services to clients across the State of Florida.

9.      As described in detail *infra*, Durall previously owned and operated several healthcare-related entities.  Moreover, on or about June 1, 2014, Durall started operating and wholly owned a Clinical Laboratory Improvement Amendments (CLIA) laboratory, Reliance Laboratory Testing, Inc. d/b/a Reliance Laboratory Testing, a Florida limited liability company ("Reliance").

10.     Durall also wholly owned and managed: (i) DL Investment Holdings, LLC f/k/a Durall Capital Holdings LLC, a Florida for-profit limited liability company ("DL Investment"); (ii) NNZ Holdings, LLC, a Florida for-profit limited liability company ("NNZ Holdings"); and (iii) Georgia Medical Holdings, Corp., a Delaware for-profit corporation ("Georgia Medical").

11.     On or about June 7, 2007, Zaffuto started operating and wholly owned a medical billing company, Medivance Billing Service, Inc. ("Medivance"), a Florida for-profit corporation primarily focused on medical billing services for healthcare providers.

*The Rural Hospitals*

12.     Campbellton-Graceville Hospital ("CGH" or "Campbellton-Graceville Hospital") was a 25-bed hospital located in Graceville, Florida. Campbellton Graceville was owned by the Campbellton-Graceville Hospital Corporation ("CGH Corporation"), a not-for-profit entity created by the State of Florida.

13.     Williston Regional General ("RGH" or "Williston Regional General") was a 40-bed hospital located in Williston, Florida. Williston was a for-profit hospital owned by Regional Health Partners, LLC, a Florida corporation.

14.     Chestatee Regional Hospital ("Chestatee" or "Chestatee Regional Hospital") was a 49-bed hospital located in Dahlonega, Georgia. In or about August 2016, Durall Capital Holdings purchased the assets of Chestatee Regional.

15.     Sonoma West Medical Center ("Sonoma West"), was a 37-bed hospital located in Sonoma, California. Cherokee Medical Center ("Cherokee") was a 60-bed hospital located in Centre, Alabama.

16.     Jenkins Medical Center ("Jenkins"), was a 25-bed critical access hospital located in Millen, Georgia.

17.     In 2015 and 2016, Reliance entered into laboratory service agreements with CGH and RGH.  Pursuant to the laboratory services agreements, Reliance provided samples to both CGH and RGH and, in turn, CGH and RGH tested the samples, released the results, and submitted claims to private insurance companies for this laboratory testing.

18.     DL Investment owned and operated Chestatee and Sonoma West.

19.     NNZ Holdings wholly owned Centre Hospital Corporation, an Alabama corporation, which managed and operated Cherokee.

20.    GA Medical wholly owned and operated Jenkins.

### *The Defendants*

21.    Defendant, Florida Blue, is a Florida for-profit corporation that is authorized to transact business in and does in fact transact business in Florida, including in Broward County.

22.    Defendant, Georgia Blue, is a Georgia for-profit corporation that is authorized to transact business in and does in fact transact business in Florida, including in Broward County.

23.    Defendant, UnitedHealth, is a Delaware for-profit corporation that is authorized to transact business in and does in fact transact business in Florida, including in Broward County.

24.    Defendant, Anthem, is an Indiana for-profit corporation that is authorized to transact business in and does in fact transact business in Florida, including in Broward County.

25.    Defendant, Aetna, is a Connecticut for-profit corporation that is registered and authorized to transact business in and does in fact transact business in Florida, including in Broward County.

26.    Florida Blue, Georgia Blue, UnitedHealth, Anthem and Aetna offered individual and group health benefit plans and served as third-party administrators for self-insured health plans.

27.    The Rural Hospitals described herein entered into contracts with the Defendants, under which the Defendants agreed and were obligated to reimburse the Rural Hospitals for providing a defined set of health care items and services, including laboratory testing services provided to the Defendants' members and subscribers.

### *Venue*

28.    The Seventeenth Judicial Circuit of Florida has personal jurisdiction over foreign Defendants, Georgia Blue, UnitedHealth, Anthem, and Aetna since they all have minimum

contacts with Florida, transact business in the State of Florida, have committed torts in the State of Florida, and have tortiously conspired with and aided and abetted Defendant, Florida Blue, which is a Florida corporation.

29.     Venue properly lies in Broward County, Florida because, *inter alia*, Plaintiffs reside in Broward County, Florida and at all material times, Defendants were authorized and did in fact conduct business in Broward County, Florida.[1] Broward County is also a proper venue as Defendants, Florida Blue, UnitedHealth, and Aetna all maintain offices in Broward County and Defendants, Georgia Blue and Anthem have agents and representatives that transact business in Broward County. Moreover, as described below, Defendants committed torts in Broward County and thus, the causes of action all accrued in Broward County. Additionally, Defendant Florida Blue distributed defamatory statements in Broward County that were viewed by individuals in Broward County. Finally, Plaintiffs suffered their injuries in Broward County due to torts being committed by Defendants in Broward County.

30.     All conditions precedent to filing this lawsuit have been performed, waived, or otherwise satisfied.

## GENERAL ALLEGATIONS

**I.     Plaintiffs develop and operate successful rural hospitals.**

31.     Rural hospitals are a critical part of the United States' healthcare delivery system, offering much needed care to the communities they serve. These rural hospitals not only deliver traditional hospital services, such as emergency care, inpatient care, and laboratory testing, but many also offer primary and long-term care to the residents of the community.

---

[1] Plaintiffs' Motion to Remand filed on September 11, 2023 [D.E. 35] is pending before this Court. Nonetheless, in the event this Court agrees that removal was proper pursuant to 28 U.S.C. §1442(a)(1), the United States District Court for the Southern District of Florida is the proper venue.

32.      In the case of many rural communities across the country, they are at least a half-hour drive from the nearest urban hospital, which is often too far when a medical emergency arises.

33.      Unfortunately, most rural hospitals lose money delivering healthcare services, unlike their urban counterparts, which usually operate at a profit. In fact, rural hospitals are only able to survive because private insurers have an obligation to pay rural hospitals 100% of their billed charges – or negotiate a contract giving the insurance company (and its insured beneficiaries) a reasonable discount.

34.      However, with disparate rates of uninsured patients, rural hospitals struggle to keep their doors open, jeopardizing rural communities' access to healthcare. In fact, the Center for Healthcare Quality and Payment Reform (CHQPR) reported that more than 150 rural hospitals nationwide closed between 2005 and 2019, and another 19 shut down in 2020, more than any year in the previous decade.

35.      The closure of a rural hospital results in the loss of nearby emergency care and other outpatient services for the residents of the rural community, who are left with no alternative but to travel much farther when they have an emergency or need medical case. As a result, the risk of death or disability when accidents or serious medical conditions develop increases exponentially.

36.      Additionally, the lack of rural hospitals often means that medical issues go undiagnosed or inadequately treated.

37.      The loss of a rural hospital not only causes a drastic change in health care access, but also eliminates a major economic driver for the area, as these hospitals often employ many residents from the community. Additionally, the absence of hospitals in these rural areas deters businesses from operating in the community or establishing new enterprises there.

38.     CGH, RGH and Chestatee hospitals entered into contracts with the Defendants, under which the Defendants agreed and were obligated to reimburse CGH, RGH and Chestatee for providing a defined set of health care items and services, including laboratory testing services provided to the Defendants' members and subscribers.

39.     Under the terms of the insurance contracts, the private insurers were obligated to pay for claims for services that were medically necessary and rendered at CGH, RGH and Chestatee hospitals.  The terms of these contracts also obligated the Defendants to pay high rates of reimbursement  for laboratory testing services and other medical services provided at CGH, RGH and Chestatee because of their status as rural hospitals.

40.     Initially, Reliance would obtain toxicology samples from physicians and drug treatment facilities that were local and outside the State of Florida.

41.     However, in late 2015, Durall, who had been operating Reliance as a successful laboratory since 2014, saw an opportunity to become involved with and invest in the rural hospital business to help rural communities.

42.     In September 2015, People's Choice Hospital, which owned and operated, CGH sought toxicology samples through a reference lab agreement from Reliance in order to obtain a new revenue stream so that the hospital could manage its finances and stay open to its rural community.

43.     On or about September 28, 2015, Reliance paid for and delivered a Carolina 720 analyzer to be installed at CGH because CGH lacked the ability to conduct the volume of samples expected from Reliance each day, or the funds to pay for the necessary laboratory equipment.

44.     Reliance also installed a new water system in conjunction with the analyzer so that the hospital could perform the toxicology testing on the samples that were sent from Reliance.

45.     On October 1, 2015, Reliance and CGH entered into a reference lab contract whereby CGH would conduct qualitative and quantitative toxicology testing on the samples that were sent to CGH.

46.     CGH obtained toxicology samples from Reliance from November 2015 until August 2016. The toxicology samples were accessioned, analyzed, and resulted utilizing the Carolina 720 that was purchased by Reliance.

47.     In or about April 2016, Reliance purchased and sent a Beckman Coulter AU680 to RGH so that toxicology samples could be analyzed and reported by the technicians at RGH. Similar to the arrangement between Reliance and CGH, Reliance entered into a lab reference agreement with RGH.

48.     In or about April 2016, Reliance began to send toxicology samples to RGH.

49.     Reliance was paid for the samples that were referenced to RGH and CGH pursuant to the lab reference contracts and all samples were tested and resulted at the hospitals.

50.     On or about August 19, 2016, Durall, through DL Investment, purchased Chestatee. Plaintiff, Zaffuto, provided operational support to Chestatee on behalf of Durall and DL Investment.

51.     On or about April 30, 2017, Durall, through NNZ Holdings, purchased Cherokee. Plaintiff, Zaffuto, provided operational support to Cherokee on behalf of Durall and NNZ Holdings.

52.     On or about June 16, 2017, Durall, through GA Medical, purchased Jenkins. Plaintiff, Zaffuto, provided operational support to Jenkins on behalf of Durall and GA Medical.

53.     On July 25, 2017, Durall, through DL Investment, began managing the operations of Sonoma West. Plaintiff, Zaffuto, provided operation support to Sonoma West on behalf of Durall and DL Investment.

54.     Chestatee, Cherokee, Jenkins, and Sonoma West, like most rural hospitals, were financially unhealthy when Durall took over their operations.

55.     As such, upon purchasing Chestatee, Cherokee, and Jenkins, and managing Sonoma West, Durall embarked on an aggressive growth strategy for each of these rural hospitals in order to offset the high costs of operating them.

56.     As part of Durall's growth strategy, he ordered millions of dollars' worth of new surgical equipment, monitors, fixtures, and furniture for the hospital rooms.

57.     Additionally, and perhaps more importantly, under Durall's leadership, Chestatee, Cherokee, Jenkins, and Sonoma West all expanded their hospital inpatient and non-patient services, including but not limited to, drug and alcohol abuse treatment and laboratory services[2].

58.     Hospitals, especially rural hospitals with limited resources, often must use third-party laboratories, known as "reference laboratories," to perform laboratory tests that the hospitals themselves are unequipped to or otherwise unable to perform.

59.     Thus, as part of his growth strategy for Chestatee, Cherokee, Jenkins, and Sonoma West, Durall equipped each of the hospitals to operate as fully accredited, highly complex laboratories by hiring additional laboratory technicians at each of the hospitals and ordering the

---

[2] Publicly available article accessible at: https://www.captodayonline.com/value-hospital-lab-outreach-underrated/ (last accessed September 13, 2020) ("Moreover, successful hospital laboratory outreach can furnish more than half of a hospital's pre-tax earnings while accounting for less than 10 percent of its overall cost.  It's one of the best-kept secrets in health care."); https://revcycleintelligence.com/news/transforming-the-hospital-laboratory-into-a-profit-center ("Hospitals that have been able to effectively institute laboratory outreach programs have awoken the sleeping giant.")

purchase of new high-tech laboratory equipment (including freezers for storage of specimen samples) and supporting laboratory software.

60.     As a result, under Durall's leadership, Chestatee, Cherokee, Jenkins, and Sonoma West were each set up to handle an increased volume of laboratory tests. In fact, at all relevant times hereto, Chestatee, Cherokee, Jenkins, and Sonoma West handled each hospital's respective patients' laboratory testing inhouse, but more importantly, were able to act as reference laboratory for other facilities.

61.     Providing laboratory services to patients outside of the rural communities in which Chestatee, Cherokee, Jenkins, and Sonoma West were located allowed each hospital to both cover losses and expand on-campus services (such as a new 10-bed Geri psych unit at Jenkins, an inpatient drug treatment facility at Chestatee, etc.) for the benefit of their respective rural communities.

## II.     Plaintiffs appropriately billed for services performed at the rural hospitals.

62.     To obtain payment from the Defendants for services provided at the rural hospitals, the rural hospitals, or their designees, submitted claims, either electronically or on paper, on the UB-04 uniform medical billing form.  There are specific fields or lines on the UB-04 billing form that that must be completed when submitting a claim, including  the Type of Bill, the rural hospital's NPI number and tax ID, the patient's name,  the patient's diagnosis described by standardized codes, a description of the service(s) rendered to the patient using standardized codes, the date the services were rendered, and the amount claimed for payment.

63.     One Type-of-Bill code that can be included on a UB-04 billing form when submitting claims is the code 141, which signifies to the Defendants that laboratory services were provided at the rural hospital for a "non-patient." A "non-patient" is defined as an individual that

is neither an "inpatient" nor an "outpatient" of the rural hospital but involves a sample that is sent to the rural hospital for analysis. A claim submitted with a 141 code is therefore a disclosure to the private insurance company Defendants that the claim is for laboratory services for a patient *that is not physically present at the rural hospital*.

64. During the time of the relationship between Reliance and CGH and RGH, CGH and RGH used an outside billing company to submit claims to the Defendants for services, including laboratory services, performed at these hospitals. All of the claims submitted on behalf of CGH and RGH to the Defendants were submitted on an electronic version of the UB-04 medical claim form, using a Type-of-Bill code 141, disclosing to the Defendants that the laboratory testing services were for "non-patients" of the hospitals.

65. During all relevant times, Chestatee, Cherokee, Jenkins, and Sonoma West used Medivance's billing services, which had years of experience working with healthcare providers, as their billing company.

66. Notably, Chestatee, Cherokee, and Sonoma West had in-network agreements with Defendants, whereby Defendants agreed to pay negotiated rates for covered services under the applicable agreements. Therefore, Medivance billed according to the negotiated terms of the applicable agreements.

67. Jenkins did not have in-network agreements with Defendants but did bill Defendants for medical services as an out-of-network provider.

68. Similar to the billing company utilized by CGH and RGH, Medivance submitted all claims for laboratory services performed at Chestatee, Cherokee, Jenkins, and Sonoma West with a Type-of-Bill code 141, disclosing to the Defendants that the laboratory testing services were for "non-patients" of the hospitals.

69.     The laboratory tests performed at CGH, RGH, Chestatee, Cherokee, and Sonoma West were in fact covered under the in-network agreements with Defendants, and Defendants initially paid according to the terms and conditions of the in-network agreement.

70.     Based on the higher reimbursement rates paid to rural hospitals for laboratory tests, Durall was able to successfully grow Chestatee, Cherokee, Jenkins, and Sonoma West and planned to continue expanding the services offered to their respective communities.

III.     **Plaintiffs were maliciously prosecuted.**

   A.     **Summary of the false allegations against Plaintiffs.**

71.     By no later than August 2016, Defendants had paid millions of dollars for laboratory testing performed on nonpatients of CGH and RGH, with the prospect of paying millions of dollars more for future claims.  Because the contracts between Defendants and the rural hospitals obligated the Defendants to pay for these laboratory services, Defendants conspired with each other to wrongfully withhold payment of tens of millions of dollars owed to CGH, RGH, Chestatee, Cherokee, and Sonoma West through false allegations of fraud.

72.     As more detailed below, Defendants conspired with each other as part of a smear campaign against and malicious prosecution of Durall and Zaffuto, an abuse of process to avoid paying Durall, through his various companies, for monies that were owed and to put Durall and Zaffuto out of the hospital and laboratory businesses.

73.     Defendants provided false documents and false information to the Department of Justice, provided false testimony and false documentation to a federal Grand Jury, and provided false trial testimony, in order to persuade the Department of Justice to prosecute Durall, Zaffuto and others. Not one but two separate entities within the Department of Justice declined to prosecute cases presented by the Defendants to the Department of Justice about Durall, Zaffuto and others,

before the United States Attorney's Office for the Middle District of Florida and the Fraud Section in Washington, D.C., were duped into taking the case.

74.     As a result, on June 29, 2020, Durall, Zaffuto and others were indicted in the Middle District of Florida. On October 7, 2020, a superseding indictment was filed against Durall, Zaffuto and others, largely correcting scrivener errors in the original indictment. **Attached hereto as Exhibit 1 is the October 7, 2020, superseding indictment.** The charges against Durall and Zaffuto were completely without merit and lacked probable cause since they were based on false testimony, false documents and false information provided by the Defendants.

75.     According to the wide-eyed prosecutors who were armed with information given to them by the private insurance companies, Durall and Zaffuto were purportedly involved in a massive, multi-state scheme to use small, rural hospitals as a hub for millions of dollars in fraudulent billings of private insurers.

76.     The indictment falsely alleged that Durall and Zaffuto would take over small, rural hospitals, often in financial trouble, using management companies they owned and operated. Moreover, the indictment baselessly claimed that Durall and Zaffuto would bill private insurance companies through those rural hospitals for millions of dollars of expensive urinalysis drug tests and blood tests, conducted mostly at outside laboratories they often controlled or were affiliated with, using billing companies that they also controlled. Additionally, the indictment perfidiously stated that outside laboratories did most of these laboratory tests and Durall and Zaffuto allegedly billed private insurance companies as if these laboratory tests were done at the rural hospitals.

77.     According to the indictment, these rural hospitals had negotiated contractual rates with private insurers that provided for higher reimbursement than if the tests were billed through

an outside laboratory.  Accordingly, this purported scheme used the hospitals as a shell to fraudulently bill for such tests.  Further, the indictment falsely alleged that the lab tests were often not even medically necessary.

78.     Based upon the charges filed, Durall and Zaffuto faced the possibility of being imprisoned for 20 or more years.

79.     The aforementioned allegations contained in the indictment were malicious, lacked probable cause and any basis in fact or reality.

80.     Due to Defendants' malicious false allegations about Durall and Zaffuto and nonpayment of monies owed, not only were they forced to close their successful businesses, but they also had to stand criminal trial *twice*.

81.     On March 21, 2023, after a multi-week trial and a short deliberation, a federal jury acquitted Durall and Zaffuto of the charges alleged in the indictment after the second trial.

82.     Durall and Zaffuto collectively incurred over a million dollars in legal fees to defend against the baseless charges brought against them. Due to the wrongful conduct of Defendants, Durall was forced to sell Chestatee, Cherokee, and Jenkins at a loss of over ten million dollars ($10,000,000.00). Chestatee Regional Hospital was ultimately forced to close its doors. Additionally, both Reliance and Medivance went out of business and DL Investment had to sever its business relationship with Sonoma West.

**B.  The Investigation of Plaintiffs leading up to the Indictment.**

83.     By early August 2016, investigators with Florida Blue, Anthem, Aetna and UnitedHealth were each investigating millions of dollars paid in reimbursements to CGH and RGH for laboratory testing services.  Early on in the investigation, Florida Blue, Anthem, Aetna and UnitedHealth realized from a review of the contracts with these rural hospitals that they were

obligated to pay for laboratory services already performed at these hospitals and would be obligated to pay future claims for similar laboratory services pursuant to those contracts. Faced with enormous financial exposure, Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth each searched for a way to "stop the bleeding."

84.     On August 4, 2016, Aetna representatives corresponded with federal agents in the Middle District of Florida, falsely speculating that CGH was submitting claims for urine testing samples most likely not being performed at the hospital. Aetna's allegations that the toxicology samples were not being performed at CGH were false and Aetna lacked any probable cause to substantiate this allegation.

85.      On August 12, 2016, Aetna representatives transmitted claims data for CGH to federal agents, falsely alleging that CGH was billing for urine drug testing not performed at CGH.

86.     At the same time that Aetna began to make false allegations about claims submitted by CGH, Florida Blue was similarly making up false narratives about claims submitted by CGH and RGH to Florida Blue.

87.     For example, by August 17, 2016, internal correspondence at Florida Blue demonstrates Florida Blue representatives openly and falsely suggesting that claims from RGH were false because they were billed with a Place-of-Service (POS) Code 22 on each claim.

88.     POS Codes are required for professional billing and submission of each claim on a CMS Form 1500 (Health Insurance Claim Form), or an electronic equivalent form used to submit health insurance claims for reimbursement. These codes are used by CMS, Medicaid, and other private insurers to highlight the sale of medically related items and services for a patient. The POS Code 22 referenced by Florida Blue in internal correspondence is a code used for "outpatient

services" and signifies that a patient physically went to a facility, had a service performed, and left that same day.

89.     As noted herein, all of the claims submitted to Florida Blue by CGH and RGH were submitted on a UB-04 and not on a CMS Form 1500.  The UB-04 does not even have a field or line on it for a POS Code, and it was therefore impossible for CGH or RGH to submit a single claim with a POS Code 22 on the claims submitted to Florida Blue. Indeed, none of the claims submitted by CGH and RGH included a POS Code 22. Thus, the internal Florida Blue communications about claims being submitted with a POS Code 22 were entirely false and lacked any probable cause. Yet Florida Blue persisted in advancing this entirely baseless claim of fraud.

90.     Between August 17, 2016, and August 22, 2016, Florida Blue shared these baseless allegations with federal agents in the Middle District of Florida, and arranged a meeting between federal agents, Florida Blue officials and representatives of CGH, to confront the CGH representatives with this entirely baseless claim of fraud.

91.     On August 22, 2016, Florida Blue representatives and the federal agents traveled to CGH and confronted various representatives of CGH, including CGH laboratory personnel and CGH's legal counsel, and falsely claimed that all laboratory testing billed by CGH was false because the claims were all submitted with a POS Code 22.  Florida Blue representatives went on to falsely claim that the POS Code 22 "defrauded" Florida Blue because it made it appear that the patients were physically present at CGH and that the services provided were for outpatients of CGH.

92.     Shocked by the allegations made by Florida Blue, an attorney for Florida Blue (and other representatives of Florida Blue) conducted an investigation of the claims and the allegation that all of the claims were false because they included the POS Code 22.

93.     After just one day of investigating, CGH representatives were able to conclusively establish that the allegations by Florida Blue representatives – that all of the claims for laboratory services submitted on behalf of CGH included the POS Code 22 -- was false and entirely without merit.

94.     On August 25, 2016, CGH representatives notified Florida Blue that the allegations lodged by Florida Blue about the POS Code 22 were entirely false and without merit. CGH representatives specifically disclosed to Florida Blue that the claims submitted on behalf of CGH were not submitted with a POS Code 22; rather, all claims were submitted with a Type-of-Bill code 141, which disclosed to Florida Blue that these were claims for nonpatients and *only* the toxicology specimen, and not the actual patient, was sent to the hospital for analysis and testing. CGH representatives went on to note for Florida Blue that there was not even a line or field to place the POS Code 22 on the claim forms submitted by CGH to Florida Blue.

95.     Although Florida Blue circulated this information from CGH to others within Florida Blue, Florida Blue ignored it, and instead shared its false theory about the POS Code 22 with other private insurance companies, including Anthem, Aetna and UnitedHealth. Florida Blue even published a nationwide alert about its false theory of fraud.

96.     On September 1, 2016, the Healthcare Fraud Prevention Partnership (HFPP) held a meeting attended by various private insurers, including representatives of Florida Blue, Anthem, Aetna and UnitedHealth. At that meeting, Florida Blue, Anthem, Aetna and UnitedHealth discussed claims submitted by CGH to these insurance companies, and Florida Blue's false allegation that CGH was defrauding Florida Blue by submitting claims with the POS Code 22.

97.     On September 7, 2016, Florida Blue posted and published a nationwide alert with false and defamatory information through the National Health Care Anti-Fraud Association's

Special Investigation Resource and Intelligence System ("NHCAA SIRIS") system stating data analytics have proved that thirty-seven million dollars ($37,000,000.00) of drug screen claims submitted by Williston Regional Hospital were "false" because the claims included the POS Code 22. **Attached hereto as Exhibit 2 is the September 7, 2016, NHCCA SIRIS posting by Jose Ramos of Florida Blue**.  Florida Blue published this alert after it had already been notified by CGH that none of the claims submitted by CGH included the POS Code 22, and there was not even a field or line to insert a POS Code 22 on a UB-04 claim form.

98.   NHCAA SIRIS is a searchable database that consists of three data sets: one devoted to provider cases; another for health care fraud schemes; and a third that administers Requests for Investigation Assistance (RIA's) from law enforcement partners. In order to use SIRIS, insurers like Florida Blue sign an agreement with NHCAA, in which they agree to only provide accurate information through SIRIS, and to update any alerts posted if the insurer learns the information posted is not accurate.

99.   After it was published by Florida Blue, on various dates, the last date being February 22, 2023, the false NHCAA alert was published and republished to numerous insurance companies throughout the United States, including representatives from Aetna, Georgia Blue, UnitedHealth and Anthem.   This false NHCCA SIRIS report was initially published and subsequently on numerous occasions republished on the NHCCA SIRIS system from September 7, 2016, through May of 2023.  Florida Blue never edited the alert or took any steps to have it taken down, despite being repeatedly advised that the information in the alert was plainly false.

100.   On September 7, 2016, Elizabeth Combs of Anthem Special Investigations Unit reviewed the false NHCAA SIRIS alert published by Florida Blue.

101.     On September 8, 2016, Susan Belair of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.

102.     On September 14, 2016, just a week after the publication of Florida Blue's false NHCAA SIRIS alert about the POS Code 22, Florida Blue representatives responsible for the false NHCAA alert scheduled a conference call with Aetna representatives responsible for false claims about CGH claims for laboratory testing not performed at CGH.

103.     At the same time as Florida Blue, Anthem, Aetna and UnitedHealth were manufacturing false allegations about the POS Code 22, and samples not being tested at CGH and RGH, Durall was in the process of purchasing other rural hospitals.

104.     On August 19, 2016, Durall through DL Investment purchased Chestatee Regional Hospital for fifteen million dollars ($15,000,000.00). After purchasing Chestatee, DL Investment bought new operating room equipment to update the operating room and to attract new doctors that wanted to use Chestatee to perform surgeries. DL Investment also hired two hospitalists so the patient census could increase for Chestatee. Additionally, DL Investment bought new furniture and monitors for the inpatient rooms. Further, the geriatric psychiatric wing was painted and refurbished, a substance abuse detox wing was completed with new staff hires, a new 401K plan was instituted for the employees and new health insurance was obtained for the employees of Chestatee. The improvements to the Chestatee Regional Hospital, the benefits for the staff and the employment of additional staff cost Durall and DL Investment in excess of five million dollars ($5,000,000.00).

105.     On October 17, 2016, Karen Allen of Cigna health insurance company viewed the false HNCAA SIRIS alert published by Florida Blue. Karen Allen viewed the false NHCAA SIRIS alert published by Florida Blue from her office in Broward County, Florida.

106.     On November 12, 2016, Patricia Hawksworth of UnitedHealth Investigations reviewed the false NHCAA SIRIS alert published by Florida Blue.

107.     On December 15, 2016, Durall, through NNZ Holdings, purchased Cherokee, in Centre, Alabama. Cherokee was another rural hospital that was struggling to stay open. NNZ Holdings brought in new lines of revenue like detoxification and urine drug testing in order to prevent the closure of the hospital which would have caused over one hundred and twenty-five (125) people to be laid off and out of work.

108.     On December 20, 2016, Rand Hawley of Aetna reviewed the false NCHAA SIRIS alert published by Florida Blue.

109.     On December 22, 2016, Rand Hawley of Aetna reviewed the false NCHAA SIRIS alert published by Florida Blue again.

110.     January 9, 2017, Brittany Kiefer of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.

111.     On March 6, 2017, Garrett Shohan of Aetna Special Investigations Unit transmitted a letter to Durall regarding Chestatee Regional Hospital about a review of the drug urine claims that were submitted to Aetna and Shohan. He falsely concluded that Chestatee Regional Hospital was billing for testing *not* performed at the hospital.

112.     On April 24, 2017, Kelly Tobin, Director of Special Investigations Unit for UnitedHealth, requested the employees at UnitedHealth to conduct a data search for all services billed by Williston Regional Hospital using a search parameter of the POS Code 22 with certain laboratory billing codes.

113.     On June 20, 2017, GA Medical Holdings purchased Jenkins in Millen, Georgia. The hospital was a critical access hospital with twenty-five (25) beds and was purchased for one

million five hundred thousand dollars ($1,500,00000). The hospital was in dire need of new revenue streams, therefore, Durall and Zaffuto invested seven hundred and fifty thousand dollars ($750,000.00) in order to build a new geriatric psychiatric wing, which would generate approximately four hundred thousand dollars ($400,000.00) of revenue to the hospital each month. Additionally, a new 401K program and new health insurance plan was provided to all of the employees. Jenkins was eventually sold back to Jenkins County at a loss for three hundred and fifty thousand dollars ($350,000.00) because of the frivolous law enforcement investigation and smear campaign surrounding Durall and Zaffuto.

114.    On July 22, 2017, Brittany Kiefer of Aetna again reviewed the false NHCAA SIRIS alert published by Florida Blue.

115.    On July 25, 2017, Durall, through DL Investment, entered into an agreement with Sonoma West Medical Center to manage the hospital. Sonoma West was in dire need of assistance with its payroll in order to keep its doors open and not have to terminate two hundred (200) employees. DL Investment Holdings loaned Sonoma Medical Center eight hundred thousand dollars ($800,000.00) for payroll and other expenses in order to keep the hospital open. DL Investment and Sonoma West entered into a contractual relationship that was reviewed and vetted by the board of directors of Sonoma West to become a reference laboratory. DL Investment was able to bring in new revenue streams and collect existing revenue for patients being seen at the hospital that resolved over eight million dollars ($8,000,000.00) of legacy debt for Sonoma West.

116.    On August 9, 2017, Special Investigative Unit investigator John Iacovelli of Georgia Blue and Anthem made a referral of fraudulent activity to the United States Attorney's Office for the Northern District of Georgia. Investigator Iacovelli submitted his referral after several months of investigating Chestatee and after placing Chestatee on pre-payment review.

117.    Georgia Blue and Anthem's policy regarding pre-payment review was that Chestatee would have to submit the requisition form (order), letter of medical necessity and the testing result with every claim that was submitted for payment to Anthem and Georgia Blue. Per Georgia Blue and Anthem's policy, every claim would be reviewed by a medical team prior to payment of said claim to verify that the claim submission should be paid. Georgia Blue and Anthem paid Chestatee tens of millions of dollars during the pre-payment review process, which was more than was paid during the electronic submission process that did not have Anthem's detailed pre-payment review process prior to payment.

118.    On August 10, 2017, the United States Attorney's Office for the Northern District of Georgia attempted to call Georgia Blue and Anthem's Investigator Iacovelli regarding the purported fraudulent activity referral by Durall and Zaffuto.

119.    On August 11, 2017, a telephone conference was held between the United States Attorney's Office for the Northern District of Georgia and Investigator Iacovelli of Georgia Blue and Anthem. During this call, the United States Attorney's Office for the Northern District of Georgia wanted to know about the fraudulent activity that was occurring and what portion of the contract with Chestatee was at issue. After the August 11, 2017, call the United States Attorney's Office for the Northern District of Georgia *declined* to prosecute the purported fraudulent activity by Durall and Zaffuto.

120.    On November 20, 2017, Stephen Ballew of Anthem's Special Investigations Unit reviewed the false NHCAA SIRIS alert published by Florida Blue.

121.    On December 11, 2017, Wendy Dingle of UnitedHealth/Optum reviewed the false NHCAA SIRIS alert published by Florida Blue.

122.     After his referral was declined by the Department of Justice in Atlanta, Investigator Iacovelli, from Georgia Blue and Anthem, continued to "shop" his referral, and by January 2018, he was sharing emails about Durall and Zaffuto with Gary Winters with the Department of Justice Fraud Division and Assistant United States Attorney Tyson Duva of the Middle District of Florida.

123.     On March 28, 2018, Gary Winters with the Department of Justice Fraud Division attempted to schedule a call with Iacovelli to discuss Chestatee.

124.     Upon information and belief, on around February or March of 2018, the Defendants, directly or through their agents and attorneys, began a media smear campaign against Durall and Reliance by knowingly providing false information that Durall and Reliance were involved in fraudulent business activities. Many false and defamatory media publications were being reported about Durall and Reliance, including a CBS News Morning News' "investigation" that was fraught with false claims that Durall, Chestatee, and Reliance were involved in fraudulent and criminal activity.

125.     By 2018, the Department of Justice and the United States Attorney's Office for the Middle District of Florida decided to pursue the false claims of fraud referred by Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth and met and/or had conference calls with representatives of each of these insurance companies.

126.     On April 11, 2018, Department of Justice and the United States Attorney's Office for the Middle District of Florida representatives had a conference call with Georgia Blue and Anthem representatives. The Department of Justice prosecutors requested accurate billing data from Georgia Blue and Anthem showing exactly how the claims were billed and how those claims were fraudulent. Georgia Blue and Anthem representatives agreed to provide the requested

information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

127.     On April 24, 2018, Department of Justice and the United States Attorney's Office for the Middle District of Florida representatives had a conference call with Aetna representatives. The Department of Justice and the United States Attorney's Office for the Middle District of Florida prosecutors requested accurate billing data from Aetna showing exactly how the claims were billed and how those claims were fraudulent. Aetna representatives agreed to provide the requested information.

128.     Beginning in April 2018, Department of Justice and the United States Attorney's Office for the Middle District of Florida prosecutors issued Grand Jury subpoenas to Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth, requesting specific claims data for laboratory testing services billed to these insurance companies by or on behalf of CGH, RGH and Chestatee hospitals, showing exactly how the claims were billed and how those claims were fraudulent.

129.     In response to the Grand Jury subpoenas, Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth provided spreadsheets that purported to represent the specific claims data for laboratory testing services billed to these insurance companies by or on behalf of CGH, RGH and Chestatee hospitals, and purportedly showing how the claims submitted by these hospitals to these insurance companies.

130.     The claims spreadsheets provided by Aetna in response to the Grand Jury subpoenas were false, in that the spreadsheets included information falsely showing that all of the claims submitted to Aetna by or on behalf of these hospitals included the POS Code 22.

131.    The claims spreadsheets provided by Florida Blue in response to the Grand Jury subpoenas were false, in that the spreadsheets included information falsely showing that all of the claims submitted to Florida Blue by or on behalf of these hospitals included the POS Code 22.

132.    The claims spreadsheets provided by Georgia Blue in response to the Grand Jury subpoenas were false, in that the spreadsheets included information falsely showing that all of the claims submitted to Florida Blue by or on behalf of these hospitals included the POS Code 22.

133.    The claims spreadsheets provided by Anthem in response to the Grand Jury subpoenas were false, in that the spreadsheets included information showing that all of the claims submitted to Anthem by or on behalf of these hospitals included the POS Code 22.

134.    The claims spreadsheets provided by UnitedHealth in response to the Grand Jury subpoenas were false, in that the spreadsheets included information showing that all of the claims submitted to UnitedHealth by or on behalf of these hospitals included the POS Code 22.

135.    From the time these claims spreadsheets were produced by Florida Blue, Georgia Blue, Anthem, Aetna, UnitedHealth in 2018, through November 2021, various representatives of Defendant met with and discussed the claims spreadsheets with the government on numerous occasions. In all of these meetings, no representative of Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth ever revealed to the government that the claims spreadsheets falsely represented that the hospitals had submitted claims with the POS Code 22.

136.    On August 2, 2018, after Florida Blue produced claims spreadsheets, Department of Justice representatives, including the lead FBI Special Agent, Robert Schwinger, met with representatives from Florida Blue to discuss the Florida Blue claims spreadsheets. During this meeting, Florida Blue falsely and maliciously stated that the claims submitted to Florida Blue were billed with the POS Code 22, and even went so far as to falsely suggest that the "22/141" billing

combination was supposed to be a "rare" combination. Florida Blue went on to falsely tell Department of Justice representatives that all of the claims submitted by these hospitals to Florida Blue were fraudulent because every claim was billed with the POS Code 22. In truth and in fact and as Florida Blue representative then well knew, none of the claims submitted by or on behalf of these hospitals included the POS Code 22, and there is no such thing as a "22/141" code combination, as the POS Code 22 is reserved for the 1500 Claim Forms, while the 141 Type-of-Bill Code is reserved for the UB-04 Claim Forms.

137.    On August 20, 2018, FBI Agent Schwinger from the FBI's Office in Jacksonville, Florida interviewed Investigator Iacovelli of Georgia Blue and Anthem regarding the urine drug testing that occurred at Chestatee. Investigator Iacovelli falsely and maliciously stated that the purported scheme that was being conducted at Chestatee was fraudulent because Chestatee was providing a misleading test location on the claim forms – i.e., the POS Code 22.  Additionally, Investigator Iacovelli falsely and maliciously stated that, "Chestatee is placing codes on the forms making it appear as if the urine drug tests are being conducted at the hospital."

138.    On September 13, 2018, the Department of Justice and United States Attorney's Office for the Middle District of Florida representatives had a conference call with UnitedHealth's representatives to discuss the claims spreadsheets provided by UnitedHealth in response to the Grand Jury subpoenas.  During this conference call, UnitedHealth representatives provided a variety of explanations about the billing data, including the POS Code 22, but at no time during the interview did UnitedHealth reveal to the Department of Justice that the claims submitted by or on behalf of the hospitals did not, in fact, include the POS Code 22 as delineated in the UnitedHealth claims data spreadsheets.

139.    On September 21, 2018, the Department of Justice and United States Attorney's Office for the Middle District of Florida representatives had a conference call with Georgia Blue and Anthem representatives to discuss the claims spreadsheets provided by Georgia Blue and Anthem in response to the Grand Jury subpoenas.  Georgia Blue and Anthem representatives provided an extensive explanation about the spreadsheets, including the 141 Types of Bill. Georgia Blue and Anthem falsely and maliciously told the Department of Justice that the 141 code was a way to hide what actually occurred with the testing.  At no time did any Georgia Blue and Anthem representative reveal to the Department of Justice that none of the claims submitted to Georgia Blue and Anthem by these rural hospitals included the POS Code 22 as set forth on the claims spreadsheets.

140.    On December 31, 2018, Michelle Gregory of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.

141.    On February 28, 2019, Stephen Ballew of Anthem Special Investigations reviewed the false NHCAA SIRIS alert published by Florida Blue.

142.    On March 22, 2019, Theresa Jackson of Aetna was interviewed by FBI Agent Schwinger about the claims spreadsheets provided by Aetna in response to the Grand Jury subpoenas.  Jackson specifically referred to the spreadsheets in the interview, and falsely and maliciously claimed that the claims submitted to Aetna were all false, and that the inclusion of the POS Code 22 on the claims made it appear as though the patients were going to the hospital for the toxicology testing at issue.  In truth and in fact, none of the claims submitted to Aetna by or on behalf of the rural hospitals included the POS Code 22.

143.    On April 3, 2019, FBI Agent Schwinger testified before the Grand Jury in the Middle District of Florida, which was investigating Durall, Zaffuto and others for purportedly false

claims submitted by on behalf of the rural hospitals to the Defendants. Armed with false information provided to him by Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth about the claims data spreadsheets provided in response to Grand Jury subpoenas, Agent Schwinger testified that all of the claims submitted by and on behalf of CGH, RGH and Chestatee to the Defendants were false because the claims were billed with codes and identifiers to make it appear as it these were tests done for patients physically at the hospital (inpatients or outpatients).

144.    On June 5, 2019, Theresa Jackson of Aetna falsely and maliciously testified before the Grand Jury about the claims data spreadsheets provided by Aetna in response to the Grand Jury subpoenas and was specifically asked questions about the meaning of the POS Code 22 included on those spreadsheets.  Ms. Jackson's testimony before the Grand Jury regarding the POS Code 22 was entirely false.  Among other things, Ms. Jackson testified that the claims submitted by or on behalf of the rural hospitals to Aetna included the POS Code 22, which meant an outpatient service in which a patient physically went to the hospital, had a service performed, and left the same day.  In truth and in fact, none of the claims submitted to Aetna by the rural hospitals included the POS Code 22, and there was no representation in any of the claims that a patient physically went to any of the rural hospitals.  In truth and in fact, all of the claims were billed with a Type-of-Bill code 141, specifically disclosing to Aetna and the other insurance companies that these claims were for nonpatients who were not physically at the rural hospitals.

145.    By November 2019, after receiving false information about the inclusion of the POS Code 22 on the claims submitted to the Defendants, the Department of Justice advised Durall and Zaffuto through their attorneys that the government was considering charging them with federal crimes for this conduct.

146.    Troubled by this news and trying to understand what the government was claiming about Durall and Zaffuto, attorneys for Durall met with representatives of the Department of Justice and United States Attorney's Office for the Middle District of Florida on November 22, 2019.

147.    During the meeting, Department of Justice and United States Attorney's Office for the Middle District of Florida prosecutors reported various pieces of the false information provided to them by the Defendants, including claims that the rural hospitals were being used as billing vehicles and that the testing billed to the Defendants was not actually being performed at the rural hospitals.  In response to questions from counsel for Durall about what was false on each claim, the Department of Justice and United States Attorney's Office for the Middle District of Florida revealed the false information provided to it by the Defendants, that all of the claims had the POS Code 22, which falsely represented to the Defendants that the patient had physically been to the rural hospital. According to the Department of Justice, the inclusion of the POS Code 22 on all of the claims was the "big lie" and was why Durall and Zaffuto were targets of the criminal investigation.

148.    At the conclusion of the meeting, the Department of Justice and United States Attorney's Office for the Middle District of Florida prosecutors again regurgitated the false information provided by the Defendants and suggested that Durall's attorneys ask Durall to give a name of a person who "walked into Chestatee" and needed a test and was referred to a reference lab. The Department of Justice said Durall's attorneys should ask Durall for that person's name because "that person doesn't exist".

149.    Throughout the course of the Department of Justice investigation, which was initiated based on the false information provided by the Defendants, the Department of Justice and

United States Attorney's Office for the Middle District of Florida investigators took various steps designed to "prove" the false claims about the POS Code 22. Numerous beneficiary interviews were conducted, yet the Department of Justice and United States Attorney's Office for the Middle District of Florida did not focus on whether the testing was actually done but instead focused on whether those beneficiaries had physically been to CGH, RGH or Chestatee where their samples had been tested. One individual was convinced to plead guilty based on the false information provided by the Defendants that all of the claims were billed to falsely suggest that the patients were physically at the hospitals. Physical evidence in the case, which would have shown exactly how many tests were performed at CGH, RGH and Chestatee, was either never seized or never analyzed by the government because the Defendants had repeatedly and falsely told the Department of Justice that all claims were billed with the POS Code 22.

150. On January 20, 2020, Jessie Buckmaster of UnitedHealth/Optum reviewed the false NHCAA SIRIS alert published by Florida Blue.

151. On February 12, 2020, FBI Agent Schwinger testified for the third and final time before the Grand Jury. Among other things, Schwinger testified about the false information provided by the Defendants: that all of the laboratory services claims submitted to the Defendants by or on behalf of CGH, RGH or Chestatee were submitted with POS Code 22. Schwinger further testified, based on false information provided to by the Defendants, that laboratory testing billed by or on behalf of CGH, RGH and Chestatee was not actually performed at the rural hospitals.

152. Shortly after Schwinger's February 2020 Grand Jury appearance, and before any indictment was returned in this case against Durall or Zaffuto, Schwinger, the lead FBI agent investigating this case, retired from the FBI and shockingly, took a job with Florida Blue. It is unknown when during this Department of Justice investigation Schwinger began seeking

employment with Florida Blue, Florida Blue tried to recruit Schwinger, or whether Schwinger's willingness to pursue the criminal investigation against Durall and Zaffuto based on the false information provided by Florida Blue influenced Florida Blue's decision to hire Schwinger.

153.    On June 17, 2020, the federal Grand Jury sitting in the Middle District of Florida returned an indictment against Durall, Zaffuto and others based on the false information provided by the Defendants.

154.    After the return of the indictment, Schwinger, now employed by Florida Blue, circulated celebratory emails with his new colleagues at Florida Blue.

155.    On April 12, 2021, Schwinger, now employed by Florida Blue, reviewed the false NHCAA SIRIS alert published by Florida Blue.

156.    On November 4, 2021, after conducting an investigation of the claims made by the Defendants on behalf of Durall, attorneys for Durall contacted the government and revealed to them that the Defendants had provided false information about the POS Code 22 to the government in various forms: a) in the claims data provided by the Defendants in response to the Grand Jury subpoenas; b) during interviews with Department of Justice representatives about the claims data provided in response to the Grand Jury subpoenas; and c) during testimony before the Grand Jury about that same claims data.  Attorneys for Durall revealed to the government that none of the claims submitted by or on behalf of CGH, RGH or Chestatee included the POS Code 22 as was claimed by the Defendants.

157.    Between November and December 2021, in response to this revelation by counsel for Durall, the Department of Justice reinterviewed representatives of Florida Blue, Georgia Blue, Anthem, Aetna and UnitedHealth about the POS Code 22.  When confronted with this new information POS Code 22, representatives of Florida Blue, Georgia Blue, Anthem, Aetna and

United Health each admitted in sum and substance that none of the claims submitted by or on behalf of CGH, RGH or Chestatee included the POS Code 22, and that in fact, the POS Code 22 was placed in the claims data provided by the Defendants in response to the Grand Jury subpoena *by the Defendants themselves.*

158.    Faced with the reality that none of the rural hospitals submitted claims with the POS Code 22, as was falsely alleged by the Defendants, the Department of Justice had no choice but to proceed with alternative false theories advanced by the Defendants: first, that the claims billed were for urine tests that were not medically necessary; and second, that the testing was not performed at the rural hospitals. As with the false information provided to the government by the Defendants about the POS Code 22, the Defendants alternative claims were equally false.

### *First Trial Begins*

159.    On May 9, 2022, the first criminal trial against Durall and Zaffuto began, and a jury was impaneled.

160.    On May 10, 2022, Kelly Tobin ("Tobin") of UnitedHealth was called as the government's first witness at trial.  During her testimony, Tobin was forced to admit that the POS Code 22 found on all of the claims data spreadsheets provided to the government by UnitedHealth in response to Grand Jury subpoenas was not submitted by or on behalf of Durall, Zaffuto or any of the other criminal defendants on trial but was instead placed on the claims-data spreadsheets by UnitedHealth. Tobin's testimony therefore proved that the spreadsheets relied upon the government as the basis for the criminal case were false, and statements by UnitedHealth employees to the government that the claims submitted by or on behalf of Durall or Zaffuto included the POS Code 22 were also false.

161.    Tobin also admitted that the contracts between the rural hospitals in the case (CGH, RGH and Chestatee) and UnitedHealth obligated UnitedHealth to pay for laboratory testing services performed at the rural hospitals.

162.    Forced to admit that UnitedHealth had provided false documents and false information to the government about the POS Code 22, and the existence of contracts that obligated UnitedHealth to pay for laboratory testing performed at the rural hospitals, Tobin attempted to suggest that the claims submitted by or on behalf of the rural hospitals to UnitedHealth were still false because of other codes on the claims submitted by or on behalf of the rural hospitals to UnitedHealth. Tobin testified that these other codes on the claims submitted by or on behalf of the rural hospitals to UnitedHealth, known as Current Procedural Terminology (CPT) codes, were for confirmatory urine drug testing, which the rural hospitals did not have the ability to perform. Through this testimony, Tobin implied that the CPT codes included on the claims proved that the urine drug testing was not actually performed at the rural hospitals, and thus UnitedHealth was not obligated to pay those claims for other reasons.

163.    On May 10, 2022, Tobin further testified as to what CPT codes are, a description of the codes and whether the codes were confirmation or screening codes:

Q. Now, if you look down Column J, the procedure codes, the CPT codes, do you see CPT codes for quantitative confirmation testing?

A. I do.

Q. Okay. What are some of those codes, if you know?
A. 80320, 80324.

Q. Okay. And in the course of reviewing Exhibit 1A, the full spreadsheet, did you see other claims of confirmation testing?

A. Most of them. Many of them.

Q. I'm sorry, you said?

A. Many of them, yes.

Q. Do you see claims for the qualitative or presumptive or screening test?

A. I did.

Q. Okay. And again, based on your review, which were the…which were the majority of the claims for?

A. The majority of them were for confirmatory testing.

164.    Tobin testified, based on the UnitedHealth claims data spreadsheets provided to the government, that the "majority" of the urine testing billed by or on behalf of CGH, RGH and Chestatee were for *confirmatory* testing that could not possibly have been performed at these rural hospitals.

165.    On May 10, 2022, Tobin testified regarding what the procedure description of the CPT codes on the spreadsheets meant:

Q.  Okay. Now, I want to move on to column K. What's column K?

A.  Column K is what we call procedure description. And so basically it is a short description of what the code is.

Q.  Okay. And just to be clear, we're just looking at Exhibit 1A (1), the CGH claims?

A.  Correct.

Q. We're only talking about CGH claims for now?

A. Right now, that's correct.

Q. We'll move on to the other spreadsheets. Okay. You said column K is the procedure description?

A. That's correct.

Q. And is that something that matches the CPT code?

A. It does.

166.    On May 10, 2022, Tobin testified regarding the testing that was performed by Chestatee Regional Hospital:

Q. Okay. Now, if you look at…on page 1, column J.

A. Yes sir.

Q. Are you there? Do you recognize that procedure code G0479?

A. I do.

Q. What is that?

A. It's a presumptive test, drug urine test.

Q. And these are…in this call-out these are all for presumptive tests?

A. Yes. That's accurate.

Q. Is that the case? Okay. And did you have the opportunity to look through the Chestatee spreadsheet and determine what the balance between the presumptive and the confirmatory tests was for Chestatee?

A. The majority of them are confirmatory.

167.    Like the earlier information provided by UnitedHealth about the POS Code 22, Tobin's testimony about the CPT codes and urine drug testing not performed at the rural hospitals was false and malicious. Tobin admitted she never visited any hospitals, never interviewed any doctors, never interviewed any patients, and never reviewed any test results. Thus, Tobin had no evidence to support her claims about the CPT codes and testing not done at the rural hospitals other than the very same spreadsheets prepared by UnitedHealth and provided to the government in response to Grand Jury subpoenas that she previously admitted were false.

168.    Even worse, the evidence established that despite Tobin's testimony, those spreadsheets, prepared by UnitedHealth, showed that the vast majority of the tests billed to

UnitedHealth were defined by UnitedHealth as *screening* tests, not confirmation tests.  This was evident from the very face of the UnitedHealth claims data spreadsheets.

169.    Worst of all, Tobin's specific testimony about confirmation testing at Chestatee was patently untrue. Tobin testified on direct examination that the "majority" of testing at Chestatee and billed by or on behalf of Chestatee to UnitedHealth were confirmatory tests. Yet, on cross-examination, Tobin was forced to admit that her testimony in this regard about Chestatee was categorically untrue. What made this testimony particularly malicious is that the government's own trial exhibits clearly proved that almost all of the urine drug testing billed by or on behalf of Chestatee to UnitedHealth was for screening tests and not for confirmation as Tobin testified to during her direct examination. Indeed, at a sidebar, even the government admitted that Tobin's testimony about confirmation testing billed by or on behalf of Chestatee was simply not true, and invited impeachment of Tobin by counsel for Durall.

170.    Tobin's false testimony about the CPT codes and testing not being done at the rural hospitals was just another example of the lengths UnitedHealth was willing to go to avoid paying claims.  Even when confronted with indisputable evidence that no one, not Durall, not Zaffuto, no one, submitted a single claim with the POS Code 22 as UnitedHealth had represented to the government in documents produced in response to Grand Jury subpoenas and in interviews with government agents, UnitedHealth would not relent, and instead manufactured, through Tobin's trial testimony, an equally false theory designed to justify not paying claims that UnitedHealth was obligated to pay.

171.    On May 11, 2020, Charles Rochay, Vice President of Payment Integrity for Florida Blue ("Rochay"), testified that the data used to adjudicate the claims submitted for the benefit of Durall and Zaffuto through Campbellton-Graceville Hospital and Williston Regional Hospital

were the CPT code (which defines the services rendered), a diagnosis code, a place of service code (i.e., the POS Code 22, which was never submitted on any claim), the member information, and provider information. Furthermore, Rochay testified that he was not familiar with a 141 code.

172.    During his testimony, Rochay was forced to admit that the POS Code 22 found on all of the claims data spreadsheets provided to the government by Florida Blue in response to Grand Jury subpoenas, was not submitted by or on behalf of Durall, Zaffuto or any of the defendants on trial, and was instead placed on the claims data spreadsheets by Florida Blue. Indeed, Rochay was forced to admit there is not even a line on the UB-04 form to place the POS Code 22.  Rochay's testimony therefore proved that the spreadsheets relied upon the government as the basis for the criminal case were false, and statements by Florida Blue employees to the government that the claims submitted by or on behalf of Durall or Zaffuto included the POS Code 22 were also false.

173.    Rochay went on to testify to the following:

Q. So had Florida Blue known that drug testing whether it is qualitative testing or positive/negative testing or the more expensive or confirmatory testing, which is quantitative testing, if Florida Blue had known that that testing was not occurring at Campbellton-Graceville and at Regional General Hospital in Williston, would Florida Blue have paid those claims?

A. No.

174.    Conversely, if Florida Blue knew that the tests were being performed at those hospitals then Florida Blue would have been obligated to pay for the claims submitted for the benefit of Durall and his companies.

175.    On May 31, 2022, Addy Clark of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.  This review occurred days before two other Aetna employees testified at trial and offered false trial testimony as set forth below.

176.    On June 2, 2022, Theresa Jackson ("Jackson") of Aetna testified. During her testimony, Jackson was forced to admit that the POS Code 22, found on all of the claims data spreadsheets provided to the government by Aetna in response to Grand Jury subpoenas, was not submitted by or on behalf of Durall, Zaffuto or any of the defendants on trial, and was instead placed on the claims data spreadsheets by Aetna.  Indeed, Jackson was forced to admit that there is not even a line on the UB-04 form to place the POS Code 22. Even worse, Jackson admitted that on some of the spreadsheets provided to the government by Aetna in response to Grand Jury subpoenas, Aetna left off the 141 Type-of-Bill code that appeared on every claim, thereby making the claims data spreadsheets submitted by Aetna in response to the Grand Jury subpoenas even more corrupt. Jackson's testimony therefore proved that the spreadsheets relied upon the government as the basis for the criminal case were false, and statements by Aetna employees to the government that the claims submitted by or on behalf of Durall or Zaffuto included the POS Code 22 were also false.

177.    Jackson went on to testify that the POS Code 22 means "outpatient" and ideally outpatient means where a member goes to the hospital to receive a service. However, Jackson testified that the POS Code 22 can also mean that a service was merely performed even if someone did not go to the place of service, which contradicted her own Grand Jury testimony. When Jackson was cross-examined, she testified that the POS Code 22 means, "boots on the ground" and that Aetna treated the 22 code claims as though the person walked into the hospital.

178.    On June 3, 2022, Garrett Shohan of Aetna Special Investigations Unit testified and stated that in November 2016 he believed that all the testing for claims submitted for the benefit of Durall and Zaffuto from Campbellton-Graceville Hospital and Williston Regional Hospital were being conducted at Reliance Laboratory Testing.  He testified as follows:

Q:  Now, leaving Chestatee out of it…so forget about Chestatee…you reviewed data and did billing reports on several of the…looked at the billing data for several of these hospitals, correct?

A.  Correct.

Q. And were you able to determine that…leaving Chestatee aside…for the other hospitals, that the majority of tests were confirmation tests?

A. Yes.

Q. And if the confirmation tests do not…are not conducted at the hospital and, thus no sample comes to the hospital for confirmation tests, but those stay at the lab, are those samples that the confirmation test is run on being delivered to the hospital?

A. Not that I was aware of.

179.    Shohan also testified that Aetna was willing to reimburse for lab services but only to the entity that performed the services. Therefore, this testimony Mr. Shohan was extremely important to the government's purported case for fraudulent billing by Durall and Zaffuto because the billing data and claims paid as interpreted by Shohan showed confirmation tests were billed for and paid by Aetna and if the hospital could not perform confirmations, then the purported fraud was clear. Defendants again provided the false testimony that a majority of the tests performed were confirmation tests and not screening tests as the data establishes.

180.    In June of 2022, Kelly Grayson, Regional Vice President for Provider Solutions for Anthem and representing Georgia Blue, testified that if services were being rendered by the hospital, then the hospital could bill for the services. Grayson was shown an internal document from Anthem and Georgia Blue and was forced to admit that the document demonstrated that Anthem and Georgia Blue knew that the tests billed to Anthem and Georgia Blue by Chestatee were actually performed at Chestatee.  Therefore, the screening tests that were billed by Chestatee Regional Hospital were rightfully paid to Chestatee pursuant to the contract that Chestatee

Regional Hospital had with Anthem and Georgia Blue. Accordingly, Chestatee Regional Hospital should have never been involved in the criminal case at all.

181.    Immediately after Grayson testified, Carey Bobbitt, an Account Management Executive Adviser at Anthem and also representing Georgia Blue, testified on behalf of the government. During her testimony, Bobbitt was forced to admit that the POS Code 22, found on all of the claims data spreadsheets provided to the government by Anthem and Georgia Blue in response to Grand Jury subpoenas, was not submitted by or on behalf of Durall, Zaffuto or any of the defendants on trial, and was instead placed on the claims data spreadsheets by Anthem and Georgia Blue. Indeed, Bobbitt was forced to admit that there is not even a line on the UB-04 form to place the POS Code 22. Bobbitt's testimony therefore proved that the spreadsheets relied upon the government as the basis for the criminal case were false, and statements by Anthem and Georgia Blue employees to the government that the claims submitted by or on behalf of Durall or Zaffuto included the POS Code 22 were also false.

182.    After seven weeks of trial, which included a two-week stoppage because of a Covid-19 outbreak, the jury deliberated for three days and was unable to reach a verdict with respect to Durall and Zaffuto.

### *Second Trial Begins*

183.    On February 21, 2023, the second trial of the *United States vs. Aaron Durall and Neisha Zaffuto* commenced in Jacksonville, Florida. The trial was set for four (4) weeks before Judge Timothy Corrigan and a jury was impaneled.

184.    On February 22, 2023, Kelly Tobin of UnitedHealth was the government's first witness. Tobin testified as follows:

Q. Okay. Do you know what 141 means?

A. 141 stands for a specimen submitted for analysis to a hospital.

Q. Does it have anything to do with who the patient is?

A. Who the patient is?

Q. With the identity of the patient, the type of patient?

A. No, just that it's a patient. Or I'm sorry, that it's a non-patient meaning that it isn't an inpatient or outpatient.

Q. Is there other information that UHC would add in after the claim is submitted by the billing provider and comes through the warehouse, excuse me, comes through the clearinghouse to UHC, is there other information that UHC would add for its own purposes in that claim?

A. We do. Sometimes there's information where one code will signify where a service is being provided. A place of service may not be available or is not available on the UB-O4 or the 837I, and so our systems connect certain codes. Based on the hospital, it'll connect it to a place of service, so indicating where the service was provided. And we need that because we need a place of service to indicate where the claim or where the service was provided.

185.    Therefore, according to Tobin's testimony during the second trial, the POS Code 22 was inserted into the claim by UnitedHealth after it was submitted by Durall and Zaffuto, in order to provide a place of service for where the testing or service was provided. Ms. Tobin testified that when the 141 non-patient code was used by the facility, a 22 "outpatient code" would automatically populate to indicate a place of service for UnitedHealth's purposes.

186.    Further, Tobin testified regarding the substance of the information presented on the spreadsheets that UnitedHealth was falsely alleging contained the data that was submitted by Aaron Durall and Neisha Zaffuto:

Q. What's in column AM?

A. That's the servicing provider name.

Q. Okay. And what's the name that's there?

A. For this spreadsheet, it's Campbellton-Graceville Hospital.

Q. Okay. And so does that confirm that those are claims that were submitted by Campbellton-Graceville Hospital?

A. It does.

Q. And then let's look at column AS, as in sample. What are we seeing in column AS?

A. That's the billing provider NPI.

Q. Do you know what NPI number this is?

A. That would be the NPI for Campbellton-Graceville Hospital.

Q. Okay. And then we look in column AL. What's there?

A. AL, the servicing provider TIN or tax ID number.

Q. Ok. Now, now when a claim is submitted with the NPI number and the tax ID of Campbellton-Graceville Hospital, what is that telling UHC's computer system when it auto-adjudicated these claims?

A. It's telling us that this hospital is billing for services that they provided.

187.   Tobin's testimony unequivocally contradicted the necessity for the POS Code 22 which was purportedly needed in order to tell UnitedHealth where the service took place. The biller NPI and tax identification number specifically indicated to UnitedHealth where the services took place, and the assertion and previous testimony as to how and why the POS Code 22 was populated was false.

188.   Tobin continued to testify regarding the spreadsheets submitted by UnitedHealth to the government in response to the Grand Jury subpoenas as follows:

Q. And then in column J, what do we see there?

A. That's a…it says PROC code, or it stands for procedure code, or what we've been talking about as it relates to HCPCS or CPT codes.

Q. And then what's in column K?

A. Column K is a product description or a product code description, procedure code description.

Q. Okay. Is the…is there a relationship between the five-digit code in column J and the description in column K?

A. Yes. The…the description that's in K should describe the procedure code that's in column J.

189.    This testimony was similar to her testimony in the first trial, which indicated that the CPT code was a five-digit number, and the description right beside the CPT code was assigned by UnitedHealth that described or matched the code for what service UnitedHealth was paying for.

190.    Tobin further falsely and maliciously testified regarding the claims that were submitted to UnitedHealth and what was being paid for by UnitedHealth as follows:

Q. Okay. Now with respect to the Campbellton-Graceville Hospital and Williston Regional Hospital, did you look through and determine whether there was confirmatory testing billed for those hospitals?

A. I did.

Q. And in respect to those hospitals, did you make a determination about whether it was more confirmatory or more screening testing?

A. More confirmatory for those facilities.

Q. Okay. Was it significantly more?

A. Yes

191.    Again, this false testimony was similar to the testimony Tobin gave at the first trial - that the majority of the tests billed for at Campbellton-Graceville Hospital and Williston Regional Hospital were for *confirmatory* testing.

192.    On cross-examination, Tobin was questioned about the CPT codes and the descriptions of those CPT codes that were utilized at Campbellton-Graceville Hospital and Williston Regional Hospital. She testified as follows:

Q. And I think you testified earlier, with respect to the CPT code description, there is nothing on this form that allows a definition of a CPT code to be put on this form, correct?

A. That's correct.

Q. That definition is put on there in this case by United Healthcare?

A. Correct.

Q. That's where the descriptions come from, right?

A. On those spreadsheets, that's correct.

Q. And I believe you testified today and in prior proceedings that the definition of a CPT code fits the code, right?

A. The definition of CPT…

Q. The definition fits the CPT code. Whatever the definition is, it fits the code?

A. It's supposed to match to that, that's correct.

Q. It's supposed to match to that, right?

A. That's correct.

193.    Tobin went on to testify during cross-examination as follows:

Q. And you said that the spreadsheet descriptions fit the code?

A. They should, yes, in general.

Q. Campbellton-Graceville Hospital and Williston Regional Hospital you said the majority of the codes you saw, were confirmatory codes, right?

A. The majority of the testing was performed by those three facilities, yes, was confirmatory.

Q. By Campbellton-Graceville Hospital and Williston Regional Hospital?

A. Those two facilities.

194.    Tobin was then shown the claims data spreadsheet provided by UnitedHealth to the

government in response to Grand Jury subpoenas, showing that the tests performed and billed by

CGH were *screening* tests, and not confirmation tests as claimed by Tobin and others at UnitedHealth. Tobin testified as follows:

> Q. There's a whole lot of descriptors on the 1A(1) that are listed as a drug screen, aren't they?
>
> A. Correct. And the descriptor, there's a number of them listed as a drug screen.
>
> Q. And all those codes and those descriptions were put on there not by the hospital but by United Healthcare, correct?
>
> A. The codes were put on there by the hospital, but the descriptors were ours.
>
> Q. Those are your descriptors?
>
> A. The descriptors were placed in there by United, that's accurate.
>
> Q. And the majority of the descriptors on here are not confirmations, are they?
>
> A. The majority of the pieces that are listed on here are screening, that's correct.
>
> Q. That's correct?
>
> A. On this topic.

195.    Confronted by UnitedHealth's own claims data spreadsheets, Tobin was forced to admit that, contrary to her own testimony, the vast majority of the tests performed at and billed by CGH were in fact screening tests, and not confirmations.

196.    Tobin was then asked if there was anything else she testified to during the first trial that was not true. The following excerpt demonstrates this exchange:

> Q. And I asked you as well if there was anything else in your testimony before that wasn't quite right? Do you remember that?
>
> A. I do.
>
> Q. And I want to ask you again: Was there anything else in your testimony from that earlier proceeding that was not right?
>
> A. Not that I recall.

Q. Okay. Now, you were asked during that prior testimony about codes and spreadsheets and things of that nature; is that right?

A. I was.

Q. And you were asked the following question: Now, if you look down column J, the procedure codes, the CPT codes, do you see codes for confirmation testing? Is that right?

A. I did.

Q. And your answer was: I do. Do you remember that?

A. I do.

Q. And then you were asked: Okay. What are some of those codes, if you know? Do you remember that?

A. I do.

Q. And you answered: 80320 and 80324. Now, 80324 on this very spreadsheet is not described as a confirmatory code, is it?

A. The descriptor says drug screen quant on one and drug screen on the other.

Q. And drug screen is not a confirmation test, is it?

A. Drug screening means presumptive.

Q. And a drug screen is not a confirmation?

A. A drug screen is not a confirmation that's correct.

Q. But you testified at the trial it was a confirmation?

A. I testified at the trial that 80324 was a confirmation test.

197.    In this excerpt, Tobin again admitted that her prior testimony -- that the CPT codes were for confirmatory tests -- was false, as the descriptions on UnitedHealth's own spreadsheets identified these as screening tests.

198.    Tobin testified further about these screening tests:

Q. And we have run through a whole lot of these codes haven't we, Ms. Tobin?

A. We have.

Q. And the vast majority of the descriptors on that spreadsheet are drug screens?

A. A number of the descriptors on there were drug screens, correct.

Q. The vast majority of them?

A. A large number of the drug screens were, correct.

Q. And the vast majority of the drug…of the descriptors on Williston Regional Hospital are also drug screens.

A. Correct.

Q. And all of the descriptors on 1C(1) were drug screens?

A. For Chestatee, correct.

199.    As noted above, during cross examination in the second trial, Tobin was forced to admit that the vast majority of the tests on UnitedHealth's own claims data spreadsheets established that the majority of the tests billed by CHG, RGH and Chestatee were screening tests, and that her earlier testimony, that they were confirmation tests, was simply not true.

200.    Later in the second trial, Theresa Jackson of Aetna testified regarding her employment history with Aetna and the positions that she has held over her twenty-seven (27) year career. Jackson testified that she had a variety of positions from data entry operator, claims processor/claims analyst, plan sponsor services meaning that she worked directly with Aetna customers, behavioral health organization, compliance organization and was then working as the lead director for Aetna's provider relations for the southeastern portion of the United States.

201.    Jackson testified as follows about CPT codes:

Q. The procedure codes, are you familiar with CPT codes?

A. Yes, I am.

Q. And does that appear to be, AX, CPT codes that are submitted with the claim?

A. Yes, they are.

Q. And AY, is that an interpretation of the CPT code that's provided?

A. No. That is the full CPT description of what was billed.

Q. There's a place of service code 22. What is that?

A. That means that services were taking place somewhere at the hospital, and the member was not confined. There was no room and board.

Q. So it means just something happened at the hospital?

A. That is correct.

202.    Through this testimony, Jackson changed her understanding of the meaning of the POS Code 22 from the explanation she provided to the Grand Jury. Before the Grand Jury, Jackson testified that the POS Code 22 meant that a member went to the hospital, had a procedure done and left the hospital the same day.

203.    On cross examination, Jackson testified as follows about the 141 Place of Service code and how the CPT codes got assigned the description:

Q. First of all, hospitals are allowed to bill with a type of bill 141, correct?

A. Yes, they are.

Q. And so if a sample from a non-patient goes to a hospital and it is tested at that hospital, that hospital can bill it, right?

A. If it is tested at the hospital, yes.

Q. Okay. And the CPT code what goes there is a number, right, or a series of numbers or letters or some iteration of that?

A. Right. As…as it says, HCPCS. So, there could also be letters as well as numbers. So, numbers are CPT. Letters are HCPCS.

Q. And there is no description on here. The description is put there by Aetna when the claim comes in?

A. Yes. I mean it's assigned.

Q. Right? So, when a…when a hospital submits a bill, they submit what the code is and Aetna attaches the description to it in those spreadsheets we've seen, right?

A. That is correct.

204.     Jackson continued to testify on cross-examination about the POS Code 22 and the

false statements she provided during her initial interview with the government and before the

Grand Jury. She testified as follows:

Q. You know the claims spreadsheets, they're difficult to understand; do you agree?

A. Yes, they are.

Q. And you've had a lot of experience with those claim spreadsheets?

A. Yes, I have.

Q. Okay. And so the spreadsheets were provided to the government in 2018 or 2019.

A. I believe so.

Q. Okay. And after the claims spreadsheets were provided to the government, did there ever come a time that you were asked to participate in an interview with the government to explain those claim spreadsheets?

A. Yes, I was.

Q. And that was in March of 2019; is that right?

A. I believe so.

Q. Okay. And the people that you spoke with were Mr. Duva and Mr. Winters?

A. Yes.

Q. And there came a time during the course of that interview that they asked you about the specific spreadsheets for at least Campbellton-Graceville Hospital that we've heard about. Do you remember that?

A. I remember going over spreadsheets.

Q. Okay. And that spreadsheets you went over were very similar to the spreadsheets we've seen today, right?

A. Yes.

Q. Okay. And do you recall being asked certain questions about the 22 code on those spreadsheets?

A. Yes.

Q. Okay. Did you tell the government that the claims had the 22 code in the HCPCS place of service field? Do you remember that?

A. On the CMS-1500, yes.[3]

Q. And do you remember telling the government that the claims had the 22 code? Do you remember telling them that?

A. I don't recall that, but if you want to show it to me. I'm not disputing that I did or I didn't say it.

Q. That would be inaccurate if you said that to the government, right?

A. Yes.

Q. Okay. And do you recall saying that looking at the Campbellton-Graceville Hospital claims, you advised the claims appear to be for patients at Campbellton-Graceville Hospital? Do you remember telling the government that?

A. Yes.

Q. And you now know that the patients were not at Campbellton-Graceville Hospital, right?

A. I do now.

Q. But at the time, when the government was seeking an explanation about these claims spreadsheets, you told the government that it appeared that the patients were at the hospital, right?

A. Yes.

205.    Through this testimony, Jackson admitted that the information she gave the government in March 2019, right before she testified before the Grand Jury, was false and

---

[3] This was actually incorrect because every claim was billed on a UB-04 and not a CMS HFCA 1500.

inaccurate. Jackson had the opportunity to correct her inaccuracies and false Grand Jury testimony during the first criminal trial, but she never did, and only made this admission upon cross-examination by Mr. Durall's attorney during the second criminal trial.

206.    In fact, Jackson tried to justify her false testimony during the second trial in later cross-examination.  Jackson testified as follows:

> Q. Going back to the interview that you did there in March 2019, do you recall telling the government that the claims data appeared to show that the patients were physically at Campbellton-Graceville Hospital?
>
> A. Yes.
>
> Q. And that was inaccurate?
>
> A. Based on the data I was looking at then and my understanding of the data, it was not inaccurate.
>
> Q. Well the data you were looking at showed that all the claims were submitted by the hospitals, right?
>
> A. Yes.
>
> Q. All of them were submitted on the UB-O4, right?
>
> A. 837, correct.
>
> Q. All of those claims…none of those claims had a 22 code on there, right?
>
> A. Correct.
>
> Q. All of the claims were submitted on a type of bill 141?
>
> A. I will not agree to that.[4]
>
> Q. You won't agree to that? Okay. But all the claims showed a 22 code on there. You'd agree with that, wouldn't you?
>
> A. Yes.

---

[4] Ms. Jackson was again inaccurate.  Every claim submitted by Durall and Zaffuto for urine testing was submitted with a 141 code.

Q. And the 22 code, you told the government, said that the patients were physically at the hospital?

A. Yes.

Q. And that was not correct?

A. Not correct if it was with the 141.

Q. Okay. Now, you were interviewed, I think I said, in March of 2019, right?

A. Yes.

Q. And after you were interviewed in March of 2019, you then testified before the Grand Jury?

A. Yes.

Q. And the Grand Jury that returned the indictment in this case?

A. Yes.

Q. Did you know that you were the only insurance witness that testified in the grand jury?

A. No, I was not.

Q. Okay. And you testified on June 5, 2019, is that right?

A. Yes.

Q. And you were asked questions by Mr. Duva?

A. I believe so.

Q. Okay. And you don't remember every question that you were asked in the Grand Jury, do you?

A. No. I don't remember most of it.

Q. And this was just a few months after you had been interviewed in March of 2019 about the claims data, right?

A. Yes.

Q. And your statements about the patients being physically at the hospital, right?

A. That is correct.

Q. Okay. And in the Grand Jury, you were shown…or discussed the claims data with the Grand Jury, didn't you?

A. Yes.

Q. And you were asked certain questions about the claims data?

A. Yes.

Q. And do you recall being asked the following question and giving the following answer: Question: Now, there's a specific code 22. What is that Aetna code 22? What does that mean? Answer: Code 22 translates to outpatient services, meaning you walked into the hospital, had a service done, and at some point, you left on the same day. Do you recall being asked that question and giving that answer to the Grand Jury that charged this case?

A.  Yes.

Q. That information is inaccurate, correct?

A. No.

Q. Well, you were suggesting to the Grand Jury, were you not, in your testimony, that for the claims in this case, the patients walked into the hospital, quote, "had a service done, and at some point, left on the same day"?

A. Yes. That was based on the information that I had.

Q. And, again, in the information you had was the claims data, right?

A. Yes.

Q. And you now know that did not happen at all in this case, right?

A. Not in all circumstances.

Q. In fact, what the evidence has shown is that the samples were being sent to the hospitals to be tested. Did you know that?

A. Like I said. I testified on the information that I had.

Q. Do you recall being asked a follow-up question by Mr. Duva?

A. I'm sure I was.

Q. Do you recall being asked the following question and giving the following answer: Question: So it contemplates on outpatient service where a patient actually goes to the hospital, walks in the doors, has some kind of procedure, some sort of testing and walks out the door? Answer: Yes, sir.

Q. Okay. And you would agree with me, like the prior question and answer, that that has nothing to do with what happened in this case, right?

A. No. I'm telling you my answers were based on the information that I had at the time.

Q. I understand that, ma'am. But what…the information you had at the time led you to provide inaccurate information to the Grand Jury, correct?

A. It's not completely inaccurate.

Q. Well, in this case, you know that the evidence shows that the samples were going to these hospitals to be tested and not the patients, right?

A. I have not seen the evidence.

Q. Okay. Do you know that the patients were not going to any of these hospitals?

A. That's what I am hearing, but that was not part of what I was testifying to. I'm looking at claim data and explaining how data is managed.

Q. When did you first hear that the patients were not going to the hospitals?

A. I heard that there were some that were not going to the hospitals. And then as the case progressed, then I started learning that there were no patients going to the hospital, even though that not what the data that I had looked at reflected in all cases.

Q. And the data you have is data that was a compilation of information that was submitted by the hospitals and information that was added to the spreadsheets by Aetna through the claims adjudication process, right?

A. That is correct.

207. This trial testimony by Jackson plainly established that Jackson gave repeated false statements to the government during her interview and false testimony before the Grand Jury which ultimately caused Durall and Zaffuto to be wrongfully indicted because *all* of the toxicology samples were being tested *at the hospitals*. Jackson admitted that "if the samples were being tested at the hospital, then Aetna is obligated to pay for the service".

208.     Jackson continued to be cross examined regarding the claims data on the Aetna claims data spreadsheets, specifically about the CPT codes, how the definition for services was obtained and what was paid for by Aetna. Ms. Jackson testified as follows:

Q. And we saw the policy document, 540, the drug screen codes were in that document, right?

A. Yes.

Q. And they were 80320 to 80377, right? Those are drug screen codes, right?

A. Yes.

Q. You see 82542 says it's a drug screen, too, right?

A. Yes.

Q. And it says 83789 is a drug screen, right?

A. Yes.

Q. So looking in the middle of the document, do you see, Ms. Jackson, 80324? It says drug screen, right?

A. Yes

Q. And if you go right, a couple of lines below that, 80358 says drug screen?

A. Yes.

Q. And 80365, it says drug screen?

A. Yes.

Q. Right below that 80372, it says drug screen, right?

A. Yes.

Q. 80353, drug screen, right?

A. Yes.

Q. And a little bit further down, 80345, drug screen, right?

A. Yes.

Q. Now with respect to the other spreadsheets, would the definitions that these are all drug screens be the same? And so I'm talking about 1K, 1K(1), 1L, 1L(1), 1M and 1M(1). The descriptions of the codes that were billed, they would all be the same?

A. Yes, they're industry standard.

Q. And so these are all drug screen codes that we're talking about, right?

A. Yes.

209.    Jackson unequivocally testified that the majority of the CPT codes billed by Durall and Zaffuto for all the hospitals were for *screening* tests and not confirmatory tests.

210.    Later in the trial, Garrett Shohan, Director of the Special Investigations Unit with Aetna, testified regarding the investigation that he performed since 2016.  Shohan testified as follows:

Q. And this analysis, what, if anything, did you learn about a 141 code?

A. Over time, I had learned that the…the type of bill 141 is for a non-patient.

Q. So did that change your understanding of whether the patients were presenting to the hospital or not?

A. Yes.

Q. So while at first you might have thought…are you familiar with what a 22 code is, a place of service code?

A. Yes.

Q. Did you ever think that the patients were actually coming to the hospital, given all these addresses?

A. No. Based off of…you know, if there were some local patients in drug treatment centers in Florida, perhaps. But then I started to see that there were patients coming in from…there were samples coming in from all over the United States, so it was pretty…I learned pretty quickly that, you know, patients were not presenting to the hospital.

Q. Okay. And so did there come a time as your investigation progressed that you started to communicate some of your findings to other people at Aetna?

A. Yes.

Q. And is that something you did commonly?

A. Yes.

Q. And, by the way, this investigation period…and we're going to get to some other exhibits in a second, but how long approximately, did it last?

A. Well, it started in around July 2016, and, you know, it tailed out in 2018.

Q. At this time, did you still think that the hospitals were not performing any kind of urine drug testing at the hospital?

A. I still believed that at that time. And then especially when I was reviewing the lab reports that I…I told Cheryl about, that they were identical, that led me to kind of still believe that Reliance was actually the one doing the testing; it was just being billed for Chestatee.[5]

Q. Okay. And have you since come to learn that Chestatee was performing at least drug screening testing?

A. I have learned that.

Q. And have you learned that Campbellton-Graceville Hospital and Williston Regional Hospital have performed drug screening testing as well?

A. Yes.

211.    On cross-examination, Shohan testified that he did not believe there was testing occurring at any of the hospitals while he investigated the hospitals beginning in 2016 through 2022. Shohan then revealed, also during cross examination, how he learned that testing was being completed at the hospitals and he testified follows:

Q. When did you come to learn that large amounts of screening tests were actually performed at the hospitals?

A. Just recently through a conversation with the government.

Q. Would that be Mr. Hayes?

A. Yes.

---

[5] Given that Durall owed both the Chestatee and Reliance it would be fairly common that he would have his entities' reports look the same.

Q. Mr. Hayes told you that, in fact, vast amounts of screening tests were done at these, hospitals, right?

A. He told me screenings were…had been done at the hospitals, yes.

212.    Despite years of investigation and a criminal prosecution Durall and Zaffuto, and an initial that included uncontroverted evidence of tens of thousands of *screening* tests performed *at the rural hospitals*, Shohan testified that he had only learned "recently" that vast amounts of screening tests had actually been performed at the rural hospitals. This testimony is shocking and demonstrates the malicious conduct by Aetna in this case.

213.    On February 26, 2023, Shohan was cross-examined about the POS Code 22, and when he gained the knowledge that patients at issue were not physically going to the hospitals. Shohan testified as follows:

Q. Okay. If…if…according to the testimony on direct, you got involved in the investigation in July, certainly in August, of 2016…correct?

A. Yes.

Q. So when did it change…vis-à-vis the place of service code 22, when did it change to another focus?

A. Well, the investigation started with the CPT codes we discussed. And then it moved on to the…place of service code, how were these patients presenting. Fairly quickly, you know, based on my claims data analysis review, you know, I realized these patients were from all over the United States. So I…it was fairly quickly that I determined that. You know, I knew they weren't presenting to the hospital. I don't have an exact day for you.

Q. So if it went from the codes, CPT codes, to place of service 22, when did you come off of "place of service 22" as being factually accurate?

A. I can't answer that.

Q. Well, are we talking about 2017 or 2018?

A. It would have been in 2016. It would have been the same…

Q. In 2016.

A. Right.

Q. So you knew the place of service code 22 did not mean, through your investigation, that patients physically went to the hospitals sometime…give you the whole year 2016, the end of 2016, correct?

A. Fair enough.

Q. When did you tell the government, in your five interviews, that the place of service code 22 did not come from the billers but was placed on the spreadsheets or the claims from Aetna by Aetna?

A. That's something I would have never said.

Q. You never said that?

A. Right.

Q. You never told the government in five interviews that the place of service code 22 was not placed there by the billers, it was placed there by Aetna, correct?

A. Correct.

214.    Shohan later testified on cross-examination about confirmation testing at the hospitals and testified regarding that topic as follows:

Q. There are times when screens can be just as costly as confirmations, correct?

A. Yes.

Q. And I'm not going to delve into it, but you can't tell us under what circumstances a screen is more expensive or whether a confirmation is more expensive, correct?

A. It would depend on the reimbursement in the plan. Some plan designs pay differently. Some pay higher than others; some pay lower than others. Reimbursement is generally driven by the plan. Some of our self-funded plans, you know, they may have a higher reimbursement rate set than some of the other ones. Some pay percentage of Medicare, some pay the contracted…you know, our contracted rates, and some pay higher.

Q. Okay. So you can't just make a conclusive statement that confirmations always cost more or screens always cost less, correct?

A. Correct.

215.    On redirect examination, the government attempted to get Shohan to testify that the vast majority of the tests billed by the rural hospitals were for confirmation testing, but Shohan could not offer any such testimony.  Shohan testified as follows:

Q. What if anything, did the data analysis show you have the relationship between confirmation tests…excuse me…screening tests in this case?

A. I'm not sure…can you…

Q. We're there more screening tests or were there more confirmation tests billed more in this case, based on the data you reviewed?

A. I don't recall offhand which one they were.

Q. Were there confirmation tests billed for?

A. I don't…I would have to see the data.

Q. Okay. But you reviewed the data and there were confirmation tests billed for, correct?

A. Yes.

216.    Later in the second trial, Carey Bobbitt of Anthem and representing Georgia Blue, testified about the contract that Chestatee had with Georgia Blue and Anthem, CPT code definitions and how Georgia Blue and Anthem adjudicated claims. Bobbitt was cross-examined about a variety of matters, including a document from 2017 showing that Georgia Blue and Anthem knew that the samples sent to Chestatee were being tested *at the hospital*, and that Georgia Blue and Anthem was therefore obligated to pay the claims pursuant to the contract.  In the same document, Anthem admitted that the problem with the testing performed at Chestatee for Georgia Blue and Anthem was that Georgia Blue and Anthem did not have a lab fee schedule with Chestatee, and therefore was obligated to pay a percentage of the billed charge, which amounted to thousands of dollars per test.  The document provides the motive for Georgia Blue and Anthem's malicious conduct: faced with an obligation to pay these claims on a percentage of the billed

charge, Georgia Blue and Anthem attempted to avoid paying those claims by providing false information to the government about the hospitals using a POS Code 22.

217.    Later in the trial, government witness Kyle Marcotte was cross examined on the topic of the insurance companies' unwillingness to reimburse for substance abuse services for out of network providers. Mr. Marcotte testified as follows:

> Q. I want to start with something you said during your direct testimony about…and I think I heard this correctly, that insurance companies will "bleed you dry". Do you remember saying that?
>
> A. Yes.
>
> Q. Okay. And what you meant by that is, particularly in the industry that you're in, if private insurance companies start paying claims, there's going to come a time when they're going to try and shut you down?
>
> A. Yes.
>
> Q. And you've had that experience throughout your career in the industry?
>
> A. Correct.
>
> Q. Regardless of whether there's any validity to what the insurance companies are doing or not?
>
> A. Yes.
>
> Q. Insurance companies do not want to pay for urine testing, right?
>
> A. No. I mean, they do pay or it, but…
>
> Q. But when they start paying for it, they're going to find a way to stop paying for it, right?
>
> A. Yes, in my experience.
>
> Q. And they are going to bleed you dry?
>
> A. Yes.

218.    Marcotte later testified about Marcotte's plea agreement in which Marcotte agreed to plead guilty to conspiracy to commit money laundering charge in July 2019. Marcotte testified as follows.

Q. And you were charged in this case, but not by way of an indictment, right?

A. No.

Q. You were not indicted by any sort of grand jury, right?

A. No.

Q. You were indicted by…or you were charged by way of what's called an information, right?

A. Yes.

Q. And with respect to this information, it's actually written by the government, right?

A. Yes.

Q. And you don't get a chance to write it, do you?

A. No.

Q. They write it?

A. Yes.

Q. They (the government) say what it is that you did?

A. Yes.

Q. Now, in this particular case, I've had the benefit of receiving tens of millions of pages of documents of discovery from the government; did you know that?

A. It doesn't surprise me.

Q. In your case, with the information, you didn't get any discovery in advance of the filing of that, did you?

A. No.

Q. Okay. You had to rely on the word of the prosecutors in the case about what was going on, right?

A. Yes.

Q. Okay. You didn't get Excel spreadsheets in advance of that information being filed?

A. No.

Q. You didn't get billing data in advance of that getting filed?

A. No.

Q. You didn't get emails from any of the insurance companies in advance of that being filed?

A. No.

Q. You didn't get reports of interview of any of the witnesses in this case before it was filed, right?

A. No.

Q. All you got was essentially what the government said, right?

A. Yes.

Q. Okay. I'm going to ask you if you recall the specific facts that were contained in this document about what was reportedly false in the claims submitted by the various hospitals in this case. Do you remember specifically what was alleged in this information about that?

A. I would need you to read it to me or see it.

Q. In fact, the information says that the claims were materially false, and fraudulent and that they falsely claim that Chestatee and other hospitals conducted the UDTs when, in fact, the UDTs were conducted primarily at laboratory A. Do you see that?

A. Yes.

Q. Do you understand laboratory A to be Reliance?

A. Yes.

Q. So the allegation is that the tests were done at Reliance and not at the hospital, right? That's the first part of it, right? That's the first part?

A. Yes, that's what they're saying, yes.

Q. And you heard testimony…I asked you before, that we've heard lots of testimony about how, in fact, the samples were tested at the hospitals. Did you know that?

A. I don't know where the tests were ran.

Q. Well, if, in fact, that were true, the allegation is not true in this information, is it?

A. That's correct.

Q. Right?

A. Yes.

Q. Because the tests were being done at the hospital, unlike what it says in this information, right?

A. Correct.

Q. Okay. And it goes on to say that the tests were conducted primarily at laboratory A for…and it says, quote, "Individuals who were not inpatients or outpatients of Chestatee or the other hospitals," right?

A. Yes.

Q. You had no way of knowing if things were billed as inpatients or outpatients, right?

A. We, I…no, I didn't know how they were billed, but I know where the patients were, because they were my patients.

Q. The patients weren't physically going to any of these hospitals, right?

A. Correct.

Q. But they made it seem in this information like they had been billed as if the patients were inpatients or outpatients at the hospital, right?

A. If that's what is says, yes.

Q. That is what the information says, isn't it?

A. Yes.
Q. You just read it, right?

A. Yes.

Q. And this is what the government told you, because the government is the one who filed this document, right?

A. Yes.

Q. And you relied on the representations in this information as the first part of your cooperation in this case, right?

A. Yes.

219.    This testimony by Marcotte proved that the government relied on the false claims data spreadsheets provided by the Defendants in response to the Grand Jury subpoenas in order to convince Marcotte to plead guilty in July 2019.  Marcotte was told by the government that the Defendants' claims data spreadsheets showed that the patients were being billed as though they were inpatients or outpatients of the rural hospitals through the POS Code 22.  Unbeknownst to the government at the time, the insurance companies' representations about the POS Code 22, which the government relied upon to convince Marcotte to plead guilty, was false.

220.    Marcotte later testified at the trial about his Grand Jury testimony on January 22, 2020, explaining it as follows:

Q. You testified in front of a grand jury, correct?

A. Yes.

Q. And you were placed under oath, right?

A. Yes.

Q. So…and, by the way, these questions also came from Mr. Duva, right?

A. Yes.

Q. Okay. So the…as far as you knew, the individuals in recovery at Beaches had no connection whatsoever with Chestatee? Is that accurate?

A. Yes

Q. Question: "How about the KTL Labs side, where KTL Labs is recruiting recovery centers to send urine directly to Reliance? Was it also your understanding that these individuals and this recovery enters or sober homes had no connection to Chestatee whatsoever as well?" Answer: "Yes, there was no connection at all. Do you recall being asked and giving that answer?"

A. Yes.

Q. The last question: "Did any of your patients…talking about referrals here, I'm talking about actual patients…ever go to Chestatee?" Answer: "No. No, not that I'm aware of."

221.    The plain import of this testimony by Marcotte before the Grand Jury was that the patients of Beaches Recovery never went to Chestatee, and that this is what the government believed rendered the claims false.  The government had been misled by the Defendants, who had provided false documents, false testimony before the Grand Jury that all of the claims billed by or on behalf of the rural hospitals were billed with the POS Code 22.  That misleading information from the Defendants led the government to elicit false testimony from Marcotte before the Grand Jury.

222.    Marcotte later testified as follows about laboratory testing:

Q. And the connection between your patient and those other labs is that the urine went to the…those other labs, right?

A. Yes.

Q. And those other labs tested the samples, right?

A. Yes.

Q. And so when it comes to urine having a connection to Chestatee Hospital, if the sample is tested at Chestatee, it, in fact, has a connection, doesn't it?

A. Yeah. I mean, in the sense of, yes, for them being tested.

Q. So when you're asking questions about whether the urine samples from your patients had any connection to Chestatee, if your urine samples had been tested at Chestatee, there is a connection, isn't there?

A. In…yes, the same as any other lab.

223.    Marcotte testified that the connection for any of the patients to these hospitals would be that their samples were tested at the hospital. Moreover, the interview of lab manager Lisa Zini, on May 10, 2019, where she stated that the thousands of samples sent to Chestatee Regional Hospital were tested as drug screens was evidence that there was a connection between these patients and Chestatee Regional Hospital. Furthermore, Gary Ayers, the lab manager at Campbellton-Graceville Hospital, and Arceli Encinzo, the lab manager at Williston Regional Hospital, both testified that Reliance specimens were being tested at the hospitals. Defendants' false and malicious narrative that the patients actually went to the hospitals was quite evident throughout the wrongful prosecution of Durall and Zaffuto and was the real fraud that was promoted since August 2016 to the government, Grand Jury and two separate criminal juries. Defendants knew there was no fraud committed by Durall and Zaffuto, so they tried to reduce or eliminate the money owed to Durall and Zaffuto through this malicious prosecution.

224.    At the conclusion of the second criminal trial, after a short deliberation, Durall and Zaffuto were exonerated of all charges by the jury.

225.    Despite their exoneration, Defendants' false and malicious conduct ruined Durall and Zaffuto's lives.  Based on Defendants' falsely implicating Durall and Zaffuto in criminal wrongdoing despite knowing that they were innocent and had committed no crime, Durall and Zaffuto were indicted. They spent years fighting these false charges until they were vindicated.

226.    The consequences of the Defendants' misconduct cannot be understated.  Durall's reputation as an attorney and businessman is in tatters, and Reliance was forced to shut its doors. Similarly, Zaffuto's reputation is ruined, and Medivance, the billing company she built over the course of years, was also shuttered. The Defendants' false accusations ended their careers in

healthcare.  Durall and Zaffuto were forced out of the hospital industry completely, and lost hundreds of millions of dollars.

227.    Durall and Zaffuto's arrest and charges were highly publicized.  They will never be able to fully rebuild their personal and professional reputations. Nor will they be able to renew the business and compensation opportunities that they lost as a result of the Defendants' false and malicious statements and conduct.

228.    Based on the Defendants' actions, including providing false evidence to the government, false testimony before the Grand Jury, and false testimony at trial, these private insurance companies bear responsibility for their malicious prosecution of Plaintiffs, abuse of process and defamation.  Plaintiffs bring this action for damages resulting from the conspiracy perpetrated by Defendants to harm Plaintiffs and force them to cease doing business, and which ultimately resulted in a malicious prosecution and abuse of process of Plaintiffs.

## CAUSES OF ACTION

### Count 1 - CIVIL REMEDIES FOR CRIMINAL ACTIVITIES
**(Against Florida Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

229.    This Count alleges claims against Defendant, Florida Blue, under the Florida Civil Remedies for Criminal Practices Act, codified in Chapter 772 of the Florida Statutes, asserting a statutory right of action against Defendants Florida Blue, Georgia Blue, UnitedHealth, Anthem and Aetna, for its conduct of, or participation in, an enterprise through a pattern of criminal activity in violation of Sections 772.103(3) of the Florida Statutes.

230.    Pursuant to Section 772.103(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation,…or other legal entity,…or group of individuals

associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

231.    Section 772.103(3) further provides that it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of criminal activity*…."

232.    At all times relevant hereto, each of the Defendants were an association-in-fact "enterprise" within the meaning of Sections 772.102(3) and 772.103(3).  The Defendants and other members and associates of the Enterprise had connections and relationships with one another and with the Enterprise.  The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise operated in Broward County, Florida, and elsewhere, for a period of time sufficient to permit its members and associates to pursue its objectives.

233.    Each of the Defendants, by, through and with its officers, employees, agents, or representatives, devised or engaged in a scheme where they were associated with the Enterprise to conduct or participate, directly or indirectly, in such Enterprise through a pattern of criminal activity.

234.    Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents."  Fla. Stat. §772.102(4).

235.    The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes the following related incidents of criminal activity and racketeering activity over an extended period of time, as more specifically set forth above:

a. Conspiracy to Violate the Florida Communications Act, in violation of Section 817.034, by engaging in a scheme to defraud and in furtherance of that scheme, used electronic mail communications to obtain property from that person, in that employees, agents or representatives of Defendants transmitted numerous emails between and amongst each other, and to Plaintiffs, as part of a scheme to deprive Plaintiffs of money from Plaintiffs;

b. Conspiracy to Commit Perjury in Official Proceedings, in violation of Section 837.02, by making false statements, which he or she does not believe to be true, under oath in an official proceeding in regards to any material matter, in that employees, agents or representatives of Defendants testified falsely before a federal grand jury and during multiple criminal trials, about a variety of material matters, including false testimony about the type of testing performed at the rural hospitals, the type of testing billed by the rural hospitals to the Defendants, and specific codes included on claims submitted by the rural hospitals to the Defendants;

c. Conspiracy to Make False Reports to Law Enforcement Authorities, in violation of Section 837.05, by knowingly giving false information to law enforcement officers concerning the alleged commission of any crime, in that Defendants provided false information and false documents to the agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participated in a scheme to defraud Defendants;

d. Conspiracy to Make False Reports of Commission of Crimes, in violation of Section 817.49, by willfully imparting, conveying, or causing to be imparted or conveyed to a law enforcement officer or employee of a public safety agency false information or reports concerning the alleged commission of a crime by Plaintiffs,

knowing such information or report to be false, and when no such crime had
actually been committed, in that Defendants provided false information and false
documents to agents with the FBI and OPM-OIG falsely claiming that Plaintiffs
and others participate in a scheme to defraud Defendants;

e.  Conspiracy to Fabricate Physical Evidence, in violation of Section 918.13, by
making, presenting or using any record, document, or other item, knowing it to be
false, during the investigation of Plaintiffs by law enforcement and later during the
criminal trials of Plaintiffs, in that Defendants provided false billing data and false
billing documents to agents with the FBI and OPM-OIG, and to members of the
United States Department of Justice during the investigation of Plaintiffs, and later
during the criminal trial of Plaintiffs in the Middle District of Florida.

236.   The criminal activity of Defendants occurred repeatedly for more than five years,
were continuous, and were not isolated incidents or events.

237.   The criminal acts of Defendants constitute a pattern of criminal activity in that they
have similar intents, results and methods.

238.   Each Defendant played a role in the management or operation of the scheme
perpetrated by and through the Enterprise.

239.   The Defendants' pattern of racketeering activity is related because it manifests in
the same or similar methods of commission having related characteristics perpetrated for the same
objectives against the same or similar victims, including Plaintiffs.  These other victims include
the rural hospitals set forth herein, and other independent laboratories similar to Reliance, such as
Lifebrite Laboratories, Sun Toxicology, Mission Toxicology, Advance Clinical Laboratory
Services, Aspen Hill Diagnostics, Auspicious Laboratory, Avutox Laboratories, Assurance

Scientific Laboratories, Axis Diagnostics Laboratory, Certus Laboratories, Complete Toxicology, Eclipse Toxicology, Elite Diagnostics, Hill Country Toxicology, Laboratory Service of America, Qualitox Laboratories, Principal Labs, B3 Diagnostic Laboratory, Central Clinical Laboratory, Cadira Labs, Sera Dynamics and Complete Recovery Lab, among others.

240.    The criminal enterprise gained considerable consideration from the pattern of racketeering activity, by failing to pay valid claims submitted for payment by Plaintiffs and others, and Defendants will continue to profit financially from this pattern of racketeering activity.

241.    The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of Section 772.103(3) and the predicate acts enumerated above.

242.    Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

243.    Defendants are therefore liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees pursuant to Section 772.104(1).

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Florida Blue, for damages in the amount of three times the actual damages sustained by the Plaintiffs; reasonable attorneys' fees and costs; punitive damages and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

## Count 2 - MALICIOUS PROSECUTION
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

244.     This is an action seeking compensatory damages for malicious prosecution relative to the criminal prosecution against Plaintiffs known as *United States v. Aaron Durall, Neisha Zaffuto, et al.*, Court Docket No. 3:20-cr-86 (M.D. Florida) (the "Criminal Case").

245.     On or about August of 2018, Defendant, Florida Blue provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida false information, including a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Florida Blue, for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital. A review of these spreadsheets showed, among other things, that Defendant, Florida Blue, provided the government with a column of data for the "place of service" for the claims submitted, and that for virtually every claim submitted, the "place of service" code is denoted with a "22" place of service code.

246.     The POS Code 22 is a code that represents to private insurers that the patient was physically present at the hospital as an outpatient, had tests performed at the hospital, and left that same day.

247.     In the Criminal Case, it was undisputed that the patients were never physically present as patients (inpatient or outpatient) of Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and/or Regional General Hospital. Thus, if Plaintiffs included a POS Code 22 on each claim submitted to Defendant, Florida Blue, as Defendant's spreadsheets of claims data provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida showed, each claim submitted by Plaintiffs would have been false and fraudulent.

248.     However, the information provided by Defendant, Florida Blue, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida about the Plaintiffs' submitting claims with a POS Code 22 was false, malicious and lacked probable cause.

249.     Plaintiffs never placed a POS Code 22 on any claims that were at issue in the Criminal Case. A careful review of the evidence in the Criminal Case revealed that it was Defendant, Florida Blue, and not the Plaintiffs, that placed POS Code 22 on all of the subject claims.

250.     Nevertheless, the discovery in the Criminal Case revealed that the government relied on the information provided by Defendant, Florida Blue, in the claims data about the POS Code 22 in prosecuting the Criminal Case against Plaintiffs.

251.     Once it was revealed that Plaintiffs did not place the POS Code 22 on the subject claims, Defendant, Florida Blue, then falsely and maliciously alleged that Plaintiffs billed and were paid for confirmation tests that we not performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and/or Regional General Hospital. This false and malicious allegation also lacked probable cause.

252.     Accordingly, at all material times herein, Defendant, Florida Blue, was the direct and proximate cause of the malicious prosecution of the Criminal Case proceedings against Plaintiffs.

253.     After more than five (5) years, and two (2) criminal trials, Plaintiffs were acquitted by a jury on March 21, 2023.

254.     Plaintiffs' acquittal in the Criminal Case was predicated upon a jury finding that there was no evidence or probable cause to substantiate the charges against Plaintiffs.

255.   At all material times hereto, Defendant, Florida Blue, knowingly brought false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida with malice.

256.   Defendant, Florida Blue, deliberately and maliciously intended to make false accusations that Plaintiffs were engaged in criminal and illicit activities.

257.   Among other malicious accusations, Defendant, Florida Blue, accused Plaintiffs of fraudulently and excessively billing for laboratory services.

258.   Defendant, Florida Blue, maliciously accused Plaintiffs of being involved in an insurance-based scheme with the objective of wrongfully procuring insurance reimbursements.

259.   As more specifically alleged above, the false accusations by Defendant, Florida Blue, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida were part of a demonstrative pattern of false claims practices that was designed to avoid paying millions of dollars of appropriately billed claims by Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital. Defendant, Florida Blue, did this with malice and without any regard for how this would impact Plaintiffs' professional and personal lives.

260.   At all material times hereto, Plaintiffs retained legal counsel to defend the maliciously prosecuted Criminal Case and spent a substantial amount of money in attorney fees to defend against the baseless claims made by Defendant, Florida Blue.

261.   At all material times hereto, Defendant, Florida Blue's, actions relative to the malicious prosecution of the Criminal was done willfully, wantonly, and with egregious and reckless disregard for the rights of Plaintiffs.

262.    Since the information relied on by the Department of Justice and the United States Attorney's Office for the Middle District of Florida in the Criminal Case was false and was fabricated by Defendant, Florida Blue, there was an absence of probable cause to proceed against Plaintiffs.

263.    As a direct and proximate result of Defendant, Florida Blue's conduct in committing malicious prosecution, Plaintiffs have sustained damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Florida Blue, for damages, including punitive damages, together with such other relief this Court deems just and proper.

## Count 3 - CONSPIRACY TO MALICIOUSLY PROSECUTE
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

264.    This is an action seeking compensatory damages for conspiring to maliciously prosecute relative to the Criminal Case against Plaintiffs.

265.    Defendant, Florida Blue and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna, collaborated, conspired, and acted in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

266.     Defendant, Florida Blue, and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna, collaborated, conspired, and acted overtly in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the government exculpatory evidence related to the POS Code 22 and confirmation tests purportedly billed and paid for.

267.     Defendant, Florida Blue, and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna, proceeded to overtly bring false and malicious claims to the Department of Justice and the United States Attorney's Office for the Middle District of Florida knowing there was no probable cause to bring criminal charges against Plaintiffs.

268.     Defendant, Florida Blue, and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna, acted overtly and with malice in providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida to persuade prosecutors to bring charges against Plaintiffs, without disclosing the exculpatory evidence regarding the POS Code 22 that they put on the bills and the exculpatory evidence regarding the confirmation tests purportedly billed and paid for.

269.     Plaintiffs suffered damages as a result of the acts performed through the conspiracy between Defendants to maliciously prosecute Plaintiffs, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Florida Blue for damages, joint and several with Defendants UnitedHealth, Georgia Blue, Anthem, and Aetna, and punitive damages together with such other relief this Court deems just and proper.

## Count 4 - AIDING AND ABETTING MALICIOUS PROSECUTION
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

270.     Defendants committed the underlying malicious prosecution against Plaintiffs by overtly and knowingly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

271.     Defendant, Florida Blue, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when Defendant tried to claim that Plaintiff's submitted claims with a POS Code 22 knowing full well and ultimately testifying under oath that it was their own adjudication systems that placed the POS Code 22 on the claims submitted by Plaintiffs. Defendant, Florida Blue, then pivoted and knowingly made another false allegation stating that the majority of the toxicology tests performed by Plaintiffs were confirmation tests, which the testimony and evidence proved was just false.

272.     Nonetheless, Defendant, Florida Blue, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Florida Blue, for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim. Defendant, Florida Blue, failed to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 at issue had been placed on the claims by Defendant, Florida Blue's, own adjudication system.

273.     The discovery and evidence in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the false

information provided by Defendant, Florida Blue, in the claims data about the POS Code 22 in building the Criminal Case against Plaintiffs.

274.    The discovery and evidence in the Criminal Case also revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the specious allegation by Defendant, Florida Blue, that the majority of the toxicology tests performed by Plaintiffs were confirmation tests.

275.    Defendant, Florida Blue, aided and abetted the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information in interviews and false testimony under oath that the POS Code 22 was placed on the claims' submission forms by the Plaintiffs, thereby allowing the government to investigate and ultimately criminally prosecute Plaintiffs based on false information.

276.    Defendant, Florida Blue, aided and abetted Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the majority of the toxicology tests being performed were confirmation test.

277.    Had Defendant, Florida Blue, not provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida with false information concerning Plaintiffs' billing, the Criminal Case would not have occurred.

278.    Defendant, Florida Blue, failed to disclose crucial information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, which would have prevented the malicious prosecution of Plaintiffs. Instead, Defendant, Florida Blue, withheld exculpatory evidence and substantially assisted the malicious prosecution of Plaintiffs.

279.    Defendant, Florida Blue, made knowingly false accusations which caused the Criminal Case to be pursued against Plaintiffs.

280.    Defendant, Florida Blue, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that Plaintiffs had fraudulently submitted claims for reimbursement of laboratory services using the POS Code 22.

281.    Defendant, Florida Blue, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that Plaintiffs had fraudulently submitted claims for confirmation tests that were not performed Chestatee Regional Hospital, Campbellton-Graceville Hospital, and/or Regional General Hospital.

282.    The Department of Justice and the United States Attorney's Office for the Middle District of Florida did in fact rely on Defendant, Florida Blue's, false information when they prosecuted the Criminal Case against Plaintiffs.

283.    As a result of Defendant, Florida Blue, aiding and abetting Defendants, UnitedHealth, Georgia Blue, Anthem, and Aetna in the underlying malicious prosecution, Plaintiffs have and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Florida Blue, joint and several with Defendants

UnitedHealth, Georgia Blue, Anthem, and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 5 - ABUSE OF PROCESS
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

284.    As set forth above, Defendant, Florida Blue, engaged in an illegal, improper, or perverted use of process.

285.    Specifically, Defendant, Florida Blue, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and that they in fact submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

286.    Additionally, Defendant, Florida Blue, knew that Plaintiffs never submitted never submitted fraudulent claims for confirmation tests.

287.    However, Defendant, Florida Blue, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, prosecuted and imprisoned.

288.    At all times relevant hereto, Defendant, Florida Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, Florida Blue, and that Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Florida Blue, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward so that they did not have to pay out the valid claims submitted to them by Plaintiffs.

289.    At all times relevant hereto, Defendant, Florida Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that Plaintiffs did not fraudulently bill for confirmation tests.

290.    Defendant, Florida Blue, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

291.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Florida Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Florida Blue, for damages, including punitive damages together with such other relief this Court deems just and proper.

### Count 6 - CONSPIRACY TO COMMIT ABUSE OF PROCESS
(Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

292.    This is an action seeking compensatory damages for conspiring to abuse process relative to the Criminal Case against Plaintiffs.

293.    Defendant, Florida Blue, and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

294.    Defendant, Florida Blue, and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the prosecutor exculpatory evidence related to the POS Code 22.

295.    Defendant, Florida Blue and the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely allege and testify under oath that the Plaintiffs fraudulently billed for confirmation tests.

296.    Defendant, Florida Blue, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and that they in fact submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

297.    Defendant, Florida Blue, knew that Plaintiffs never submitted fraudulent claims for confirmation tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

298.    However, Defendant, Florida Blue, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, and they in fact substantially caused the abuse of process.

299.    At all times relevant hereto, Defendant, Florida Blue, despite knowing the truth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by themselves, and that Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

300.     At all times relevant hereto, Defendant, Florida Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

301.     Defendant, Florida Blue, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

302.     Defendant, Florida Blue, had an ulterior motive for its actions; to wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

303.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Florida Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Florida Blue, joint and several with Defendants UnitedHealth, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 7 - AIDING AND ABETTING ABUSE OF PROCESS
**(Against Florida Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

304.     Defendants committed the underlying abuse of process against Plaintiffs by knowingly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

305.    Defendant, Florida Blue, was aware of the false information it was providing to the government because its own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs, and which were at issue in the Criminal Case.

306.    Nonetheless, Defendant, Florida Blue, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Florida Blue, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim. Defendant, Florida Blue, chose not to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the code had been placed on the claims by Defendant, Florida Blue's, own adjudication system because that would ruin their case against Plaintiffs.

307.    Defendant, Florida Blue, also provided false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when they alleged that Plaintiffs fraudulently billed for confirmation tests despite data to the contrary.

308.    By providing false information and testimony, Defendant, Florida Blue, aided and abetted the other Defendants, UnitedHealth, Georgia Blue, Anthem and Aetna in deliberately misusing the criminal process by allowing the Criminal Case against Plaintiffs to go forward based on false information they provided to the government in order to avoid having to pay out on valid claims and force Plaintiffs out of the healthcare business.

309.    Defendant, Florida Blue, overtly acted knowing that the information being provided to the Department of Justice and the United States Attorney's Office for the Middle District of

Florida was false, and its actions did in fact substantially contribute to the abuse of process against Plaintiffs.

310.    Defendant, Florida Blue, had an ulterior motive for its actions; to wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

311.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Florida Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Florida Blue, joint and several with Defendants UnitedHealth, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 8 - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

312.    By, among other things, communicating false information to third parties in the healthcare industry about Plaintiffs, providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and aiding in the malicious prosecution of Plaintiffs in the Criminal Case, Defendant, Florida Blue, intentionally and unjustifiably interfered with Plaintiffs' beneficial business relationships with their clients and third-party payors.

313.     Defendant, Florida Blue, was aware of Plaintiffs' aforementioned business relationships with clients, which included healthcare providers and laboratories across the country, as well as third-party payors.

314.     Defendant's, Florida Blue, actions caused Plaintiffs' to shut down their various businesses, which in turn disrupted the aforementioned business relationships.

315.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Florida Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Florida Blue, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 9 – NEGLIGENCE
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

316.     Plaintiffs plead this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

317.     At all times material hereto, Defendant, Florida Blue, owed a duty to Plaintiffs to act in good faith and not provide false information to government agencies.

318.     Defendant, Florida Blue, breached its duties to the Plaintiffs by providing the Department of Justice and United States Attorney's Office for the Middle District of Florida  a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in

connection with all of the claims submitted to Defendant, Florida Blue, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim and failing to advise the government that the code had been placed on the claims by the Defendant, Florida Blue's, own adjudication system and not by Plaintiffs.

319.    Defendant, Florida Blue, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because they knew and testified that their own adjudication systems placed the POS Code 22 on each and every one of the claims submitted by the Plaintiffs that were at issue in the Criminal Case.

320.    Defendant, Florida Blue, also falsely alleged and testified that the Plaintiffs fraudulently billed for confirmation tests despite having in their possession evidence to the contrary.

321.    Alternatively, if Defendant, Florida Blue was not aware that the information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, then it was negligent in providing false information that it should have known was false with proper due diligence.

322.    Therefore, Defendant, Florida Blue, acted negligently against the Plaintiffs.

323.    As a direct and proximate result of Defendant, Florida Blue's negligence, Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Florida Blue, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 10 – DEFAMATION
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

324.   On September 7, 2016, Jose Ramos of Florida Blue posted and published a false and defamatory alert through the National Health Care Anti-Fraud Association's Special Investigation Resource and Intelligence System ("NHCCA SIRIS") system stating data analytics have proved that thirty-seven million dollars ($37,000,000.00) of drug screen claims submitted by Williston Regional Hospital were false because the claims included the POS Code 22 from the laboratories performing and billing for laboratory services that took place at Williston Regional Hospital.

325.   Plaintiffs, through their business entities, were laboratories performing and billing for laboratory services at Williston Regional Hospital.

326.   Defendant, Florida Blue, was aware or should have been aware of the false information it was providing and publishing through the NHCCA SIRIS system because they knew or should have known that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs for laboratory services at Williston Regional Hospital.

327.   After it was published by Florida Blue, on various dates, the last date being February 22, 2023, the false NHCAA SIRIS alert was republished and viewed by numerous insurance companies throughout the United States, including representatives from Aetna, UnitedHealth, Georgia Blue and Anthem.

328.    Each time the false NHCAA SIRIS alert was viewed, was a separate and distinct republication.

329.    The NHCAA SIRIS was published in confidence to only those people or companies possessing the appropriate credentials to gain access to such alerts and the Plaintiffs did not learn of the dissemination of the inaccurate alert until 2022, well after the initial inaccurate alert was published.

330.    As a direct and proximate result of Defendant, Florida Blue's, defamation, Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Florida Blue, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 11 – DEFAMATION *PER SE*
### (Against Florida Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

331.    On September 7, 2016, Jose Ramos of Florida Blue posted and published a false and defamatory alert through the National Health Care Anti-Fraud Association's Special Investigation Resource and Intelligence System ("NHCCA SIRIS") system stating data analytics have proved that thirty seven million dollars ($37,000,000.00) of drug screen claims submitted by Williston Regional Hospital were false because the claims included the POS Code 22 from the laboratories performing and billing for laboratory services at Williston Regional Hospital.

332.     Plaintiffs, through their business entities, were laboratories performing and billing for laboratory services at Williston Regional Hospital.

333.     The September 7, 2016, publication by Florida Blue through the NCHAA SIRIS system was libelous *per se* and actionable *per se* because, when considered alone without innuendo: (1) it charged that the Plaintiffs had committed an infamous crime, felony or fraud; (2) it subjected the Plaintiffs to hatred, distrust, ridicule, contempt and disgrace and (3) it injured the Plaintiffs in their trade and profession.

334.     Defendant, Florida Blue, was aware or should have been aware of the false information it was providing and publishing through the NHCAA SIRIS system because Defendants knew or should have known that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs for laboratory services performed at Williston Regional Hospital.

335.     After it was published by Florida Blue, on various dates, the last date being February 22, 2023, the false NHCAA SIRIS alert was republished and viewed by numerous insurance companies throughout the United States, including representatives from Aetna, UnitedHealth, Georgia Blue and Anthem.

336.     Each time the false NHCAA SIRIS alert was viewed, was a separate and distinct republication.

337.     The NHCAA SIRIS was published in confidence to only those people or companies possessing the appropriate credentials to gain access to such alerts and the Plaintiffs did not learn of the dissemination of the inaccurate alert until 2022, well after the initial inaccurate alert was published.

338.     As a direct and proximate result of Defendant, Florida Blue's, defamation *per se*, Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Florida Blue, together with such further and additional relief as this Honorable Court deems just and proper.

<u>**Count 12 - CIVIL REMEDIES FOR CRIMINAL ACTIVITIES**</u>
**(Against Georgia Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

339.     This Count alleges claims against Defendant, Georgia Blue, under the Florida Civil Remedies for Criminal Practices Act, codified in Chapter 772 of the Florida Statutes, asserting a statutory right of action against Defendants Florida Blue, Georgia Blue, UnitedHealth, Anthem and Aetna, for its conduct of, or participation in, an enterprise through a pattern of criminal activity in violation of Sections 772.103(3) of the Florida Statutes.

340.     Pursuant to Section 772.103(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation,…or other legal entity,…or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

341.     Section 772.103(3) further provides that it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of criminal activity*…."

342.    At all times relevant hereto, each of the Defendants were an association-in-fact "enterprise" within the meaning of Sections 772.102(3) and 772.103(3).  The Defendants and other members and associates of the Enterprise had connections and relationships with one another and with the Enterprise.  The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise operated in Broward County, Florida, and elsewhere, for a period of time sufficient to permit its members and associates to pursue its objectives.

343.    Each of the Defendants, by, through and with its officers, employees, agents, or representatives, devised or engaged in a scheme where they were associated with the Enterprise to conduct or participate, directly or indirectly, in such Enterprise through a pattern of criminal activity.

344.    Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents."  Fla. Stat. §772.102(4).

345.    The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes the following related incidents of criminal activity and racketeering activity over an extended period of time, as more specifically set forth above:

    a.    Conspiracy to Violate the Florida Communications Act, in violation of Section 817.034, by engaging in a scheme to defraud and in furtherance of that scheme, used electronic mail communications to obtain property from that person, in that employees, agents or representatives of Defendants transmitted numerous emails

between and amongst each other, and to Plaintiffs, as part of a scheme to deprive Plaintiffs of money from Plaintiffs;

b. Conspiracy to Commit Perjury in Official Proceedings, in violation of Section 837.02, by making false statements, which he or she does not believe to be true, under oath in an official proceeding in regards to any material matter, in that employees, agents or representatives of Defendants testified falsely before a federal grand jury and during multiple criminal trials, about a variety of material matters, including false testimony about the type of testing performed at the rural hospitals, the type of testing billed by the rural hospitals to the Defendants, and specific codes included on claims submitted by the rural hospitals to the Defendants;

c. Conspiracy to Make False Reports to Law Enforcement Authorities, in violation of Section 837.05, by knowingly giving false information to law enforcement officers concerning the alleged commission of any crime, in that Defendants provided false information and false documents to the agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participated in a scheme to defraud Defendants;

d. Conspiracy to Make False Reports of Commission of Crimes, in violation of Section 817.49, by willfully imparting, conveying, or causing to be imparted or conveyed to a law enforcement officer or employee of a public safety agency false information or reports concerning the alleged commission of a crime by Plaintiffs, knowing such information or report to be false, and when no such crime had actually been committed, in that Defendants provided false information and false documents to agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participate in a scheme to defraud Defendants;

e.   Conspiracy to Fabricate Physical Evidence, in violation of Section 918.13, by making, presenting or using any record, document, or other item, knowing it to be false, during the investigation of Plaintiffs by law enforcement and later during the criminal trials of Plaintiffs, in that Defendants provided false billing data and false billing documents to agents with the FBI and OPM-OIG, and to members of the United States Department of Justice during the investigation of Plaintiffs, and later during the criminal trial of Plaintiffs in the Middle District of Florida.

346.   The criminal activity of Defendants occurred repeatedly for more than five years, were continuous, and were not isolated incidents or events.

347.   The criminal acts of Defendants constitute a pattern of criminal activity in that they have similar intents, results and methods.

348.   Each Defendant played a role in the management or operation of the scheme perpetrated by and through the Enterprise.

349.   The Defendants' pattern of racketeering activity is related because it manifests in the same or similar methods of commission having related characteristics perpetrated for the same objectives against the same or similar victims, including Plaintiffs.  These other victims include the rural hospitals set forth herein, and other independent laboratories similar to Reliance, such as Lifebrite Laboratories, Sun Toxicology, Mission Toxicology, Advance Clinical Laboratory Services, Aspen Hill Diagnostics, Auspicious Laboratory, Avutox Laboratories, Assurance Scientific Laboratories, Axis Diagnostics Laboratory, Certus Laboratories, Complete Toxicology, Eclipse Toxicology, Elite Diagnostics, Hill Country Toxicology, Laboratory Service of America, Qualitox Laboratories, Principal Labs, B3 Diagnostic Laboratory, Central Clinical Laboratory, Cadira Labs, Sera Dynamics and Complete Recovery Lab, among others.

350.     The criminal enterprise gained considerable consideration from the pattern of racketeering activity, by failing to pay valid claims submitted for payment by Plaintiffs and others, and Defendants will continue to profit financially from this pattern of racketeering activity.

351.     The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of Section 772.103(3) and the predicate acts enumerated above.

352.     Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

353.     Defendants are therefore liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees pursuant to Section 772.104(1).

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Georgia Blue, for damages in the amount of three times the actual damages sustained by the Plaintiffs; reasonable attorneys' fees and costs; punitive damages and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

### Count 13 - MALICIOUS PROSECUTION
#### (Against Georgia Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

354.     This is an action seeking compensatory damages for malicious prosecution relative to the criminal prosecution against Plaintiffs known as *United States v. Aaron Durall, Neisha Zaffuto, et al.*, Court Docket No. 3:20-cr-86 (M.D. Florida) (the "Criminal Case").

355.     On or about August of 2018, Defendant, Georgia Blue provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida false information, including a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Georgia Blue, for laboratory

tests performed at Chestatee Regional Hospital. A review of these spreadsheets showed, among other things, that Defendant, Georgia Blue, provided the government with a column of data for the "place of service" for the claims submitted, and that for virtually every claim submitted, the "place of service" code is denoted with a "22" place of service code.

356.    The POS Code 22 is a code that represents to private insurers that the patient was physically present at the hospital as an outpatient, had tests performed at the hospital, and left that same day.

357.    In the Criminal Case, it was undisputed that the patients were never physically present as patients (inpatient or outpatient) of Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and/or Regional General Hospital. Thus, if Plaintiffs included a POS Code 22 on each claim submitted to Defendant, Georgia Blue, as Defendant's spreadsheets of claims data provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida showed, each claim submitted by Plaintiffs would have been false and fraudulent.

358.    However, the information provided by Defendant, Georgia Blue, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida about the Plaintiffs' submitting claims with a POS Code 22 was false, malicious and lacked probable cause.

359.    Plaintiffs never placed a POS Code 22 on any claims that were at issue in the Criminal Case. A careful review of the evidence in the Criminal Case revealed that it was Defendant, Georgia Blue, and not the Plaintiffs, that placed POS Code 22 on all of the subject claims.

360.     Nevertheless, the discovery in the Criminal Case revealed that the government relied on the information provided by Defendant, Georgia Blue, in the claims data about the POS Code 22 in prosecuting the Criminal Case against Plaintiffs.

361.     Once it was revealed that Plaintiffs did not place the POS Code 22 on the subject claims, Defendant, Georgia Blue, then falsely and maliciously alleged that Plaintiffs billed and were paid for confirmation tests that we not performed at Chestatee Regional Hospital. This false and malicious allegation also lacked probable cause.

362.     Accordingly, at all material times herein, Defendant, Georgia Blue, was the direct and proximate cause of the malicious prosecution of the Criminal Case proceedings against Plaintiffs.

363.     After more than five (5) years, and two (2) criminal trials, Plaintiffs were acquitted by a jury on March 21, 2023.

364.     Plaintiffs' acquittal in the Criminal Case was predicated upon a jury finding that there was no evidence or probable cause to substantiate the charges against Plaintiffs.

365.     At all material times hereto, Defendant, Georgia Blue, knowingly brought false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida with malice.

366.     Defendant, Georgia Blue, deliberately and maliciously intended to make false accusations that Plaintiffs were engaged in criminal and illicit activities.

367.     Among other malicious accusations, Defendant, Georgia Blue, accused Plaintiffs of fraudulently and excessively billing for laboratory services.

368.     Defendant, Georgia Blue, maliciously accused Plaintiffs of being involved in an insurance-based scheme with the objective of wrongfully procuring insurance reimbursements.

369.     As more specifically alleged above, the false accusations by Defendant, Georgia Blue, to the Department of Justice and the United States Attorney's Office for the Middle District of Georgia were part of a demonstrative pattern of false claims practices that was designed to avoid paying millions of dollars of appropriately billed claims by Chestatee Regional Hospital and did this with malice and without any regard for how this would impact Plaintiffs' professional and personal lives.

370.     At all material times hereto, Plaintiffs retained legal counsel to defend the maliciously prosecuted Criminal Case and spent a substantial amount of money in attorney's fees to defend against the baseless claims made by Defendant, Georgia Blue.

371.     At all material times hereto, Defendant, Georgia Blue's, actions relative to the malicious prosecution of the Criminal was done willfully, wantonly, and with egregious and reckless disregard for the rights of Plaintiffs.

372.     Since the information relied on by the Department of Justice and the United States Attorney's Office for the Middle District of Florida in the Criminal Case was false and was fabricated by Defendant, Georgia Blue, there was an absence of probable cause to proceed against Plaintiffs.

373.     As a direct and proximate result of Defendant, Georgia Blue's conduct in committing malicious prosecution, Plaintiffs have sustained damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Georgia Blue, for damages, including punitive damages together with such other relief this Court deems just and proper.

### Count 14 - CONSPIRACY TO MALICIOUSLY PROSECUTE
### (Against Georgia Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

374.   This is an action seeking compensatory damages for conspiring to maliciously prosecute relative to the Criminal Case against Plaintiffs.

375.   Defendant, Georgia Blue and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna, collaborated, conspired, and acted in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

376.   Defendant, Georgia Blue, and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna, collaborated, conspired, and acted overtly in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the government exculpatory evidence related to the POS Code 22 and confirmation tests purportedly billed and paid for.

377.   Defendant, Georgia Blue, and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna, proceeded to overtly bring false and malicious claims to the Department of Justice and the United States Attorney's Office for the Middle District of Florida knowing there was no probable cause to bring criminal charges against Plaintiffs.

378.   Defendant, Georgia Blue, and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna, acted overtly and with malice in providing false information to the Department

of Justice and the United States Attorney's Office for the Middle District of Florida to persuade prosecutors to bring charges against Plaintiffs, without disclosing the exculpatory evidence regarding the POS Code 22 that they put on the bills and the exculpatory evidence regarding the confirmation tests purportedly billed and paid for.

379.    Plaintiffs suffered damages as a result of the acts performed through the conspiracy between Defendants to maliciously prosecute Plaintiffs, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Georgia Blue, for damages, joint and several with Defendants Florida Blue, UnitedHealth, Anthem, and Aetna, and punitive damages together with such other relief this Court deems just and proper.

### Count 15 - AIDING AND ABETTING MALICIOUS PROSECUTION
### (Against Georgia Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

380.    Defendants committed the underlying malicious prosecution against Plaintiffs by overtly and knowingly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

381.    Defendant, Georgia Blue, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when Defendant tried to claim that Plaintiff's submitted claims with a POS Code 22 knowing full well and ultimately testifying under oath that it was their own adjudication systems that placed the POS Code 22 on the claims submitted by Plaintiffs. Defendant, Georgia Blue, then pivoted and

knowingly made another false allegation stating that the majority of the toxicology tests performed by Plaintiffs were confirmation tests, which the testimony and evidence proved was just false.

382.    Nonetheless, Defendant, Georgia Blue, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Georgia Blue, for laboratory tests performed at Chestatee Regional with a POS Code 22 for each claim. Defendant, Georgia Blue, failed to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 at issue had been placed on the claims by Defendant, Georgia Blue's, own adjudication system.

383.    The discovery and evidence in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the false information provided by Defendant, Georgia Blue, in the claims data about the POS Code 22 in building the Criminal Case against Plaintiffs.

384.    The discovery and evidence in the Criminal Case also revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the specious allegation by Defendant, Georgia Blue, that the majority of the toxicology tests performed by Plaintiffs were confirmation tests.

385.    Defendant, Georgia Blue, aided and abetted the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information in interviews and false testimony under oath that the POS Code 22 was placed on the claims' submission forms by the Plaintiffs, thereby allowing the government to investigate and ultimately criminally prosecute Plaintiffs based on false information.

386.     Defendant, Georgia Blue, aided and abetted Defendants, Florida Blue, UnitedHealth, Anthem and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the majority of the toxicology tests being performed were confirmation test.

387.     Had Defendant, Georgia Blue, not provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida with false information concerning Plaintiffs' billing, the Criminal Case would not have occurred.

388.     Defendant, Georgia Blue, failed to disclose crucial information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, which would have prevented the malicious prosecution of Plaintiffs. Instead, Defendant, Georgia Blue, withheld exculpatory evidence and substantially assisted the malicious prosecution of Plaintiffs.

389.     Defendant, Georgia Blue, made knowingly false accusations which caused the Criminal Case to be pursued against Plaintiffs.

390.     Defendant, Georgia Blue, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that Plaintiffs had fraudulently submitted claims for reimbursement of laboratory services using the POS Code 22.

391.     Defendant, Georgia Blue, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that Plaintiffs had fraudulently submitted claims for confirmation tests that were not performed Chestatee Regional Hospital.

392.    The Department of Justice and the United States Attorney's Office for the Middle District of Florida did in fact rely on Defendant, Georgia Blue's, false information when they prosecuted the Criminal Case against Plaintiffs.

393.    As a result of Defendant, Georgia Blue, aiding and abetting Defendants, Florida Blue, UnitedHealth, Anthem, and Aetna in the underlying malicious prosecution, Plaintiffs have and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Georgia Blue, joint and several with Defendants Florida Blue, UnitedHealth, Anthem, and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

<u>**Count 16 - ABUSE OF PROCESS**</u>
**(Against Georgia Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

394.    As set forth above, Defendant, Georgia Blue, engaged in an illegal, improper, or perverted use of process.

395.    Specifically, Defendant, Georgia Blue, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and that they in fact submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

396.     Additionally, Defendant, Georgia Blue, knew that Plaintiffs never submitted never submitted fraudulent claims for confirmation tests.

397.     However, Defendant, Georgia Blue, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, prosecuted and imprisoned.

398.     At all times relevant hereto, Defendant, Georgia Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, Georgia Blue, and that Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital. Georgia Blue did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward so that they did not have to pay out the valid claims submitted to them by Plaintiffs.

399.     At all times relevant hereto, Defendant, Georgia Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that Plaintiffs did not fraudulently bill for confirmation tests.

400.     Defendant, Georgia Blue, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

401.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Georgia Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Georgia Blue, for damages, including punitive damages together with such other relief this Court deems just and proper.

## Count 17 - CONSPIRACY TO COMMIT ABUSE OF PROCESS
### (Against Georgia Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

402.    This is an action seeking compensatory damages for conspiring to abuse process relative to the Criminal Case against Plaintiffs.

403.    Defendant, Georgia Blue, and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

404.    Defendant, Georgia Blue, and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the prosecutor exculpatory evidence related to the POS Code 22.

405.    Defendant, Georgia Blue and the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna collaborated, conspired, and acted in concert to falsely allege and testify under oath that the Plaintiffs fraudulently billed for confirmation tests.

406.    Defendant, Georgia Blue, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and that they in fact submitted valid claims for laboratory tests performed at Chestatee Regional Hospital.

407.    Defendant, Georgia Blue, knew that Plaintiffs never submitted fraudulent claims for confirmation tests performed at Chestatee Regional Hospital.

408.    However, Defendant, Georgia Blue, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, and they in fact substantially caused the abuse of process.

409.    At all times relevant hereto, Defendant, Georgia Blue, despite knowing the truth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by themselves, and that Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital.

410.    At all times relevant hereto, Defendant, Georgia Blue, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

411.    Defendant, Georgia Blue, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

412.    Defendant, Georgia Blue, had an ulterior motive for its actions; to wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

413.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Georgia Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Georgia Blue, joint and several with Defendants Florida Blue, UnitedHealth, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

<u>**Count 18 - AIDING AND ABETTING ABUSE OF PROCESS**</u>
**(Against Georgia Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

414.    Defendants committed the underlying abuse of process against Plaintiffs by knowingly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

415.    Defendant, Georgia Blue, was aware of the false information it was providing to the government because its own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs, and which were at issue in the Criminal Case.

416.    Nonetheless, Defendant, Georgia Blue, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Georgia Blue, for laboratory tests performed at Chestatee Regional Hospital with a POS Code 22 for each claim. Defendant, Georgia Blue, chose not to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the code had been placed on the claims by Defendant, Georgia Blue's, own adjudication system because that would ruin their case against Plaintiffs.

417.     Defendant, Georgia Blue, also provided false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when they alleged that Plaintiffs fraudulently billed for confirmation tests despite data to the contrary.

418.     By providing false information and testimony, Defendant, Georgia Blue, aided and abetted the other Defendants, Florida Blue, UnitedHealth, Anthem and Aetna in deliberately misusing the criminal process by allowing the Criminal Case against Plaintiffs to go forward based on false information they provided to the government in order to avoid having to pay out on valid claims and force Plaintiffs out of the healthcare business.

419.     Defendant, Georgia Blue, overtly acted knowing that the information being provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, and its actions did in fact substantially contribute to the abuse of process against Plaintiffs.

420.     Defendant, Georgia Blue, had an ulterior motive for its actions; to wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

421.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Georgia Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Georgia Blue, joint and several with Defendants Florida

Blue, UnitedHealth, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 19 - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against Georgia Blue)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

422.    By, among other things, communicating false information to third parties in the healthcare industry about Plaintiffs, providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and aiding in the malicious prosecution of Plaintiffs in the Criminal Case, Defendant, Georgia Blue, intentionally and unjustifiably interfered with Plaintiffs' beneficial business relationships with their clients and third-party payors.

423.    Defendant, Georgia Blue, was aware of Plaintiffs' aforementioned business relationships with clients, which included healthcare providers and laboratories across the country, as well as third-party payors.

424.    Defendant's, Georgia Blue, actions caused Plaintiffs' to shut down their various businesses, which in turn disrupted the aforementioned business relationships.

425.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Georgia Blue's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Georgia Blue, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 20 – NEGLIGENCE
**(Against Georgia Blue)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

426.    Plaintiffs plead this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

427.    At all times material hereto, Defendant, Georgia Blue, owed a duty to Plaintiffs to act in good faith and not provide false information to government agencies.

428.    Defendant, Georgia Blue, breached its duties to the Plaintiffs by providing the Department of Justice and United States Attorney's Office for the Middle District of Florida  a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Georgia Blue, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim and failing to advise the government that the code had been placed on the claims by the  Defendant, Georgia Blue's, own adjudication system and not by Plaintiffs.

429.    Defendant, Georgia Blue, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because they knew and testified that their own adjudication systems placed the POS Code 22 on each and every one of the claims submitted by the Plaintiffs that were at issue in the Criminal Case.

430.    Defendant, Georgia Blue, also falsely alleged and testified that the Plaintiffs fraudulently billed for confirmation tests despite having in their possession evidence to the contrary.

431.    Alternatively, if Defendant, Georgia Blue was not aware that the information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, then it was negligent in providing false information that it should have known was false with proper due diligence.

432.    Therefore, Defendant, Georgia Blue, acted negligently against the Plaintiffs.

433.    As a direct and proximate result of Defendant, Georgia Blue's negligence, Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Georgia Blue, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 21 - CIVIL REMEDIES FOR CRIMINAL ACTIVITIES
### (Against UnitedHealth)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

434.    This Count alleges claims against Defendant, UnitedHealth, under the Florida Civil Remedies for Criminal Practices Act, codified in Chapter 772 of the Florida Statutes, asserting a statutory right of action against Defendants Florida Blue, Georgia Blue, UnitedHealth, Anthem

and Aetna, for its conduct of, or participation in, an enterprise through a pattern of criminal activity in violation of Sections 772.103(3) of the Florida Statutes.

435.    Pursuant to Section 772.103(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation,…or other legal entity,…or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

436.    Section 772.103(3) further provides that it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of criminal activity*…."

437.    At all times relevant hereto, each of the Defendants were an association-in-fact "enterprise" within the meaning of Sections 772.102(3) and 772.103(3).  The Defendants and other members and associates of the Enterprise had connections and relationships with one another and with the Enterprise.  The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise operated in Broward County, Florida, and elsewhere, for a period of time sufficient to permit its members and associates to pursue its objectives.

438.    Each of the Defendants, by, through and with its officers, employees, agents, or representatives, devised or engaged in a scheme where they were associated with the Enterprise to conduct or participate, directly or indirectly, in such Enterprise through a pattern of criminal activity.

439.    Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices,

victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents." Fla. Stat. §772.102(4).

440.    The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes the following related incidents of criminal activity and racketeering activity over an extended period of time, as more specifically set forth above:

    a.  Conspiracy to Violate the Florida Communications Act, in violation of Section 817.034, by engaging in a scheme to defraud and in furtherance of that scheme, used electronic mail communications to obtain property from that person, in that employees, agents or representatives of Defendants transmitted numerous emails between and amongst each other, and to Plaintiffs, as part of a scheme to deprive Plaintiffs of money from Plaintiffs;

    b.  Conspiracy to Commit Perjury in Official Proceedings, in violation of Section 837.02, by making false statements, which he or she does not believe to be true, under oath in an official proceeding in regards to any material matter, in that employees, agents or representatives of Defendants testified falsely before a federal grand jury and during multiple criminal trials, about a variety of material matters, including false testimony about the type of testing performed at the rural hospitals, the type of testing billed by the rural hospitals to the Defendants, and specific codes included on claims submitted by the rural hospitals to the Defendants;

    c.  Conspiracy to Make False Reports to Law Enforcement Authorities, in violation of Section 837.05, by knowingly giving false information to law enforcement officers concerning the alleged commission of any crime, in

that Defendants provided false information and false documents to the agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participated in a scheme to defraud Defendants;

d. Conspiracy to Make False Reports of Commission of Crimes, in violation of Section 817.49, by willfully imparting, conveying, or causing to be imparted or conveyed to a law enforcement officer or employee of a public safety agency false information or reports concerning the alleged commission of a crime by Plaintiffs, knowing such information or report to be false, and when no such crime had actually been committed, in that Defendants provided false information and false documents to agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participate in a scheme to defraud Defendants;

e. Conspiracy to Fabricate Physical Evidence, in violation of Section 918.13, by making, presenting or using any record, document, or other item, knowing it to be false, during the investigation of Plaintiffs by law enforcement and later during the criminal trials of Plaintiffs, in that Defendants provided false billing data and false billing documents to agents with the FBI and OPM-OIG, and to members of the United States Department of Justice during the investigation of Plaintiffs, and later during the criminal trial of Plaintiffs in the Middle District of Florida.

441.   The criminal activity of Defendants occurred repeatedly for more than five years, were continuous, and were not isolated incidents or events.

442.    The criminal acts of Defendants constitute a pattern of criminal activity in that they have similar intents, results and methods.

443.    Each Defendant played a role in the management or operation of the scheme perpetrated by and through the Enterprise.

444.    The Defendants' pattern of racketeering activity is related because it manifests in the same or similar methods of commission having related characteristics perpetrated for the same objectives against the same or similar victims, including Plaintiffs.  These other victims include the rural hospitals set forth herein, and other independent laboratories similar to Reliance, such as Lifebrite Laboratories, Sun Toxicology, Mission Toxicology, Advance Clinical Laboratory Services, Aspen Hill Diagnostics, Auspicious Laboratory, Avutox Laboratories, Assurance Scientific Laboratories, Axis Diagnostics Laboratory, Certus Laboratories, Complete Toxicology, Eclipse Toxicology, Elite Diagnostics, Hill Country Toxicology, Laboratory Service of America, Qualitox Laboratories, Principal Labs, B3 Diagnostic Laboratory, Central Clinical Laboratory, Cadira Labs, Sera Dynamics and Complete Recovery Lab, among others.

445.    The criminal enterprise gained considerable consideration from the pattern of racketeering activity, by failing to pay valid claims submitted for payment by Plaintiffs and others, and Defendants will continue to profit financially from this pattern of racketeering activity.

446.    The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of Section 772.103(3) and the predicate acts enumerated above.

447.    Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

448.    Defendants are therefore liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees pursuant to Section 772.104(1).

**WHEREFORE**, Plaintiffs demand judgment against Defendant, UnitedHealth, for damages in the amount of three times the actual damages sustained by the Plaintiffs; reasonable attorneys' fees and costs; punitive damages and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

**Count 22 - MALICIOUS PROSECUTION**
**(Against UnitedHealth)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

449.     This is an action seeking compensatory damages for malicious prosecution relative to the criminal prosecution against Plaintiffs known as *United States v. Aaron Durall, Neisha Zaffuto, et al.*, Court Docket No. 3:20-cr-86 (M.D. Florida) (the "Criminal Case").

450.     On or around August of 2018, Defendant, UnitedHealth, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida with false information, including a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to UnitedHealth for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital. UnitedHealth falsely and maliciously alleged that the Plaintiffs had submitted fraudulent claims in connection with all of the claims submitted to Defendant, UnitedHealth, for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital. UnitedHealth falsely and fraudulently alleged that the Plaintiffs denoted on their claims submitted for laboratory services with a POS Code 22.

451.     The POS Code 22 is a code that represents to private insurers that the patient was physically present at the hospital as an outpatient, had tests performed at hospital, and left that same day.

452.    In the Criminal Case, it was undisputed that none of the patients were physically present as patients (inpatients or outpatients) of Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Thus, if the Plaintiffs included a POS Code 22 on each claim submitted to Defendant, UnitedHealth, as alleged by Defendant, UnitedHealth, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, then each claim submitted by Plaintiffs would have been false and fraudulent.

453.    However, it was Defendants who placed the POS Code 22 on each and every claim submitted by the Plaintiffs and thus, the information provided by Defendant, UnitedHealth, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida about the Plaintiffs submitting claims with a POS Code 22 was false, malicious and lacked probable cause.

454.    Plaintiffs never placed a POS Code 22 on any claims that were at issue in the Criminal Case and a careful review of the evidence in the Criminal Case revealed that it was Defendant, UnitedHealth, and not Plaintiffs, that placed the POS Code 22 on all of the subject claims.

455.    Nonetheless, the discovery in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the distorted information provided by Defendant, UnitedHealth, in the claims data about the POS Code 22 being placed on the claims by the Plaintiff in investigating, developing and ultimately prosecuting the Criminal Case against Plaintiffs.

456.    Once it was revealed that the Plaintiffs did not place the POS Code 22 on the subject claims, Defendant, UnitedHealth, then pivoted and falsely and maliciously alleged that Plaintiffs billed and were paid for confirmation tests that we not performed at Chestatee Regional Hospital,

Campbellton-Graceville Hospital, and Regional General Hospital despite physical evidence to the contrary. This false and malicious allegation also lacked probable cause.

457.    Accordingly, at all material times hereto, Defendant, UnitedHealth, was the direct and proximate cause for the malicious prosecution of Criminal Case proceedings against the Plaintiffs.

458.    After more than five (5) years, and two (2) criminal trials, the Plaintiffs were acquitted by a jury on March 21, 2023.

459.    The Plaintiffs' acquittal in the Criminal Case was predicated upon a jury finding that there was no evidence or probable cause to substantiate the charges against Plaintiffs.

460.    At all material times hereto, Defendant, UnitedHealth, brought false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida with malice.

461.    Defendant, UnitedHealth, deliberately and maliciously intended to make false accusations that Plaintiffs were engaged in criminal and illicit activities.

462.    Among other malicious accusations, Defendant, UnitedHealth, accused Plaintiffs of fraudulently and excessively billing for laboratory services.

463.    Defendant, UnitedHealth, maliciously accused Plaintiffs of being involved in an insurance-based scheme with the objective of wrongfully procuring insurance reimbursements.

464.    As more specifically alleged above, the false accusations by Defendant, UnitedHealth, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida were part of a demonstrative pattern of false claim practices that was designed to avoid paying millions of dollars of appropriately billed claims by Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, UnitedHealth, did

this with malice and without any regard for how this would impact Plaintiffs' professional and personal lives.

466.    At all material times hereto, Plaintiffs retained legal counsel to defend the maliciously prosecuted Criminal Case and spent a substantial amount of money in attorney fees to defend against the baseless allegations made by Defendant.

466.    At all material times hereto, Defendant, UnitedHealth's, actions relative to the malicious prosecution of the Criminal were done willfully, wantonly, and with egregious and reckless disregard for the rights of Plaintiffs.

467.    Since the information relied on by the Department of Justice and the United States Attorney's Office for the Middle District of Florida in the Criminal Case was false, there was an absence of probable cause to proceed against Plaintiffs.

468.    As a direct and proximate result of Defendant, UnitedHealth's, conduct in committing malicious prosecution, Plaintiffs have sustained damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant, UnitedHealth, for damages, including punitive damages together with such other relief this Court deems just and proper.

<u>**Count 23 - CONSPIRACY TO MALICIOUSLY PROSECUTE**</u>
**(Against UnitedHealth)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

469.     This is an action seeking compensatory damages for conspiring to maliciously prosecute relative to the Criminal Case against Plaintiffs.

470.     Defendant, UnitedHealth and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna, collaborated, conspired, and acted in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

471.     Defendant, UnitedHealth, and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna, collaborated, conspired, and acted overtly in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose exculpatory evidence related to the POS Code 22 and related to the confirmation tests purportedly billed and paid for to the government.

472.     Defendant, UnitedHealth, and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna, proceeded to overtly bring false and malicious claims to the Department of Justice and the United States Attorney's Office for the Middle District of Florida knowing there was no probable cause for crimes against Plaintiffs.

473.     Defendant, UnitedHealth, and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna, acted overtly and with malice in providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida to persuade prosecutors to bring charges against Plaintiffs, without disclosing the exculpatory evidence regarding the POS Code 22 and the confirmation tests purportedly billed and paid for.

474.     Plaintiffs suffered damages as a result of the acts performed through the conspiracy between Defendants to maliciously prosecute Plaintiffs, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to

reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant, UnitedHealth, for damages, joint and several with Defendants, Florida Blue, Georgia Blue, Anthem, and Aetna and punitive damages together with such other relief this Court deems just and proper.

### Count 24 - AIDING AND ABETTING MALICIOUS PROSECUTION
### (Against UnitedHealth)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

475.    Defendants committed the underlying malicious prosecution against Plaintiffs by overtly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

476.    Defendant, UnitedHealth, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because they knew that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case.  Defendant, United Health, was also aware that allegation that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests was inaccurate and at odds with the evidence presented in the Criminal Case.

477.    Nonetheless, Defendant, UnitedHealth, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, UnitedHealth, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, yet Defendant, United Health, neglected to advise the Department of Justice and

the United States Attorney's Office for the Middle District of Florida that the code had been placed on the claims by Defendant, UnitedHealth's, own adjudication system.

478.    The discovery and evidence in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the information provided by Defendant, UnitedHealth, regarding the claims data about the POS Code 22 in investigating and building the Criminal Case against Plaintiffs.

479.    The discovery and evidence in the Criminal Case also revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the specious allegation by Defendant, UnitedHealth, that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests.

480.    Defendant, UnitedHealth, aided and abetted Defendants, Florida Blue, Georgia Blue, Anthem and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the POS Code 22 was placed on the claims submitted by the Plaintiffs, thereby allowing the government to investigate and ultimately criminally prosecute Plaintiffs based on flawed information.

481.    Defendant, United Health, aided and abetted the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna in the underlying malicious prosecution of the Plaintiffs as referenced above by overtly providing inaccurate information that the majority of the toxicology tests being performed were confirmation tests despite proof to the contrary.

482.    Had Defendant, UnitedHealth, not provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida false information concerning the Plaintiffs, the Criminal Case would not have transpired.

483.    Defendant, UnitedHealth, failed to disclose crucial exculpatory information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, which would have prevented the malicious prosecution of the Plaintiffs, and thereby substantially assisted the malicious prosecution.

484.    Defendant, UnitedHealth's, actions caused the Criminal Case to be pursued against the Plaintiffs.

485.    Defendant, UnitedHealth, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that Plaintiffs had fraudulently submitted claims for reimbursement of laboratory services using the POS Code 22.

486.    Defendant, UnitedHealth, knowingly and intentionally told and allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that Plaintiffs had fraudulently submitted claims for confirmation tests that were not performed.

487.    The Department of Justice and the United States Attorney's Office for the Middle District of Florida did in fact rely on Defendant, UnitedHealth's, false information when they prosecuted the Criminal Case against the Plaintiffs.

488.    As a result of Defendant, UnitedHealth's, aiding and abetting of the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna in the underlying malicious prosecution, Plaintiffs have and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable

expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, UnitedHealth, joint and several with Defendants, Florida Blue, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 25 - ABUSE OF PROCESS
**(Against UnitedHealth)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

489.    As set forth above, Defendant, UnitedHealth, engaged in an illegal, improper, or perverted use of process.

490.    Specifically, Defendant, UnitedHealth, knew that the Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and, in fact, Defendant, UnitedHealth, knew that the claims the Plaintiffs submitted for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital were valid claims, they just didn't like it.

491.    Additionally, Defendant, UnitedHealth, knew that the Plaintiffs never submitted fraudulent claims for confirmation tests because they provided evidence to the contrary.

492.    Despite their knowledge of the facts, Defendant, UnitedHealth, knowingly submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, prosecuted and imprisoned.

126

493.     At all times relevant hereto, Defendant, UnitedHealth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, UnitedHealth, and that the Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, UnitedHealth, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward to avoid having to pay the claims for the above.

494.     At all times relevant hereto, Defendant, UnitedHealth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

495.     Defendant, UnitedHealth, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

496.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, UnitedHealth actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant, UnitedHealth, for damages, including punitive damages together with such other relief this Court deems just and proper.

### Count 26 - CONSPIRACY TO COMMIT ABUSE OF PROCESS
### (Against UnitedHealth)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

497.    This is an action seeking compensatory damages for conspiring to abuse process relative to the Criminal Case against Plaintiffs.

498.    Defendant, UnitedHealth, and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

499.    Defendant, UnitedHealth, and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the prosecutor exculpatory evidence related to the POS Code 22.

500.    Defendant, UnitedHealth and the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna collaborated, conspired, and acted in concert to falsely allege and testify that the Plaintiffs fraudulently billed for confirmation tests.

501.    Defendant, UnitedHealth, knew that the Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and, in fact, they knew that they Plaintiffs submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

502.    Defendant, UnitedHealth, knew that the Plaintiffs never submitted fraudulent claims for confirmation tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

503.    However, despite this knowledge, Defendant, UnitedHealth, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, and that in fact substantially caused the abuse of process.

504.    At all times relevant hereto, Defendant, UnitedHealth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, UnitedHealth, and that the Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

505.    At all times relevant hereto, Defendant, UnitedHealth, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

506.    Defendant, UnitedHealth, neglected to inform the government of the above in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

507.    Defendant, UnitedHealth, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

508.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, UnitedHealth's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, UnitedHealth, joint and several with Defendants, Florida Blue, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 27 - AIDING AND ABETTING ABUSE OF PROCESS
**(Against UnitedHealth)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

509.    Defendants committed the underlying abuse of process against Plaintiffs by providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

510.    Defendant, UnitedHealth, was aware of the false information it was providing to the government because its own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs, and which were at issue in the Criminal Case.

511.    Nonetheless, Defendant, UnitedHealth, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, UnitedHealth, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim.  Defendant, UnitedHealth, failed to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the code had been placed on the claims by Defendant, UnitedHealth's, own adjudication system.

512.    Defendant, UnitedHealth, also provided false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when they stated that the Plaintiffs fraudulently billed for confirmation tests despite evidence to the contrary.

513.    By providing false information and testimony, Defendant, UnitedHealth, aided and abetted the other Defendants, Florida Blue, Georgia Blue, Anthem and Aetna to abuse the process in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward knowing that the allegations were distorted and untrue.

514.    Defendant, UnitedHealth, deliberately acted knowing that the information being provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, and its actions did in fact substantially contribute to the abuse of process against Plaintiffs.

515.    Defendant, UnitedHealth, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

516.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, UnitedHealth's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, UnitedHealth, joint and several with Defendants, Florida Blue, Anthem and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 28 - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against UnitedHealth)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

517.    By, among other things, communicating false information to third parties in the healthcare industry about Plaintiffs, providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and aiding in the malicious prosecution of Plaintiffs in the Criminal Case, Defendant, UnitedHealth, intentionally and unjustifiably interfered with Plaintiffs' beneficial business relationships with their clients and third-party payors.

518.    Defendant, UnitedHealth, was aware of Plaintiffs' aforementioned business relationships with clients, which included healthcare providers and laboratories across the country, as well as third-party payors.

519.    Defendant's, UnitedHealth, actions caused Plaintiffs to shut down their various businesses, which in turn disrupted the aforementioned business relationships.

520.    The Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, UnitedHealth's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages and punitive damages against Defendant, UnitedHealth, together with such further and additional relief as this Honorable Court deems just and proper.

## Count 29 – NEGLIGENCE
### (Against UnitedHealth)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

521.    Plaintiffs plead this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

522.    At all times material hereto, Defendant, UnitedHealth, owed a duty to Plaintiffs to act in good faith and not provide false information to government agencies.

523.    Defendant, UnitedHealth, breached its duties to the Plaintiffs by providing the Department of Justice and United States Attorney's Office for the Middle District of Florida  false information, to include a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, UnitedHealth, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, and then failing to advise the government that the code had been placed on the claims by Defendant, UnitedHealth's, own adjudication system.

524.    Defendant, UnitedHealth, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because its own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs, and which were at issue in the Criminal Case.

525.    Defendant, UnitedHealth, also falsely alleged and testified that the Plaintiffs fraudulently billed for confirmation tests.

526.    Alternatively, if Defendant, UnitedHealth was not aware that the information it was providing to the Department of Justice and the United States Attorney's Office for the Middle

District of Florida was false, then it was negligent in providing false information that it should have known was false with proper due diligence.

527.     Therefore, Defendant, UnitedHealth, acted negligently against the Plaintiffs.

528.     As a direct and proximate result of Defendant, UnitedHealth's negligence, the Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages and punitive damages against Defendant, UnitedHealth, together with such further and additional relief as this Honorable Court deems just and proper.

### Count 30 - CIVIL REMEDIES FOR CRIMINAL ACTIVITIES
**(Against Anthem)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

529.     This Count alleges claims against Defendant, Anthem, under the Florida Civil Remedies for Criminal Practices Act, codified in Chapter 772 of the Florida Statutes, asserting a statutory right of action against Defendants Florida Blue, Georgia Blue, UnitedHealth, Anthem and Aetna, for its conduct of, or participation in, an enterprise through a pattern of criminal activity in violation of Sections 772.103(3) of the Florida Statutes.

530.     Pursuant to Section 772.103(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation,…or other legal entity,…or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

531.     Section 772.103(3) further provides that it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of criminal activity*…."

532.     At all times relevant hereto, each of the Defendants were an association-in-fact "enterprise" within the meaning of Sections 772.102(3) and 772.103(3).  The Defendants and other members and associates of the Enterprise had connections and relationships with one another and with the Enterprise.  The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise operated in Broward County, Florida, and elsewhere, for a period of time sufficient to permit its members and associates to pursue its objectives.

533.     Each of the Defendants, by, through and with its officers, employees, agents, or representatives, devised or engaged in a scheme where they were associated with the Enterprise to conduct or participate, directly or indirectly, in such Enterprise through a pattern of criminal activity.

534.     Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents."  Fla. Stat. §772.102(4).

535.     The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes the following related incidents of criminal activity and racketeering activity over an extended period of time, as more specifically set forth above:

        a.     Conspiracy to Violate the Florida Communications Act, in violation of Section 817.034, by engaging in a scheme to defraud and in furtherance

of that scheme, used electronic mail communications to obtain property from that person, in that employees, agents or representatives of Defendants transmitted numerous emails between and amongst each other, and to Plaintiffs, as part of a scheme to deprive Plaintiffs of money from Plaintiffs;

b.       Conspiracy to Commit Perjury in Official Proceedings, in violation of Section 837.02, by making false statements, which he or she does not believe to be true, under oath in an official proceeding in regards to any material matter, in that employees, agents or representatives of Defendants testified falsely before a federal grand jury and during multiple criminal trials, about a variety of material matters, including false testimony about the type of testing performed at the rural hospitals, the type of testing billed by the rural hospitals to the Defendants, and specific codes included on claims submitted by the rural hospitals to the Defendants;

c.       Conspiracy to Make False Reports to Law Enforcement Authorities, in violation of Section 837.05, by knowingly giving false information to law enforcement officers concerning the alleged commission of any crime, in that Defendants provided false information and false documents to the agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participated in a scheme to defraud Defendants;

d.       Conspiracy to Make False Reports of Commission of Crimes, in violation of Section 817.49, by willfully imparting, conveying, or causing to be imparted or conveyed to a law enforcement officer or employee of a public safety agency false information or reports concerning the alleged

commission of a crime by Plaintiffs, knowing such information or report to be false, and when no such crime had actually been committed, in that Defendants provided false information and false documents to agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participate in a scheme to defraud Defendants;

e.      Conspiracy to Fabricate Physical Evidence, in violation of Section 918.13, by making, presenting or using any record, document, or other item, knowing it to be false, during the investigation of Plaintiffs by law enforcement and later during the criminal trials of Plaintiffs, in that Defendants provided false billing data and false billing documents to agents with the FBI and OPM-OIG, and to members of the United States Department of Justice during the investigation of Plaintiffs, and later during the criminal trial of Plaintiffs in the Middle District of Florida.

536.    The criminal activity of Defendants occurred repeatedly for more than five years, were continuous, and were not isolated incidents or events.

537.    The criminal acts of Defendants constitute a pattern of criminal activity in that they have similar intents, results and methods.

538.    Each Defendant played a role in the management or operation of the scheme perpetrated by and through the Enterprise.

539.    The Defendants' pattern of racketeering activity is related because it manifests in the same or similar methods of commission having related characteristics perpetrated for the same objectives against the same or similar victims, including Plaintiffs.  These other victims include the rural hospitals set forth herein, and other independent laboratories similar to Reliance, such as

Lifebrite Laboratories, Sun Toxicology, Mission Toxicology, Advance Clinical Laboratory Services, Aspen Hill Diagnostics, Auspicious Laboratory, Avutox Laboratories, Assurance Scientific Laboratories, Axis Diagnostics Laboratory, Certus Laboratories, Complete Toxicology, Eclipse Toxicology, Elite Diagnostics, Hill Country Toxicology, Laboratory Service of America, Qualitox Laboratories, Principal Labs, B3 Diagnostic Laboratory, Central Clinical Laboratory, Cadira Labs, Sera Dynamics and Complete Recovery Lab, among others.

540.    The criminal enterprise gained considerable consideration from the pattern of racketeering activity, by failing to pay valid claims submitted for payment by Plaintiffs and others, and Defendants will continue to profit financially from this pattern of racketeering activity.

541.    The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of Section 772.103(3) and the predicate acts enumerated above.

542.    Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

543.    Defendants are therefore liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees pursuant to Section 772.104(1).

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Anthem, for damages in the amount of three times the actual damages sustained by the Plaintiffs; reasonable attorneys' fees and costs; punitive damages and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

## Count 31 - MALICIOUS PROSECUTION
### (Against Anthem)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

544.     This is an action seeking compensatory damages for malicious prosecution relative to the criminal prosecution against the Plaintiffs known as *United States v. Aaron Durall, Neisha Zaffuto, et al.*, Court Docket No. 3:20-cr-86 (M.D. Florida) (the "Criminal Case").

545.     On or around August of 2018, Defendant, Anthem, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida with false information, including a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Anthem for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital.  Anthem falsely alleged that the Plaintiffs had submitted fraudulent claims in connection with each and every one of the claims submitted to Defendant, Anthem, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Anthem, falsely and fraudulently alleged that the Plaintiffs submitted their claims for laboratory services with a POS Code 22.

546.     The POS Code 22 is a code that represents to private insurers that the patient was physically present at the hospital as an outpatient, had tests performed at hospital, and left that same day.

547.     In the Criminal Case, it was undisputed that none of the patients were physically present as patients (inpatient or outpatient) of Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Thus, if Plaintiffs included a POS Code 22 on each claim submitted to Defendant, Anthem, as alleged by Defendant, Anthem, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, then each claim submitted by Plaintiffs would have been false and fraudulent.

548.    However, the information provided by Defendant, Anthem, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida about Plaintiffs submitting claims with a POS Code 22 was false, malicious and lacked probable cause.

549.    Plaintiffs never placed a POS Code 22 on any claims that were at issue in the Criminal Case. A careful review of the evidence in the Criminal Case revealed that it was Defendant, Anthem, and not Plaintiffs, that placed the POS Code 22 on all of the subject claims.

550.    Nonetheless, the discovery in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the information provided by Defendant, Anthem, in the claims data regarding the POS Code 22 in wrongfully prosecuting the Criminal Case against Plaintiffs.

551.    Once it was revealed that the Plaintiffs did not place the POS Code 22 on the subject claims, Defendant, Anthem, then falsely and maliciously alleged that Plaintiffs billed and were paid for confirmation tests that we not performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. This false and malicious allegation also lacked probable cause and was contrary to the evidence.

552.    Accordingly, at all material times herein, Defendant, Anthem, was the direct and proximate cause for the malicious prosecution of Criminal Case proceedings against the Plaintiffs.

553.    After more than five (5) years, and two (2) criminal trials, Plaintiffs were acquitted by a jury on March 21, 2023.

554.    Plaintiffs' acquittal in the Criminal Case was predicated upon a jury finding that there was no evidence or probable cause to substantiate the charges against Plaintiffs.

555.    At all material times hereto, Defendant, Anthem, brought false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida with malice.

556.    Defendant, Anthem, deliberately and maliciously intended to make false accusations that Plaintiffs were engaged in criminal and illicit activities.

557.    Among other malicious accusations, Defendant, Anthem, accused the Plaintiffs of fraudulently and excessively billing for laboratory services.

558.    Defendant, Anthem, maliciously accused Plaintiffs of being involved in an insurance-based scheme with the objective of wrongfully procuring insurance reimbursements.

559.    As more specifically alleged above, the false accusations by Defendant, Anthem, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida were part of a demonstrative pattern of false claim practices that was designed to avoid paying millions of dollars of appropriately billed claims by Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Anthem, did this with malice and without any regard for how this would impact Plaintiffs' professional and personal lives.

560.    At all material times hereto, Plaintiffs retained legal counsel to defend the maliciously prosecuted Criminal Case and spent a substantial amount of money in attorney fees in the defense thereof.

561.    At all material times, Defendant, Anthem's, actions relative to the malicious prosecution of the Criminal was done willfully, wantonly, and with egregious and reckless disregard for the rights of Plaintiffs.

562.     Since the information relied on by the Department of Justice and the United States Attorney's Office for the Middle District of Florida in the Criminal Case was false, there was an absence of probable cause to proceed with a criminal investigation against the Plaintiffs.

563.     As a direct and proximate result of Defendant, Anthem's, conduct in committing malicious prosecution, Plaintiffs have sustained compensatory damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully demand judgment against Defendant, Anthem, for damages, including punitive damages together with such other relief this Court deems just and proper.

<u>**Count 32 - CONSPIRACY TO MALICIOUSLY PROSECUTE**</u>
**(Against Anthem)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

564.     This is an action seeking compensatory damages for conspiring to maliciously prosecute relative to the Criminal Case against Plaintiffs.

565.     Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna, collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

566.     Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna, collaborated, conspired, and acted overtly in concert to falsely identify

Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the government exculpatory evidence related to the POS Code 22 and confirmation tests purportedly billed and paid for by Defendant.

567.    Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna, proceeded to overtly bring false and malicious claims to the Department of Justice and the United States Attorney's Office for the Middle District of Florida knowing there was no factual basis to justify a finding of probable cause for crimes against Plaintiffs.

568.    Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna, acted overtly and with malice in providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in its proactive efforts to persuade the government to bring charges against Plaintiffs, while intentionally withholding the exculpatory evidence regarding the POS Code 22 and the confirmation tests purportedly billed and paid for.

569.    Plaintiffs suffered damages as a result of the acts performed through the conspiracy between Defendants to maliciously prosecute Plaintiffs, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Anthem, for damages, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna and punitive damages together with such other relief this Court deems just and proper.

### Count 33 - AIDING AND ABETTING MALICIOUS PROSECUTION
**(Against Anthem)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

570.    Defendant, Anthem, committed the underlying malicious prosecution against the Plaintiffs by overtly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

571.    Defendant, Anthem, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case.  Defendant, Anthem, was also aware that allegation that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests was false.

572.    Nonetheless, Defendant, Anthem, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by the Plaintiffs in connection with all of the claims submitted to Defendant, Anthem, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, and Defendant, Anthem, intentionally neglected to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 had been placed on the claims by Defendant, Anthem's, own adjudication system.

573.    The discovery and evidence in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the information provided by Defendant, Anthem, in the claims data about the POS Code 22 in building and ultimately prosecuting the Criminal Case against Plaintiffs.

574.     The discovery and evidence in the Criminal Case also revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the specious allegation by Defendant, Anthem, that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests.

575.     Defendant, Anthem, aided and abetted Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the POS Code 22 was placed on the claims submission forms by Plaintiffs, thereby allowing the government to criminally prosecute Plaintiffs based on information Defendant, Anthem, knew to be false.

576.     Defendant, Anthem, aided and abetted Defendants, Florida Blue, Georgia Blue, UnitedHealth, and Aetna in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the majority of the toxicology tests being performed were confirmation tests.

577.     Had Defendant, Anthem, not provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida false information concerning Plaintiffs, the Criminal Case would not have occurred.

578.     Defendant, Anthem, failed to disclose crucial information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, which would have prevented the malicious prosecution of Plaintiffs. By failing to disclose that critical information and exculpatory evidence, Defendant, Anthem, substantially assisted the malicious prosecution.

579.     Defendant, Anthem's, actions caused the Criminal Case to be pursued against Plaintiffs.

580.    Defendant, Anthem, knowingly and intentionally allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that the Plaintiffs had fraudulently submitted claims for reimbursement of laboratory services using the POS Code 22.

581.    Defendant, Anthem, knowingly and intentionally allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that the Plaintiffs had fraudulently submitted claims for confirmation tests that were not performed.

582.    The Department of Justice and the United States Attorney's Office for the Middle District of Florida did in fact rely on Defendant, Anthem's, false information when the government prosecuted the Criminal Case against the Plaintiffs.

583.    As a result of Defendant, Anthem, aiding and abetting the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna in the underlying malicious prosecution, the Plaintiffs have and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Anthem, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 34 - ABUSE OF PROCESS
**(Against Anthem)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

584.    As set forth above, Defendant, Anthem, engaged in an illegal, improper, or perverted use of process.

585.    Specifically, Defendant, Anthem, knew that the Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and, in fact, Defendant, Anthem, knew that the Plaintiffs submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

586.    Further, Defendant, Anthem, knew that the Plaintiffs never submitted fraudulent claims for confirmation tests.

587.    However, Defendant, Anthem, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have the Plaintiffs criminally charged, prosecuted and imprisoned.

588.    At all times relevant hereto, Defendant, Anthem, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, Anthem, and that the Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Anthem, neglected to notify the government that they were the ones who placed the POS Code 22 on each and every single bill in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward for their benefit.

589.    At all times relevant hereto, Defendant, Anthem, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

590.    Defendant, Anthem, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

591.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Anthem's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant, Anthem, for damages, including punitive damages together with such other relief this Court deems just and proper.

## Count 35 - CONSPIRACY TO COMMIT ABUSE OF PROCESS
### (Against Anthem)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

592.    This is an action seeking compensatory damages for conspiring to abuse process relative to the Criminal Case against Plaintiffs.

593.    Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

594.    Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna collaborated, conspired, and acted in concert to falsely identify Plaintiffs

as the perpetrators of healthcare fraud by unlawfully failing to disclose to the government exculpatory evidence related to the POS Code 22.

595.   Defendant, Anthem, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna collaborated, conspired, and acted in concert when they alleged and testified under oath that the Plaintiffs fraudulently billed for confirmation tests knowing that to be false.

596.   Defendant, Anthem, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and that Plaintiffs in fact submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

597.   Defendant, Anthem, also knew that Plaintiffs never submitted fraudulent claims for confirmation tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

598.   However, Defendant, Anthem, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have the Plaintiffs criminally charged, thus, substantially causing the abuse of process.

599.   At all times relevant hereto, Defendant, Anthem, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on every single claim by Defendant, Anthem, and that the Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

600.    At all times relevant hereto, Defendant, Anthem, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the Plaintiffs did not fraudulently bill for confirmation tests.

601.    Defendant, Anthem, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

602.    Defendant, Anthem, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

603.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Anthem's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Anthem, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 36 - AIDING AND ABETTING ABUSE OF PROCESS
### (Against Anthem)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

604.    Defendant, Anthem, committed the underlying abuse of process against Plaintiffs by providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

605. Defendant, Anthem, was aware of the false information it was providing to the government because Defendant, Anthem, knew that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case.

606. Nonetheless, Defendant, Anthem, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida information, to include a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Anthem, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, but Defendant, Anthem, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the code had been placed on the claims by Defendant, Anthem's, own adjudication system and had the government believe that the Plaintiffs placed the POS Code 22 on each and every claim they submitted.

607. Defendant, Anthem, also provided false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida when they stated that the Plaintiffs fraudulently billed for confirmation tests.

608. By providing false information and testimony, Defendant, Anthem, aided and abetted the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna to abuse the process in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward knowing that the allegations made were distorted and untrue.

609. Defendant, Anthem, overtly acted knowing that the information being provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida

was false, and their actions did in fact substantially contribute to the abuse of process against the Plaintiffs.

610.     Defendant, Anthem, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force the Plaintiffs out of the healthcare business.

611.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Anthem's actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Anthem, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Aetna and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

## Count 37 – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against Anthem)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

612.     By, among other things, communicating false information to third parties in the healthcare industry about Plaintiffs, providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and aiding in the malicious prosecution of Plaintiffs in the Criminal Case, Defendant, Anthem, intentionally and unjustifiably interfered with Plaintiffs' beneficial business relationships with their clients and third-party payors.

613.     Defendant, Anthem, was aware of Plaintiffs' aforementioned business relationships with clients, which included healthcare providers and laboratories across the country, as well as third-party payors.

614.     Defendant's, Anthem, actions caused Plaintiffs to shut down their various businesses, which in turn disrupted the aforementioned business relationships.

615.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Anthem's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Anthem together with such further and additional relief as this Honorable Court deems just and proper.

## Count 38 – NEGLIGENCE
### (Against Anthem)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

616.     Plaintiffs plead this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

617.     At all times material hereto, Defendant, Anthem, owed a duty to the Plaintiffs to act in good faith and not provide false information to government agencies.

618.     Defendant, Anthem, breached its duties to Plaintiffs by providing the Department of Justice and United States Attorney's Office for the Middle District of Florida  false information, to include a spreadsheet of billing data that purported to represent the information submitted by

the Plaintiffs in connection with all of the claims submitted to Defendant, Anthem, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, and failing to advise the government that the code had been placed on the claims by Defendant, Anthem's, own adjudication system.

619.    Defendant, Anthem, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because its own adjudication systems placed the POS Code 22 on the claims submitted by the Plaintiffs which were at issue in the Criminal Case.

620.    Defendant, Anthem, also falsely alleged and then falsely testified that the Plaintiffs fraudulently billed for confirmation tests.

621.    Alternatively, if Defendant, Anthem was not aware that the information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, then it was negligent in providing false information that it should have known was false with proper due diligence.

622.    Therefore, Defendant, Anthem, acted negligently against Plaintiffs.

623.    As a direct and proximate result of Defendant, Anthem's, negligence, the Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages, including punitive damages against Defendant, Anthem, together with such further and additional relief as this Honorable Court deems just and proper.

## Count 39 - CIVIL REMEDIES FOR CRIMINAL ACTIVITIES
### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

624.     This Count alleges claims against Defendant, Aetna, under the Florida Civil Remedies for Criminal Practices Act, codified in Chapter 772 of the Florida Statutes, asserting a statutory right of action against Defendants Florida Blue, Georgia Blue, UnitedHealth, Anthem and Aetna, for its conduct of, or participation in, an enterprise through a pattern of criminal activity in violation of Sections 772.103(3) of the Florida Statutes.

625.     Pursuant to Section 772.103(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation,…or other legal entity,…or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

626.     Section 772.103(3) further provides that it is unlawful for any person "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a *pattern of criminal activity*…."

627.     At all times relevant hereto, each of the Defendants were an association-in-fact "enterprise" within the meaning of Sections 772.102(3) and 772.103(3).  The Defendants and other members and associates of the Enterprise had connections and relationships with one another and with the Enterprise.  The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise operated in Broward County, Florida, and elsewhere, for a period of time sufficient to permit its members and associates to pursue its objectives.

628.    Each of the Defendants, by, through and with its officers, employees, agents, or representatives, devised or engaged in a scheme where they were associated with the Enterprise to conduct or participate, directly or indirectly, in such Enterprise through a pattern of criminal activity.

629.    Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents."  Fla. Stat. §772.102(4).

630.    The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes the following related incidents of criminal activity and racketeering activity over an extended period of time, as more specifically set forth above:

> a.      Conspiracy to Violate the Florida Communications Act, in violation of Section 817.034, by engaging in a scheme to defraud and in furtherance of that scheme, used electronic mail communications to obtain property from that person, in that employees, agents or representatives of Defendants transmitted numerous emails between and amongst each other, and to Plaintiffs, as part of a scheme to deprive Plaintiffs of money from Plaintiffs;

> b.      Conspiracy to Commit Perjury in Official Proceedings, in violation of Section 837.02, by making false statements, which he or she does not believe to be true, under oath in an official proceeding in regards to any material matter, in that employees, agents or representatives of Defendants testified falsely before a federal grand jury and during multiple criminal trials, about a variety of material matters, including false testimony about

the type of testing performed at the rural hospitals, the type of testing billed by the rural hospitals to the Defendants, and specific codes included on claims submitted by the rural hospitals to the Defendants;

c.     Conspiracy to Make False Reports to Law Enforcement Authorities, in violation of Section 837.05, by knowingly giving false information to law enforcement officers concerning the alleged commission of any crime, in that Defendants provided false information and false documents to the agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participated in a scheme to defraud Defendants;

d.     Conspiracy to Make False Reports of Commission of Crimes, in violation of Section 817.49, by willfully imparting, conveying, or causing to be imparted or conveyed to a law enforcement officer or employee of a public safety agency false information or reports concerning the alleged commission of a crime by Plaintiffs, knowing such information or report to be false, and when no such crime had actually been committed, in that Defendants provided false information and false documents to agents with the FBI and OPM-OIG falsely claiming that Plaintiffs and others participate in a scheme to defraud Defendants;

e.     Conspiracy to Fabricate Physical Evidence, in violation of Section 918.13, by making, presenting or using any record, document, or other item, knowing it to be false, during the investigation of Plaintiffs by law enforcement and later during the criminal trials of Plaintiffs, in that Defendants provided false billing data and false billing documents to agents

with the FBI and OPM-OIG, and to members of the United States Department of Justice during the investigation of Plaintiffs, and later during the criminal trial of Plaintiffs in the Middle District of Florida.

631.    The criminal activity of Defendants occurred repeatedly for more than five years, were continuous, and were not isolated incidents or events.

632.    The criminal acts of Defendants constitute a pattern of criminal activity in that they have similar intents, results and methods.

633.    Each Defendant played a role in the management or operation of the scheme perpetrated by and through the Enterprise.

634.    The Defendants' pattern of racketeering activity is related because it manifests in the same or similar methods of commission having related characteristics perpetrated for the same objectives against the same or similar victims, including Plaintiffs.  These other victims include the rural hospitals set forth herein, and other independent laboratories similar to Reliance, such as Lifebrite Laboratories, Sun Toxicology, Mission Toxicology, Advance Clinical Laboratory Services, Aspen Hill Diagnostics, Auspicious Laboratory, Avutox Laboratories, Assurance Scientific Laboratories, Axis Diagnostics Laboratory, Certus Laboratories, Complete Toxicology, Eclipse Toxicology, Elite Diagnostics, Hill Country Toxicology, Laboratory Service of America, Qualitox Laboratories, Principal Labs, B3 Diagnostic Laboratory, Central Clinical Laboratory, Cadira Labs, Sera Dynamics and Complete Recovery Lab, among others.

635.    The criminal enterprise gained considerable consideration from the pattern of racketeering activity, by failing to pay valid claims submitted for payment by Plaintiffs and others, and Defendants will continue to profit financially from this pattern of racketeering activity.

636.    The injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violations of Section 772.103(3) and the predicate acts enumerated above.

637.    Plaintiffs have been and will continue to be injured in an amount to be determined at trial.

638.    Defendants are therefore liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees pursuant to Section 772.104(1).

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Aetna, for damages in the amount of three times the actual damages sustained by the Plaintiffs; reasonable attorneys' fees and costs; punitive damages and for such other and further relief, in law or in equity, as this Court deems just and proper under the circumstances.

### Count 40 - MALICIOUS PROSECUTION
**(Against Aetna)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

639.    This is an action seeking compensatory damages for malicious prosecution relative to the criminal prosecution against Plaintiffs known as *United States v. Aaron Durall, Neisha Zaffuto, et al.*, Court Docket No. 3:20-cr-86 (M.D. Florida) (the "Criminal Case").

640.    On or around August of 2018, Defendant, Aetna, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida with false information, including a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Aetna for laboratory tests performed at Chestatee Regional Hospital, Campbelltown-Graceville Hospital, and Regional General Hospital. Aetna falsely alleged that the Plaintiffs had submitted fraudulent claims in connection with all of the claims submitted to Defendant, Aetna, for laboratory tests performed at

Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Aetna falsely and fraudulently alleged that the Plaintiffs submitted their claims for laboratory services with a POS Code 22.

641.    The POS Code 22 is a code that represents to private insurers that the patient was physically present at the hospital as an outpatient, had tests performed at hospital, and left that same day.

642.    In the Criminal Case, it was undisputed that none of the patients were physically present as patients (inpatients or outpatients) of Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Thus, if the Plaintiffs included a POS Code 22 on each claim submitted to Defendant, Aetna, as alleged by Defendant, Aetna, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, then each claim submitted by Plaintiffs would have been false and fraudulent.

643.    However, the information provided by Defendant, Aetna, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida about the Plaintiffs' submitting claims with a POS Code 22 was false, malicious and lacked probable cause.

644.    Plaintiffs never placed a POS Code 22 on any claim that was at issue in the Criminal Case and a careful review of the evidence in the Criminal Case revealed that it was actually Defendant, Aetna, and not Plaintiffs, that placed the POS Code 22 on every single one of the subject claims.

645.    It should be noted that the discovery in the Criminal Case revealed that in prosecuting the Criminal Case against the Plaintiffs, the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the distorted information provided by Defendant, Aetna, in the claims data regarding the POS Code 22.

646.    Once it was revealed that the Plaintiffs did not place the POS Code 22 on the subject claims, Defendant, Aetna, then falsely and maliciously alleged that Plaintiffs billed and were paid for confirmation tests that we not performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. This false and malicious allegation also lacked probable cause.

647.    Accordingly, at all material times hereto, Defendant, Aetna, was the direct and proximate cause for the malicious prosecution of Criminal Case against the Plaintiffs.

648.    After more than five (5) years, and two (2) criminal trials, Plaintiffs were acquitted by a jury on March 21, 2023.

649.    Plaintiffs' acquittal in the Criminal Case was predicated upon a jury finding that there was no evidence or probable cause to substantiate the charges against Plaintiffs.

650.    At all material times hereto, Defendant, Aetna, brought false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida with malice.

651.    Defendant, Aetna deliberately and maliciously intended to make false accusations that Plaintiffs were engaged in criminal and illicit activities.

652.    Among other malicious accusations, Defendant, Aetna, accused the Plaintiffs of fraudulently and excessively billing for laboratory services.

653.    Defendant, Aetna, maliciously accused the Plaintiffs of being involved in an insurance-based scheme with the objective of wrongfully procuring insurance reimbursements.

654.    As more specifically alleged above, the false accusations by Defendant, Aetna, to the Department of Justice and the United States Attorney's Office for the Middle District of Florida were part of a demonstrative pattern of false claim practices that was designed to avoid paying

millions of dollars of appropriately billed claims by Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Aetna, did this with malice and without any regard for how this would impact Plaintiffs' professional and personal lives.

655.     At all material times hereto, Plaintiffs retained legal counsel to defend the maliciously prosecuted Criminal Case and spent a substantial amount of money in attorney's fees in defense of these fraudulent claims.

656.     At all material times hereto, Defendant, Aetna's, actions relative to the malicious prosecution of the Criminal Case was done willfully, wantonly, and with egregious and reckless disregard for the rights of Plaintiffs.

657.     Since the information relied on by the Department of Justice and the United States Attorney's Office for the Middle District of Florida in the Criminal Case was false, there was an absence of probable cause to proceed against Plaintiffs.

658.     As a direct and proximate result of Defendant, Aetna's, conduct in committing malicious prosecution, Plaintiffs have sustained compensatory damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Aetna for damages, including punitive damages together with such other relief this Court deems just and proper.

## Count 41 - CONSPIRACY TO MALICIOUSLY PROSECUTE
### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

659.     This is an action seeking compensatory damages for conspiring to maliciously prosecute relative to the Criminal Case against the Plaintiffs.

660.     Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem, collaborated, conspired, and acted in concert to falsely identify the Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

661.     Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem, collaborated, conspired, and acted overtly in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose exculpatory evidence related to the POS Code 22 and confirmation tests purportedly billed and paid for to the government.

662.     Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem, proceeded to overtly bring false and malicious claims to the Department of Justice and the United States Attorney's Office for the Middle District of Florida knowing there was no real probable cause for crimes against the Plaintiffs.

663.     Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem, acted overtly and with malice in providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida to persuade the government to bring charges against Plaintiffs, without disclosing the exculpatory evidence regarding the POS Code 22 and the confirmation tests purportedly billed and paid for.

664.     Plaintiffs suffered damages as a result of the acts performed through the conspiracy between Defendants to maliciously prosecute Plaintiffs, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to

reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, the Plaintiffs demand judgment against Defendant, Aetna, for damages, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem and punitive damages together with such other relief this Court deems just and proper.

### Count 42 - AIDING AND ABETTING MALICIOUS PROSECUTION
### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

665.    Defendants committed the underlying malicious prosecution against Plaintiffs by overtly providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

666.    Defendant, Aetna, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because Defendant, Aetna, knew or should have known that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case. Defendant, Aetna, was also aware that allegation that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests was false.

667.    Nonetheless, Defendant, Aetna, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Aetna, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, but conveniently failed to advise the Department of Justice and the United States Attorney's

Office for the Middle District of Florida that the POS Code 22 had been placed on the claims by Defendant, Aetna's, own adjudication system.

668.    The discovery and evidence in the Criminal Case revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the false and misleading information provided by Defendant, Aetna, in the claims data about POS Code 22 in building the Criminal Case against Plaintiffs.

669.    The discovery and evidence in the Criminal Case also revealed that the Department of Justice and the United States Attorney's Office for the Middle District of Florida relied on the specious allegation by Defendant, Aetna, that the majority of the toxicology tests performed by the Plaintiffs were confirmation tests.

670.    Defendant, Aetna, aided and abetted the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the POS Code 22 was placed on the claims' submission forms by Plaintiffs, thereby allowing the government to criminally prosecute Plaintiffs based on false and distorted information.

671.    Defendant, Aetna, aided and abetted Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem in the underlying malicious prosecution of Plaintiffs as referenced above by overtly providing false information that the majority of the toxicology tests being performed were confirmation test despite evidence to the contrary.

672.    Had Defendant, Aetna, not provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida false information concerning the Plaintiffs, the Criminal Case would not have occurred.

673.     Defendant, Aetna, failed to disclose crucial information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and such disclosure would have prevented the malicious prosecution of Plaintiffs, so it follows that Defendant, Aetna's failure to disclose the exculpatory information substantially assisted in the malicious prosecution of the Plaintiffs.

674.     Defendant, Aetna's, actions caused the Criminal Case to be pursued against the Plaintiffs.

675.     Defendant, Aetna, knowingly and intentionally allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that Plaintiffs had fraudulently submitted claims for reimbursement of laboratory services using the POS Code 22.

676.     Defendant, Aetna, knowingly and intentionally allowed the Department of Justice and the United States Attorney's Office for the Middle District of Florida to believe that that Plaintiffs had fraudulently submitted claims for confirmation tests that were not performed.

677.     The Department of Justice and the United States Attorney's Office for the Middle District of Florida did in fact rely on Defendant, Aetna's, false information when the government prosecuted the Criminal Case against the Plaintiffs.

678.     As a result of Defendant, Aetna, aiding and abetting the other Defendants, Florida Blue, UnitedHealth and Anthem in the underlying malicious prosecution, Plaintiffs have and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Aetna, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

<u>**Count 43 - ABUSE OF PROCESS**</u>
**(Against Aetna)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

679.    As set forth above, Defendant, Aetna, engaged in an illegal, improper, or perverted use of process.

680.    Specifically, Defendant, Aetna, knew that the Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and, in fact, Defendant knew that the Plaintiffs submitted valid claims for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

681.    Additionally, Defendant, Aetna, knew that Plaintiffs never submitted fraudulent claims for confirmation tests.

682.    Despite knowing that Plaintiffs were innocent, Defendant, Aetna, submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, prosecuted and imprisoned.

683.    At all times relevant hereto, Defendant, Aetna, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, Aetna, and that Plaintiffs had properly billed all claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital. Defendant, Anthem, never informed the government that

they were the ones who placed the POS Code 22 on every single claim of theirs in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

684.    At all times relevant hereto, Defendant, Aetna, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that Plaintiffs did not fraudulently bill for confirmation tests.

685.    Defendant, Aetna, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

686.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Aetna's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, Aetna, for damages, including punitive damages together with such other relief this Court deems just and proper.

### Count 44 - CONSPIRACY TO COMMIT ABUSE OF PROCESS
**(Against Aetna)**

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

687.    This is an action seeking compensatory damages for conspiring to abuse process relative to the Criminal Case against Plaintiffs.

688.    Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem collaborated, conspired, and acted in concert to falsely identify

Plaintiffs as the perpetrators of healthcare fraud, with reckless disregard for the truth of the matter and with great indifference to the persons, property, or rights of Plaintiffs.

689.    Defendant, Aetna, and the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem collaborated, conspired, and acted in concert to falsely identify Plaintiffs as the perpetrators of healthcare fraud by unlawfully failing to disclose to the government exculpatory evidence related to the POS Code 22.

690.    Defendant, Aetna, and the other Defendants, Florida, Georgia Blue, UnitedHealth and Anthem collaborated, conspired, and acted in concert to falsely allege and testify that the Plaintiffs fraudulently billed for confirmation tests.

691.    Defendant, Aetna, knew that Plaintiffs never submitted the claims at issue in the Criminal Case using the POS Code 22 and, in fact, Defendant, Aetna, knew that Plaintiffs submitted valid claims for the laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

692.    Defendant, Aetna, knew that the Plaintiffs never submitted fraudulent claims for confirmation tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

693.    However, Defendant, Aetna, knowingly submitted false evidence to the Department of Justice and the United States Attorney's Office for the Middle District of Florida in an effort to have Plaintiffs criminally charged, and this in fact substantially caused the abuse of process.

694.    At all times relevant hereto, Defendant, Aetna, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22 was placed on the claims by Defendant, Aetna, and that Plaintiffs had properly billed all

claims for laboratory testing performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital.

695.     At all times relevant hereto, Defendant, Aetna, failed to inform the Department of Justice and the United States Attorney's Office for the Middle District of Florida that Plaintiffs did not fraudulently bill for confirmation tests.

696.     Defendant, Aetna, did so in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward.

697.     Defendant, Aetna, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

698.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Aetna's actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Aetna, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem and punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 45 - AIDING AND ABETTING ABUSE OF PROCESS
### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

699.     Defendant, Aetna, committed the underlying abuse of process against Plaintiffs by providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida.

700.     Defendant, Aetna, was aware of the false information it provided to the government because they knew that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case.

701.     Nonetheless, Defendant, Aetna, provided the Department of Justice and the United States Attorney's Office for the Middle District of Florida information, to include a spreadsheet of billing data that purported to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Anthem, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, but Defendant, Aetna, failed to advise the Department of Justice and the United States Attorney's Office for the Middle District of Florida that the POS Code 22  had been placed on each and every one of the claims in question by Defendant, Aetna's, own adjudication system.

702.     Defendant, Aetna, also provided false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida alleging that the Plaintiffs fraudulently billed for confirmation tests.

703.     By providing false information and testimony, Defendant, Aetna, aided and abetted the other Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem to abuse the process in an attempt to continue to allow the Criminal Case against Plaintiffs to go forward knowing that the allegations were distorted and untrue.

704.    Defendant, Aetna, overtly acted knowing that the information provided to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, and Defendant, Aetna's, actions did in fact substantially contribute to the abuse of process against Plaintiffs.

705.    Defendant, Aetna, had an ulterior motive for its actions; to-wit, to avoid paying millions of dollars of valid claims for laboratory services and to force Plaintiffs out of the healthcare business.

706.    Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Aetna's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Aetna, joint and several with Defendants, Florida Blue, Georgia Blue, UnitedHealth and Anthem and punitive damage together with such further and additional relief as this Honorable Court deems just and proper.

## Count 46 - TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

707.    By, among other things, communicating false information to third parties in the healthcare industry about Plaintiffs, providing false information to the Department of Justice and the United States Attorney's Office for the Middle District of Florida, and aiding in the malicious prosecution of Plaintiffs in the Criminal Case, Defendant, Aetna, intentionally and unjustifiably

interfered with Plaintiffs' beneficial business relationships with their clients and third-party payors.

708.   Defendant, Aetna, was aware of Plaintiffs' aforementioned business relationships with clients, which included healthcare providers and laboratories across the country, as well as third-party payors.

709.   Defendant's, Aetna, actions caused Plaintiffs to shut down their various businesses, which in turn disrupted the aforementioned business relationships.

710.   Plaintiffs have suffered and will continue to suffer damages as a result of Defendant, Aetna's, actions, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation; mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Aetna, including punitive damages together with such further and additional relief as this Honorable Court deems just and proper.

### Count 47 – NEGLIGENCE
#### (Against Aetna)

Plaintiffs reallege and readopt the allegations set forth in paragraphs 1 through 228 above as if fully set forth herein.

711.   Plaintiffs plead this Count in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

712.   At all times material hereto, Defendant, Aetna, owed a duty to Plaintiffs to act in good faith and not provide false information to government agencies.

713.     Defendant, Aetna, breached its duties to Plaintiffs by providing the Department of Justice and United States Attorney's Office for the Middle District of Florida false information, to include a spreadsheet of billing data that claimed to represent the information submitted by Plaintiffs in connection with all of the claims submitted to Defendant, Aetna, for laboratory tests performed at Chestatee Regional Hospital, Campbellton-Graceville Hospital, and Regional General Hospital with a POS Code 22 for each claim, yet failing to advise the government that the POS Code 22 in question had been placed on the claims by Defendant, Aetna's, own adjudication system.

714.     Defendant, Aetna, was aware of the false information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida because they knew or should have known that their own adjudication systems placed the POS Code 22 on the claims submitted by Plaintiffs which were at issue in the Criminal Case.

715.     Defendant, Aetna, also falsely alleged and testified that Plaintiffs fraudulently billed for confirmation tests.

716.     Alternatively, if Defendant, Aetna was not aware that the information it was providing to the Department of Justice and the United States Attorney's Office for the Middle District of Florida was false, then it was negligent in providing false information that it should have known was false with proper due diligence.

717.     Therefore, Defendant, Aetna, acted negligently against Plaintiffs.

718.     As a direct and proximate result of Defendant, Aetna's, negligence, Plaintiffs suffered and will continue to suffer damages, including but not limited to compensatory damages; lost earnings; lost profits; complete destruction of their businesses; actual harm to reputation;

mental anguish; personal humiliation and embarrassment; and reasonable expenses, including attorney's fees, unnecessarily incurred by Plaintiffs in the criminal proceedings.

**WHEREFORE**, Plaintiffs respectfully requests this Honorable Court enter an Order awarding damages against Defendant, Aetna, together with such further and additional relief as this Honorable Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs, AARON DURALL and NEISHA ZAFFUTO demand that the issues herein be tried by a jury.

**Dated November 6, 2023.**

Respectfully Submitted,

**DI PIETRO PARTNERS, PLLC**
901 East Las Olas Blvd., Suite 202
Fort Lauderdale, FL 33301
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

*/s/   David Di Pietro*
**DAVID DI PIETRO, ESQ.**
Florida Bar No.: 10370
*david@ddpalaw.com*
**LISANDRA ESTEVEZ, ESQ.**
Florida Bar No.: 111475
*lisandra@ddpalaw.com*
*Counsel for Plaintiffs*

**HALICZER PETTIS AND SCHWAMM P.A.**
One Financial Plaza
Seventh Floor
Fort Lauderdale, FL 33394
Telephone: (954) 523-9922
Facsimile: (954) 522-2512

*/s/ Eugene K. Pettis*
**EUGENE PETTIS, ESQ.**
Florida Bar No.: 508454

eg@gkzlegal.com
**DEBRA P. KLAUBER, ESQ.**
Florida Bar No.: 55646
*dklauber@hpslegal.com*
*Co-Counsel for Plaintiffs*

**RAFFERTY LAW, LLC**
1575 Johnson Road NE
Atlanta, Georgia 30306
(912)658-0912

*/s/Brian T. Rafferty*
**BRIAN R. RAFFERTY, ESQ.**
Georgia Bar No.: 311903
Brian@raffertylawfirm.com
*Co-Counsel for Plaintiffs*
*\* Pro-hac admission pending*